1

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN


TAMMY L. ROBINETTE,                )
                                   )
                Plaintiff,         )
                                   )
v.                                 ) Case No.: 3:09-cv-00600-slc
                                   )
WESTCONSIN CREDIT UNION,           )
                                   )
                Defendant.         )
                                   )
   _____)


DEPOSITION OF:   TAMMY L. ROBINETTE

DATE:            Friday, May 21, 2010

LOCATION:        103 N. Knowles Avenue
                 New Richmond,
                 Wisconsin  54017

REPORTED BY:     LORI SORENSON, RMR

**2**

```
 1              Deposition of TAMMY L. ROBINETTE, taken under
 2    the Rules of Civil Procedure for the District Courts of
 3    the State of Wisconsin, at 103 N. Knowles Avenue, New
 4    Richmond, Wisconsin, beginning at 1:30 p.m. and ending
 5    at 3:55 p.m., before Lori Sorenson, RMR, a notary
 6    public in and for the County of Dakota, State of
 7    Minnesota.
 8
 9    APPEARANCES OF COUNSEL:
10
11    FOR THE PLAINTIFF TAMMY L. ROBINETTE:
12         CAROL DITTMAR LAW OFFICE, LLC
13         BY: CAROL DITTMAR, ESQ.
14         24 W. Cedar Street
15         Chippewa Falls, Wisconsin  54729
16         (715) 720-1889
17
18    FOR DEFENDANT WESTCONSIN CREDIT UNION:
19         GONZALEZ, SAGGIO & HARLAN, LLP
20         ELIZABETH A. McDUFFIE, ESQ.
21         225 East Michigan Street
22         Fourth Floor
23         Milwaukee, Wisconsin  53202
24         (414) 277-8500
25
```

**3**

```
 1                    I N D E X
 2
 3    WITNESS                                    EXAMINATION
 4    TAMMY L. ROBINETTE
 5    BY MS. McDUFFIE                               5, 94
 6    BY MS. DITTMAR                                90
 7
 8                    EXHIBITS
 9    NUMBER    DESCRIPTION                         PAGE
10    1         Insider Responsibilities Statement  10
11              dated 5/7/08
12    2         Insider Responsibilities Statement  13
13              dated 5/26/09
14    3         Job Title - Office Manager          16
15    4         WCCA court action Discover Bank v.  24
16              Tammy Robinette
17    5         WCCA court action Citibank v.       28
18              Tammy Robinette
19    6         WCCA court action Citibank v.       30
20              Tammy Robinette
21    7         Complaint                           44
22    8         Plaintiff's Responses to Defendant's 63
23              First Set of Interrogatories and Requests
24              to Produce Documents
25    9         Employee Manual Receipt Form        66
```

**4**

```
 1
 2               I N D E X (Continued)
 3
 4                    EXHIBITS
 5    NUMBER    DESCRIPTION                         PAGE
 6
 7    10        HR-EM #102.02 - Insider Responsibilities 67
 8    11        HR-EM #102.14 - Disciplinary Action  67
 9    12        New Richmond News re: Civil Court    68
10              actions
11    13        401(k) distribution forms            83
12
13              OBJECTIONS:
14              MS. DITTMAR         45, 46, 48, 64, 88
15              MS. McDUFFY                          92
16
17
18    INSTRUCTIONS NOT TO ANSWER                    46
19
20
21
22
23
24
25
```

**5**

```
 1        NEW RICHMOND, WISCONSIN; FRIDAY, MAY 21, 2010
 2             1:30 p.m. - 3:55 p.m.
 3
 4             TAMMY ROBINETTE,
 5    having been first duly sworn on oath, was examined and
 6    testified as follows:
 7             E X A M I N A T I O N
 8    BY MS. McDUFFIE:
 9        Q   Hi, Miss Robinette.  My name is Liz
10    McDuffy and I'm the attorney representing the defendant
11    in this case, and I'm going to ask you a series of
12    questions.  But just as a preliminary matter, as we go
13    through this, you know, answer each question; nodding
14    and "uh-huh" and "uhn-uhn," I'd prefer that you speak
15    verbally yes or no, and nodding and shaking your
16    head -- that will help the court reporter --
17        A   Sure.
18        Q   -- to get down your answer appropriately.
19             Answer each question fully, as you can,
20    under -- you're under oath.  Obviously you know that.
21    If for any reason you don't understand a question or
22    I'm unclear or you can't hear me, just let me know --
23        A   Okay.
24        Q   -- and I'll repeat it or rephrase it, or
25    whatever it takes to make sure you understand and
```

6

1  you're answering the question I intend you to answer.
2  Okay?
3      A   Okay.
4      Q   If you need a break, let me know.  This is
5  not an endurance event.  If we're in the middle of a
6  question, I will ask that you finish that answer and
7  then we'll take a break if you need a break.  Okay?
8      A   Okay.
9      Q   Please state your name for the record.
10     A   Tammy Robinette.
11     Q   Please spell your last name.
12     A   R-o-b-i-n-e-t-t-e.
13     Q   Have you been known by any other name
14  other than Tammy Robinette?
15     A   My maiden name.
16     Q   And what is that?
17     A   Hathaway.
18     Q   And will you spell that.
19     A   H-a-t-h-a-w-a-y.
20     Q   Is there any reason that you cannot give,
21  you know, full testimony here today?
22     A   No, there's not.
23     Q   Okay.  You're not under the influence of
24  any medication or drugs or alcohol or anything like
25  that?

7

1      A   No.
2      Q   What is your current address?
3      A   14219 Azalea, A-z-a-l-e-a, Path.  That's
4  in Rosemount, Minnesota  55068.
5      Q   How long have you lived there?
6      A   Just since the beginning of the year.
7      Q   January, then, of this year?
8      A   Uh-hmm.
9      Q   And do you own or rent?
10     A   We rent.
11     Q   Are you married, Miss Robinette?
12     A   Yes, I am.
13     Q   Okay.  What's your husband's name?
14     A   Jerald, J-e-r-a-l-d, Sr.
15     Q   And I'm going to assume Robinette as well?
16     A   Correct.
17     Q   Okay.  Do you have any children?
18     A   Yes, I do.
19     Q   And can you give me their names and ages,
20  please.
21     A   Excuse me?
22     Q   Names and ages.
23     A   Sure.  I have Jerald, Jr., who's 19, same
24  last name; Tyler, same last name; and Riley, R-i-l-e-y,
25  same last name.

8

1      Q   And how old is Tyler and Riley?
2      A   Tyler is 16 and Riley is just nine.
3      Q   Okay.  Have you ever been deposed before?
4      A   Excuse me?
5      Q   Have you ever been deposed before?
6      A   I guess I don't know what that is.
7      Q   What you're doing right now, you're in a
8  deposition.
9      A   Oh.  No, I have not.
10     Q   Okay.  Have you ever filed any other
11  lawsuits against anybody?
12     A   No, I have not.
13     Q   Did you prepare for your deposition here
14  today?
15     A   Not really.
16     Q   Okay.
17     A   I read through my notes that I gave to
18  Carol when we first met.
19     Q   And when you say your notes, what are you
20  talking about?
21     A   It was the stuff that she asked me to
22  prepare --
23     Q   Okay.
24     A   -- before our meeting.
25     Q   Did you take any -- when you left

9

1  employment with Westconsin Credit Union, did you
2  take any papers or notes or anything from Westconsin
3  Credit Union?
4      A   I took nothing with me, just my personal
5  belongings.
6      Q   Did you speak to anyone today to prepare
7  for this deposition?
8      A   I did not.
9      Q   Okay.  When did you begin working for
10  Westconsin Credit Union?
11     A   It was -- I think it was like August 18th
12  of 2004.  It was between the 16th, 17th or 18th,
13  somewhere around that time.
14     Q   In 2004?
15     A   '04, correct.
16     Q   What position were you hired for?
17     A   Office manager.
18     Q   Okay.
19     A   Of the New Richmond office.
20     Q   Had you been an office manager before with
21  any other --
22     A   I was a branch manager.
23     Q   At what organization?
24     A   Cherokee Bank.
25     Q   Cherokee Bank?

10

1      A   Uh-hmm.
2      Q   What's the difference between a branch
3  manager and an office manager?
4      A   There is no difference.
5      Q   Okay.
6      A   It's just the bank called it branch
7  manager.  The credit union called it office manager.
8      Q   Okay.  What's your educational background?
9  How far in school did you go?
10     A   I went through high school, senior,
11  graduated high school, and then I've had just
12  classes through banking.
13     Q   With Westconsin Credit Union, you say you
14  were hired as office manager.  Did you hold -- have
15  you held any other positions or did you hold any
16  other positions with Westconsin Credit Union?
17     A   I did not.
18     Q   You were hired as a office manager and you
19  remained an office manager?
20     A   Correct.
21         (Deposition Exhibit No. 1 was marked for
22     identification)
23     Q   Let me show you what's been marked as
24  Robinette Deposition Exhibit No. 1.  Just take a
25  look at that first, please.

11

1      A   Sure.
2      Q   Do you recognize that?
3      A   I do.
4      Q   What is it?
5      A   It's the Insider Responsibilities
6  Statement.
7      Q   And is that your signature on the second
8  page of that statement?
9      A   Yes, it is.
10     Q   Okay.  I want to direct your attention
11  to -- under the caption that says "Insider
12  Responsibilities," item number one.
13     A   Sure.
14     Q   Do you see that?
15     A   I do.
16     Q   Can you take a second just to read through
17  it for me, please.
18     A   Okay.
19     Q   Do you see in there where it says, "I will
20  adhere to established policies and handle my
21  personal finances in a businesslike manner"?
22     A   Yes, I do.
23     Q   Okay.  Can you tell me what that means --
24  or what you believe that means?
25     A   What I believe that whole statement means?

12

1      Q   "I will adhere to established policies."
2  But more importantly, the second part of that,
3  "handle my personal finances in a businesslike
4  manner."
5      A   That I'll -- I don't know, I guess just
6  pay my bills.
7      Q   Okay.  Now I want to direct your attention
8  to item number two under the "Insider
9  Responsibilities."  Will you just read that for me,
10  please.
11     A   Sure.  "I understand it is my
12  responsibility as an insider to report any violation
13  of policy to the Corporate Officers, or if
14  necessary, to the Chairman of the Board of
15  Directors.  If I violate any policy or fail to
16  report a violation, I may be subject to disciplinary
17  action, which may include termination."
18     Q   Okay.  I want to ask you a question
19  about -- well, your answer to number one was -- when
20  I asked you what does handle my personal finances in
21  a businesslike manner mean, you say pay your bills.
22  And item number two says you have a responsibility
23  to report any violation of the policy to the
24  corporate officers.  Did I read that correctly?
25     A   Correct.

13

1      Q   Okay.  All right.
2         (Deposition Exhibit No. 2 was marked for
3     identification).
4      Q   I'm going to show you what's been marked
5  as Robinette Deposition Exhibit 2.  Do you recognize
6  that document?
7      A   I do.
8      Q   Okay.  Do you recognize -- is that your
9  signature on page two of that document?
10     A   Yes, it is.
11     Q   Okay.  What is it?  What is that document
12  I just handed you?
13     A   The Insider Responsibilities Statement.
14     Q   And for what period -- when was that --
15  when was Exhibit No. 2 signed?
16     A   May 26th of '09.
17     Q   Okay.  And with regard to Exhibit No. 1,
18  when was that signed?
19     A   May 7th of '08.
20     Q   Okay.  As an employee of the credit union,
21  are you bound to follow Exhibit 1 and Exhibit 2?
22     A   We sign it.  We would sign it every year,
23  yes.
24     Q   Okay.  So you are bound to follow the
25  provisions of the Insider Responsibilities

14

1   Statement?
2       A   I guess nobody ever told us that.  I was
3   never told -- I was never told what this document
4   really meant.
5       Q   Okay.
6       A   I never had training on it, if that's what
7   you're asking.
8       Q   Okay.  You were given a copy of it to
9   sign?
10      A   Correct.
11      Q   And did you read through it before you
12  signed it?
13      A   Correct.
14      Q   Okay.  And you said you never received
15  training on the insider responsibilities?
16      A   No, we did not.  It was handed --
17  basically it was sent out to us in an envelope each
18  year, have your people sign it, get it back to us.
19      Q   And you were an office manager --
20      A   Correct.
21      Q   -- is that correct?  So you would hand
22  this out to your people?
23      A   Just to my direct reports.
24      Q   Okay.  For their signature?
25      A   Correct.

15

1       Q   And then you would gather it back, and I
2   assume --
3       A   Correct.
4       Q   And you would get it back from your direct
5   reports; is that correct?
6       A   Correct.
7       Q   And then what would you do with it?
8       A   Send it back to HR.
9       Q   Did anyone ever ask you a question
10  about --
11      A   Nope.
12      Q   -- this report?  So none of your direct
13  reports ever asked you a question?
14      A   No.
15      Q   Did you ever take it upon yourself to ask
16  anyone --
17      A   No.
18      Q   -- what you -- wait.  Just, again, let
19  me --
20      A   I'm sorry.
21      Q   That's one of the things we also -- I
22  should have said, you have to let me finish a
23  question --
24      A   Sure.
25      Q   -- and then you answer, so we're not -- if

16

1   we're both speaking, it's hard for her to take
2   down --
3       A   Sure.
4       Q   -- the question or what's being said,
5   okay?
6           Did you ever ask about what it was you
7   were handing out to your direct reports?
8       A   No, I did not.
9       Q   Did you ever ask what it was that you were
10  signing?
11      A   No, I did not.
12      Q   Did you ever ask for training on the
13  Insider Responsibilities Statement?
14      A   No.
15      Q   Why not?
16      A   I guess I never really saw a need to.
17          (Deposition Exhibit No. 3 was marked for
18  identification.)
19      Q   I want to hand you what's been marked as
20  Robinette Deposition Exhibit No. 3.  Just take a
21  quick look at that for me, please.  Do you recognize
22  that document?
23      A   I do.
24      Q   What is it?
25      A   It's a job description.

17

1       Q   For what position?
2       A   Office manager.
3       Q   And that was your position, correct?
4       A   Yes.
5       Q   Okay.  I want to direct your attention to
6   paragraph number two.
7       A   Okay.
8       Q   Do you see that --
9       A   Yes.
10      Q   -- paragraph number two?  And what does
11  paragraph number two require?
12      A   It "adheres to established policies and
13  procedures; keeps member account and WCU information
14  confidential; and handles personal finances in a
15  businesslike manner."
16      Q   Now, that was part of your job
17  description, and you said you were familiar with
18  this job description; is that correct?
19      A   Correct.
20      Q   Did you ever ask what it meant to handle
21  personal finances in a businesslike manner?
22      A   No, I did not.
23      Q   Okay.  As part of your job duties as an
24  office manager, did you ever go out into the
25  community and talk about financial situations with

18

1 schools or credit union members?
2   A   Um, in regards to checking accounts and
3 what not, and then just basically an overview of
4 here's what a credit report looks like, that was it.
5   Q   Okay.  And you say -- did you ever prepare
6 outlines for --
7   A   I did not.
8   Q   Or handouts for the people that you were
9 speaking to?
10   A   I did not personally.
11   Q   So when you would -- Did you speak to
12 school, school children?
13   A   Yes.
14   Q   Okay.  How many times did you do that?
15   A   I couldn't tell you.
16   Q   If you had to guess, just an estimate?
17   A   Maybe five, six times.
18   Q   And what level were these school children?
19 Were they high school, grade school?
20   A   There were some in middle school and some
21 in high school.
22   Q   And middle school, what is that
23 considered?
24   A   It was eighth grade.
25   Q   Eighth grade?

19

1   A   Uh-hmm.
2   Q   And what did you speak with them about?
3   A   We -- the majority of our talk was in
4 regards to budgeting and checking accounts.
5   Q   And what did you talk to them about in
6 terms of budgeting?
7   A   We just kind of went through a basic
8 budget form, your rent, your car payments, saving
9 for, you know, car repairs, stuff like that.
10   Q   What kind of things did you tell them?
11   A   We just kind of showed them how to create
12 a budget.
13   Q   Okay.  And did you have a --
14   A   There was a budget form.
15   Q   There was a budget form?
16   A   Uh-hmm.
17   Q   And where did you get the budget form
18 from?
19   A   It was -- I'm not even sure where it came
20 from.  I'm thinking it came from one -- somebody who
21 created the program took it off from another program
22 that the credit union had.
23   Q   So you think it was a Westconsin Credit
24 Union form?
25   A   I think it was, yes.  Or in one of their

20

1 training-in-a-box programs, I believe it was in one
2 of those.
3   Q   And so you talked to them about budgets,
4 and what else did you say?
5   A   You know, kind of how to balance a
6 checkbook.
7   Q   Okay.
8   A   How you input your checking information,
9 how you put your deposits, your withdrawals and
10 that, and how you balance it at the end of each
11 month and --
12   Q   Okay.  And that's what you spoke to the
13 high school students about.  Did you have any -- as
14 I said before, did you ever talk to credit union
15 members as well?
16   A   No.
17   Q   Any other groups other than high school --
18   A   Nope.
19   Q   -- and grade school, middle school
20 students?
21   A   Nope.  We read to the elementary kids, but
22 it had nothing to do with -- I mean, it had to do
23 with piggy banks.  I mean, it had nothing to do
24 with -- and that was something we did on our own.
25   Q   Okay.  When you say "it had to do with

21

1 piggy banks," what do you mean?  Was it a story
2 about --
3   A   Well, it was a story about a piggy bank,
4 yeah.
5   Q   Was it something you created -- a story
6 you created --
7   A   No.
8   Q   -- or a story you read from someone?
9   A   It was -- it was an actual book.
10   Q   A book.  Oh, okay.
11   A   Uh-hmm.
12   Q   Do you remember the name of the book?
13   A   I do not.  I think it's "Arthur Breaks
14 the -- that's what it was, it was "Arthur Breaks the
15 Bank."
16   Q   Did you do any other presentations other
17 than the ones that you described --
18   A   I did not.
19   Q   -- thus far?
20       Okay.  You're going to have to wait for
21 me to finish those questions.
22   A   Oh, I'm sorry.
23   Q   It's okay.  It's all right.
24       Did you ever sit in any booths or, you
25 know, at a seminar for the credit union?

22

1    A   Not that I remember.
2    Q   Okay.  Did the credit union have what they
3  called -- what you call wellness fairs or seminars
4  that they would put on for the community?
5    A   They did.
6    Q   But you never manned one of those booths?
7    A   No.
8    Q   Did you ever have discussions with your
9  employees regarding the Insider Responsibility
10  Statement other than when you were handing it out?
11  I'm just talking about generally speaking.
12    A   I did not personally, no.
13    Q   Okay.  And you worked only out of the New
14  Richmond office; is that correct?
15    A   Yes.
16    Q   And so those were the employees you were
17  responsible for?
18    A   Yes.
19    Q   Okay.  What were your duties as a office
20  manager, generally speaking?
21    A   To basically make sure the branch was
22  running smoothly.  We had staff.  We had, you know,
23  the proper staff doing what they should be doing.  I
24  met with customers here and there -- excuse me,
25  members here and there.  But otherwise it was to,

23

1  you know, kind of make sure everything was running
2  smoothly and make sure we were on budget for our
3  goals and get the staff motivated and keep them
4  motivated and...
5    Q   Okay.
6    A   That's basically about it.
7    Q   Basically about it?
8    A   Uh-hmm.
9    Q   Okay.
10    A   At one point, way back when we first
11  started, we were doing loan approvals, but by the
12  time -- months before I left, that was all changed.
13    Q   Okay.  Did you have any occasion while you
14  were an employee at the Westconsin Credit Union to
15  discipline any employee or counsel any employee?
16    A   I did.
17    Q   What kind of things did you counsel or
18  discipline an employee for?
19    A   In regards to sharing member information
20  outside of the credit union.  There was that I dealt
21  with on a couple of occasions.
22    Q   Okay.  Anything else?
23    A   As far as that -- otherwise, it was -- I
24  mean, at one point there was a gal that was not
25  living up to her duties for her job in regards to

24

1  accounts opening and, you know, getting stuff done
2  quickly and --
3    Q   So performance-based?
4    A   Somewhat, yes.
5    Q   But you never counseled or disciplined
6  employees regarding personal finances or handling
7  their personal finances?
8    A   I did not personally, no.
9    Q   Were you ever involved -- when you say
10  personally, were you ever involved or made aware of
11  situations in which someone hadn't handled their
12  personal finances in a businesslike manner?
13    A   For overdrawn checking accounts.
14    Q   Okay.
15    A   But that was up to the supervisor to meet
16  with them.
17    Q   But they made you aware of those
18  situations?
19    A   Correct.
20    Q   Other than making you aware, were you
21  involved at all in any other aspect of it?
22    A   I was not.
23    Q   Okay.
24        (Deposition Exhibit No. 4 was marked for
25  identification).

25

1    Q   I'm going to show you what's been marked
2  as Robinette Deposition Exhibit 4.  Have you had a
3  chance to take a look at that?
4    A   I did.
5    Q   Do you recognize that?
6    A   I do.
7    Q   Okay.  And what is it?
8    A   It's a filing that was filed with the
9  county in regards to a civil judgment.
10    Q   Involving you?
11    A   Correct.
12    Q   Okay.  And this civil judgment, the case
13  was filed by Discover Bank; is that correct?
14    A   Yes.
15    Q   What was this -- why was this -- why was
16  that case filed against you, do you know?
17    A   Because we owed them money.
18    Q   Was it a credit -- you owed them money on
19  a credit card?
20    A   Correct.
21    Q   And what happened with regard to the
22  payment of the credit card?
23    A   We fell behind on it.
24    Q   Did you ever have any discussions with
25  other employees regarding this cause of action that

### 26

1  was filed against you?
2      A   I did not.
3      Q   Did you have any discussions with anyone
4  regarding --
5      A   Just when my -- sorry.
6      Q   That's okay.  That's okay.
7          Any discussions regarding this cause of
8  action that had been filed against you?
9      A   Just when Mike Schmitz came out and
10  brought it up to me.
11      Q   Anybody other than Mike Schmitz?  I'm
12  saying anybody in general.  I'm not talking about
13  just Westconsin Credit Union employees.
14      A   I guess I'm not understanding your
15  question.
16      Q   Did you discuss this cause of action with
17  anyone that --
18      A   No.
19      Q   Did you report this cause of action to the
20  credit union?
21      A   I did not.
22      Q   Do you recall when you became aware that
23  Discover had filed an action against you?
24      A   I don't know a date.  I don't remember.
25      Q   Okay.  Would that -- would it have been

### 27

1  before Mike Schmitz spoke to you about it?
2      A   Yes.
3      Q   Did you have an obligation to report this
4  cause of action to the credit union?
5      A   I did not feel I did.
6      Q   I want to direct your attention back to
7  Exhibit 1 and 2, paragraphs that are numbered one
8  and two in both of those exhibits.
9      A   Uh-hmm.
10      Q   Previously I'd asked you what does it mean
11  to handle your personal finances in a businesslike
12  manner, and you testified paying your bills.
13      A   Correct.
14      Q   And you also read the item number two that
15  said you had a responsibility -- it's a violation of
16  the policy -- let's see, I understand it is my
17  responsibility as an insider to report any violation
18  of the policy to the corporate officers, if
19  necessary to the chairman of the board of directors;
20  is that correct?
21      A   Correct.
22      Q   So if this -- if Exhibit No. 4 evidences
23  that you weren't paying your bills in a timely
24  manner, why didn't you report that under the insider
25  responsibilities?

### 28

1      A   I didn't feel like I had gone against the
2  insider responsibility.
3      Q   Okay.
4          (Deposition Exhibit No. 5 was marked for
5      identification).
6      Q   I want to show you what's been marked as
7  Exhibit 5.  Please take a look at that for me,
8  please.  Do you recognize that?
9      A   I do.
10      Q   Okay.  And what is it?
11      A   It's a filing against my husband.
12      Q   By whom?
13      A   Citibank.
14      Q   And do you know why Citibank filed an
15  action against your husband?
16      A   I would assume it's because he had a
17  credit card with them.
18      Q   Okay.  Is this the first time you're
19  becoming aware that this exists?
20      A   No.
21      Q   Okay.  So you are familiar with this case;
22  is that correct?
23      A   Yes.
24      Q   And so can you tell me, again, do you know
25  why Citibank filed this action against your husband?

### 29

1      A   I can assume.
2      Q   Oh, so you've never seen the Complaint?
3      A   I have seen this before, yes.
4      Q   Okay.  You've seen the Complaint that goes
5  with this case; is that correct?
6      A   I don't know that I have.
7      Q   Oh.  And you are still married; is that
8  correct?
9      A   Yes, I am.
10      Q   Did you report this cause of action -- let
11  me strike that.
12          When was the first time you became aware
13  of this cause of action being filed against your
14  husband?
15      A   I don't know the exact date.
16      Q   Can you give me about when you became
17  aware of it?
18      A   Sometime in June.
19      Q   In June of 2009?
20      A   Correct.
21      Q   Did you report this cause of action to the
22  credit union?
23      A   No, I did not.
24      Q   Did you have any discussions with anyone
25  about this cause of action being filed against your

30

1  husband?
2      A   Other than Mike Schmitz?
3      Q   Anyone.
4      A   Mike Schmitz.
5      Q   Is that it?
6      A   That's it.
7      Q   Okay.  And you're not sure what this cause
8  of action involves?
9      A   I -- I can't say for sure.
10     Q   Okay.
11         (Deposition Exhibit No. 6 was marked for
12     identification).
13     Q   I'm going to hand you what's been marked
14  as Robinette Deposition Exhibit No. 6.  Please take
15  a look at that for me.  Do you recognize that?
16     A   I do.
17     Q   Can you tell me what it is, please?
18     A   It's a court filing from Citibank.
19     Q   Against you?
20     A   Yes.
21     Q   Do you know what this cause of action is
22  about?
23     A   It was for a credit card.
24     Q   Okay.  And why -- why did Citibank file a
25  cause of action against you for a credit card?

31

1      A   Because we were late on our payments.
2      Q   Was this cause of action ever resolved?
3      A   No, it was not.
4      Q   What happened with this cause of action?
5      A   It was included in our bankruptcy.
6      Q   Did you have any discussions with any
7  Westconsin Credit Union employees about this cause
8  of action?
9      A   Just Mike Schmitz.
10     Q   Did you report this cause of action to the
11  Westconsin Credit Union?
12     A   I did not.
13     Q   When did you become aware that Citibank
14  had filed this cause of action against you?
15     A   I can't say for sure.
16     Q   Any estimate of when it was?
17     A   I'd say probably in June sometime.
18     Q   Of 2009?
19     A   Correct.
20     Q   I want to direct your attention back to
21  Exhibit No. 4.  You have them in front of you.  Did
22  Exhibit No. 4 result in a judgment against you?
23     A   I believe so.
24     Q   You're not sure?
25     A   I'm almost positive it did.

32

1      Q   Did you contest this cause of action?  And
2  I'm talking about -- I'm speaking of Exhibit 4.
3      A   I did not.
4      Q   Did you report the judgment that is
5  associated with Exhibit 4 to the credit union?
6      A   I did not.
7      Q   Did you discuss the judgment from Exhibit
8  4 with anyone?
9      A   I did not.
10     Q   Do you think -- again, looking at Exhibits
11  1 and 2, we've gone over the requirements of the
12  Insider Responsibilities Statement where it says you
13  have a responsibility to handle your personal
14  finances in a businesslike manner.  Do you think
15  having a judgment rendered against you is consistent
16  with handling your personal finances in a
17  businesslike manner?
18     A   I guess everyone looks at it differently.
19     Q   I'm asking you.
20     A   I guess I don't find that that would be
21  against the Insider Responsibilities Statement.
22     Q   Okay.  We're going to shift gears a little
23  bit here.  Did you take any vacation in 2009?
24     A   I did.
25     Q   It sounded like it was a good time.  When

33

1  did you take vacation in 2009?
2      A   Oh, I can't -- I couldn't give you the
3  exact dates.
4      Q   Okay.  Let's narrow it down.  Do you
5  recall taking vacation in May of 2009?
6      A   I did.
7      Q   And when was that?
8      A   It was at the end of the month, that's all
9  I know.
10     Q   Was it associated with anything?
11     A   It was.
12     Q   What was that?
13     A   My son graduated high school.
14     Q   Do you recall whether you took vacation
15  before the graduation or after the graduation?
16     A   I think it was before graduation, because
17  I was preparing for the grad party.
18     Q   I'm sorry, for the what party?
19     A   I was preparing for his graduation party.
20     Q   All right.  And what high school did your
21  son attend?
22     A   Henry Sibley High School.  And that's in
23  Mendota Heights, Minnesota.
24     Q   And which son was that?
25     A   Jerald, Jr.

**34**

1     Q  Do you recall how long -- how much
2 vacation you took or how long your vacation was?
3     A  I believe I took a week off.
4     Q  Okay. In June of 2009 did you have a
5 meeting with Mike Schmitz?
6     A  Yes.
7     Q  Do you recall when that was?
8     A  There were several of them.
9     Q  Okay. Let's go to the first one. When
10 was the first meeting you had with Mike Schmitz?
11     A  Well, to be honest, I don't know if I --
12 if June 15th was the first meeting I had with Mike
13 because I had monthly meetings with Mike.
14     Q  Okay.
15     A  And he came out a certain time every
16 single month, and I don't remember if I had my
17 one-on-one with him prior to our meeting on the
18 15th. But I believe June 15th was the first.
19     Q  When you said you had monthly -- when did
20 those monthly meetings usually occur?
21     A  I believe they were the third Wednesday of
22 every month.
23     Q  So you say you met with Mike on June --
24 you believe on June 15th, 2009?
25     A  Correct.

**35**

1     Q  And what time of day was that?
2     A  It was in the morning. It was after -- we
3 were open. It was after 9:00, I would say.
4     Q  Okay. Was that -- that -- was it a
5 planned meeting?
6     A  It was not.
7     Q  And had Mike called you before and
8 said he was coming up to meet with you?
9     A  No, he did not.
10     Q  And what did you and Mike talk about?
11     A  Well, he wanted to -- he said that he had
12 came across this information in the paper in regards
13 to a filing that was made against my husband, and
14 then he did a little further investigating and he
15 showed me these (indicating).
16     Q  And when you say "these," what are you --
17     A  I'm referring to Exhibit 6, 5 and 4.
18     Q  Okay. And what did you say in response to
19 that?
20     A  Well, he asked me what was going on.
21     Q  Okay. And how did you respond?
22     A  I told him that my husband and I had been
23 struggling financially and that we had met with a
24 lawyer and we were filing bankruptcy.
25     Q  Did you tell Mike anything else during

**36**

1 that meeting?
2     A  Not that I can remember. You mean during
3 that specific meeting?
4     Q  During that specific meeting, the first
5 meeting in the morning on June 15th, 2009.
6     A  He asked me how, you know -- what was
7 going on financially, why, you know, we were
8 struggling, and I informed him that there were a
9 couple things that have kind of added up to it.
10     Q  And what were those things?
11     A  The fact that we had medical bills that we
12 paid off -- we put on credit cards, because I had a
13 surgery that was hundreds of thousands of dollars
14 that was not covered on my insurance.
15     Q  Okay.
16     A  So we had to pay those, so unfortunately
17 we chose that way to do it. And that the payments
18 had tripled and we were struggling paying those
19 payments. My husband was driving an hour to and
20 from work every day, gas prices had jumped to
21 four-something a gallon. We were going through four
22 times the amount of gas that we were initially.
23     Q  Okay.
24     A  And house values had dropped. I mean, we
25 were stuck.

**37**

1     Q  And you told this all to Mike --
2     A  I did.
3     Q  -- in that meeting?
4       Anything else?
5     A  That I said, no.
6     Q  Okay. What did Mike say to you in
7 response; do you recall?
8     A  He said that this could happen to anyone,
9 this could even happen to me. And then he informed
10 me that he needed to take this information back to
11 the corporate officers. They would chat about it.
12 He did not want to make me wait long to find out
13 what was going on, and that he did not want to lose
14 me as an office manager because I had really turned
15 the New Richmond branch around and everything was
16 going well.
17     Q  Anything else?
18     A  Then he did say that he was going to go
19 into one of the spare offices before he left.
20     Q  Okay.
21     A  So then he left my office.
22     Q  Okay. When was the next time you had a
23 conversation or met with Mike Schmitz; do you
24 recall?
25     A  Within an hour later -- not even an hour

38

1   later.  It was probably a half an hour later.
2       Q   Okay.  And what was that meeting about?
3       A   He stopped back by my office.  He said, "I
4   have a couple more questions for you.  Do you have
5   time?"  And I said, "I sure do."
6       Q   What time of day -- you said about a half
7   an hour --
8       A   I'd say probably a half hour.
9       Q   So if the first meeting was a little bit
10  after 9:00 or somewhere in the morning, this -- was
11  this still in the morning time?
12      A   Yes.
13      Q   Okay.  All right.  Go ahead.  I'm sorry.
14      A   And then he shut my door and he asked me,
15  he goes, "Have you guys decided or have you talked
16  at all about what loans you're going to reaffirm
17  with your bankruptcy?"  And I said, "To be honest
18  with you, we have looked at that.  Our hope is that
19  we can reaffirm our loans with the credit union.
20  They are current right now and we're planning on
21  keeping them that way."  Then he said, "Well, I just
22  want you to know that I can't tell you what loans
23  you have to reaffirm," and I said, "That's fine."
24  And then as he turned to walk out of my office he
25  goes, "One other thing."  He said, "How do you plan

39

1   on telling your employees if they come up to ask you
2   in the future about your bankruptcy when it's in the
3   paper?  How do you intend on, you know, explaining
4   that to them?"  And I said, "Well, I will be honest
5   with them."
6       Q   Okay.  Did you take notes during these two
7   meetings?
8       A   I did not.
9       Q   You did not?
10      A   Uhn-uhn.
11      Q   Anything else in the second meeting on
12  June 15th, 2009?
13      A   Not that I can recall.
14      Q   Did both the meetings you say take place
15  in your office?
16      A   Yes.
17      Q   Was there anyone else in your office at
18  that time?
19      A   No, there was not.
20      Q   Just you and Mike?
21      A   Correct.
22      Q   Okay.  How long do you think the second
23  meeting lasted?
24      A   Fifteen minutes tops.
25      Q   Okay.  And the first meeting?

40

1       A   Oh, a half hour, 45 minutes.
2       Q   Did you tell Mike that you should resign
3   from --
4       A   I did not.
5       Q   You got to let me finish those questions.
6           Did you tell Mike you should resign from
7   the Westconsin Credit Union?
8       A   I did not.
9       Q   When's the next time you met with Mike
10  Schmitz?  Or was there a next meeting with Mike
11  Schmitz?
12      A   There was.
13      Q   And when was that?
14      A   June 16th.
15      Q   Do you recall what time of day that
16  meeting took place?
17      A   Shortly after 3:00.
18      Q   And was this -- where was this meeting
19  held?
20      A   In my office in New Richmond as well.
21      Q   Was there anyone else in the meeting with
22  you and Mike?
23      A   No, there was not.
24      Q   And who initiated conversation?  Did Mike
25  start the conversation?

41

1       A   Yes.
2       Q   And do you recall what he said to you?
3       A   He said that the corporate officers, they
4   had met and, you know, it's not an easy thing to
5   have to do, but they had decided, based on the fact
6   that my bankruptcy would make the credit union look
7   bad, that I was going to be terminated.  However, he
8   said we did decide to come up with a severance
9   package that we would like to offer you if you would
10  agree to resign your position with the credit union.
11      Q   Okay.  And how did you respond?
12      A   I said I would not resign from the credit
13  union.
14      Q   Did you take notes of this meeting?
15      A   I did not.
16      Q   Anything else said?
17      A   He asked again, he goes, "So what you're
18  saying is that you do not want to take the severance
19  package and resign?"  I said, "Correct, I do not --
20  I will not resign my position at the credit union."
21      Q   Okay.
22      A   And that's when he said, "Then you're
23  terminated."
24      Q   What happened next?
25      A   What happened was I had to gather my stuff

42

1 up, so I asked Mike, I said, "Is it all right if I
2 gather my personal belongings?" He said, "Yes." I
3 didn't have a box. All I had was a box that was in
4 the corner in my office that had credit union hats
5 in it. I said, "Do you mind if I take this box if I
6 put the hats in another box?" He said, "Nope,
7 that's fine." So I took the box and I showed him
8 every piece of paper, everything that I took and
9 packed in the box I made Mike look at so he knew
10 what I was taking, put it in the box. I gave him my
11 keys, I took my name tag off, I gave him my name
12 tag, and I did let Mike know that there was one
13 person in the office that has been known to go
14 around town and share personal Westconsin Credit
15 Union information, and I said if I did hear that,
16 that I would sue her for confidentiality.
17 Q  You would sue her or --
18 A  I would sue her.
19 Q  -- the credit union?
20 A  Her.
21 Q  Okay. And who is this employee you're
22 talking about?
23 A  Marie Gremore. It's G-r-e-m-o-r-e.
24 Q  Did you discuss your meetings with Mike
25 with anyone else?

43

1 A  Just my husband.
2 Q  Okay. And what did you tell your husband?
3 A  Well, obviously, I told him that I was
4 terminated based on the fact that I had told the
5 credit union the truth, that we were filing
6 bankruptcy.
7 Q  Uh-hmm. Did you share the first
8 meeting -- the first two meetings you had with your
9 husband as well?
10 A  After the fact, yes.
11 Q  And what did you tell him about the first
12 two meetings you had?
13 A  I told him that he brought these out to me
14 and asked me about them.
15 Q  Okay. And other than with regard to the
16 June 16th meeting in which you were -- in which your
17 employment was terminated, what else did you share
18 with your husband about the meetings that you had
19 with Mike?
20 A  That was it.
21 Q  Did you share it with anyone else?
22 A  I did not.
23 Q  So no friends, family, other than your
24 husband?
25 A  Other than my husband.

44

1 Q  Okay.
2 A  However, I did have to let my bankruptcy
3 attorney know that I no longer had a --
4    MS. DITTMAR: Wait. Anything that you
5 tell your bankruptcy attorney is privileged and I
6 direct you not to speak about that.
7    MS. McDUFFIE: That's fine.
8 BY MS. McDUFFIE:
9 Q  When did you file for bankruptcy? Did you
10 file for bankruptcy?
11 A  Yes, I did.
12 Q  When did you file for bankruptcy?
13 A  I don't know the exact date.
14 Q  Do you recall what month it was?
15 A  It was June. It was June of '09.
16 Q  What's the current status of your
17 bankruptcy?
18 A  It was discharged.
19 Q  Do you know when that occurred?
20 A  August of '09.
21    (Deposition Exhibit No. 7 was marked for
22    identification).
23 Q  Let me show you what's been marked as
24 Exhibit 7. Do you recognize that?
25 A  I do.

45

1 Q  Okay. Let me know when you've had a
2 chance to review it and you're ready.
3 A  Okay.
4 Q  I want to direct your attention to
5 paragraph 11. Please read that for me. You don't
6 have to read it out loud. Just read it to yourself.
7 A  Oh, sure.
8 Q  Have you had chance to read it to
9 yourself?
10 A  I did.
11 Q  In paragraph 11, it states that you
12 disclosed the cause of your action in your
13 bankruptcy filings and the trustee in charge of your
14 bankruptcy filings indicated that you may pursue
15 this claim in your own interest, individual
16 interest. Is that a fair representation of what
17 paragraph 11 states?
18 A  Correct.
19 Q  Okay. When did you speak to your trustee
20 in bankruptcy about this action?
21 A  I personally did not.
22 Q  Who did?
23 A  My attorney.
24 Q  How were you made aware that your
25 bankruptcy trustee said you could pursue this in

46

1   your own interest?
2       MS. DITTMAR:  Any conversation between you
3   and I is privileged.
4       THE WITNESS:  Okay.
5       MS. McDUFFIE:  Are you directing -- you're
6   directing her not to answer that; is that correct?
7       MS. DITTMAR:  I'm just telling her that
8   she can't speak about anything that she and I
9   discussed.
10      Q   Okay.  I want to -- I'm trying to find out
11  with regard to an allegation you've made in your --
12  in paragraph 11, that the bankruptcy trustee
13  indicated that you may pursue this claim in your own
14  individual interest.  How did you become aware of
15  that?
16      A   I -- I can't answer that.
17      MS. DITTMAR:  You can't answer that
18  without disclosing a privileged conversation?
19      THE WITNESS:  Correct.
20      MS. DITTMAR:  Okay.
21      MS. McDUFFIE:  This will be an easy case,
22  then, okay.
23      Q   So you disclosed -- what did you disclose
24  to your bankruptcy -- in your bankruptcy filing
25  regarding this cause of action?

47

1       A   What did I --
2       Q   It says, "Plaintiff disclosed this cause
3   of action in her bankruptcy filings."  What did you
4   disclose in your bankruptcy filing?  I don't have
5   the documents, for some reason.
6       A   I know it was in there.
7       Q   What did it say?
8       A   I can't tell you what the words -- word
9   for word said.
10      Q   Do you have copies of the filings that you
11  did in bankruptcy?
12      A   I do not.
13      Q   Okay.  Does the attorney who represented
14  you have copies of the filings that you did in
15  bankruptcy?
16      A   I would assume yes.
17      Q   Have you made any inquiry from an attorney
18  to get copies of those filings?
19      A   I have not.
20      Q   Okay.  In paragraph 11 you say, And the
21  trustee in charge of the plaintiff's bankruptcy
22  filings indicated -- has indicated that plaintiff
23  may pursue this claim in her own individual
24  interest.  How were you able to make that assertion
25  in your Complaint?

48

1       MS. DITTMAR:  If you can -- I'm sorry, are
2   you done?  I don't want to interrupt.  Is that --
3   are you done with the question?
4       MS. McDUFFIE:  I am.
5       MS. DITTMAR:  If you cannot answer that
6   question without disclosing a privileged
7   conversation, then you can't answer.
8       A   I can't answer that.
9       Q   Okay.  You can't answer it because you
10  can't disclose a privileged conversation with your
11  attorney; is that correct?
12      A   That's correct.
13      Q   Okay.  Have you ever had a direct
14  conversation with the bankruptcy trustee?
15      A   No, I have not.
16      Q   So you've never spoken to the bankruptcy
17  trustee?
18      MS. DITTMAR:  Objection, asked and
19  answered.
20      But go ahead.
21      A   Just during bankruptcy court.
22      Q   So you have spoken to the bankruptcy
23  trustee?
24      A   I guess I have.
25      Q   Maybe the question is confusing, so I'll

49

1   try and ask it again.  Have you ever spoken to the
2   bankruptcy trustee?
3       A   Yes.
4       Q   Who is your bankruptcy -- who was your
5   bankruptcy trustee?
6       A   I do not remember his name.
7       Q   Is there anyplace you have written down
8   where you might be able to refer and find his name?
9       A   I'm sure I have it at home.
10      Q   Okay.
11      MS. DITTMAR:  If you can give me a minute,
12  I'll pull it out too.
13      MS. McDUFFIE:  Okay.
14      MS. DITTMAR:  But I don't have it right
15  now.
16      A   I can't think of it.
17      Q   Did you ever speak to the bankruptcy
18  trustee about this cause of action?
19      A   I did not.
20      Q   You did not.  Okay.  I'm just making sure
21  I understand that.
22      MS. DITTMAR:  Do you mind if I ask if it
23  could be a certain individual?
24      Was it Howard White?
25      THE WITNESS:  Yes.

50

1    MS. DITTMAR:  He's an attorney in
2  Eau Claire.
3  BY MS. McDUFFIE:  (Continuing)
4    Q   So you now recall who the bankruptcy
5  trustee was?
6    A   Yes.
7    Q   And who is it?
8    A   Howard White.
9    Q   I would like to direct your attention back
10  to Exhibit 9 -- Exhibit 7, excuse me, to paragraph
11  nine.  Can you read that for me to yourself, please.
12    A   Sure.
13    Q   Have you had a chance to read it?
14    A   Yes.
15    Q   It states that plaintiff was an exemplary
16  employee and there was no other reason for her
17  termination.  What facts do you have to support that
18  statement?
19    A   Reviews.
20    Q   Okay.  Anything else?
21    A   Just meetings, you know, verbal meetings
22  that I had with Mike Schmitz.
23    Q   And in those verbal meetings, what did
24  Mike say?
25    A   Well, just through throughout the five

51

1  years that I was there, how well things were going,
2  how the branch had really improved, the staff was
3  coming around.  On many occasions, I can't tell you
4  how many, I couldn't even count how many times he
5  told me what a wonderful job I was doing.
6    Q   And you also met with Mike on June 15th,
7  2009 and he brought up the causes of action that had
8  been brought against you and your husband; is that
9  correct?
10    A   Yes.
11    Q   Okay.  And he also brought up the judgment
12  that had been rendered against you?
13    A   He actually did not bring up the word
14  judgment.
15    Q   What word did he use?
16    A   The filings is what he had said, court
17  filings.
18    Q   I want to direct your attention to
19  paragraph 17 of Exhibit 7.  Please have a chance to
20  read through that for me, please.
21    Have you had a chance to read through it?
22    A   I did.
23    Q   It says, "The only reason Plaintiff's
24  employment was terminated was her disclosure that
25  she and her husband were filing a bankruptcy

52

1  petition and her insolvency."
2    What facts do you have to support that
3  statement?
4    A   Other than the fact that that's what Mike
5  Schmitz told me?
6    Q   So he -- and he told you what exactly?
7    A   He told me that I was being terminated
8  because the bankruptcy would make the credit union
9  look bad.
10    Q   Okay.  And her insolvency, what does that
11  have -- what facts support that portion of paragraph
12  17?
13    A   Well, the fact that he knew that we were
14  struggling paying our bills.
15    Q   Okay.  And so where did you get insolvency
16  from struggling to pay your bills?
17    A   We couldn't afford to make our monthly
18  payments.
19    Q   And did he say that to you as well, that
20  he was terminating you because you could not afford
21  to make your monthly payments?
22    A   No, he did not say those words.
23    Q   And you -- so you allege that Mike Schmitz
24  said that you were being terminated because of the
25  bankruptcy filing; is that correct?

53

1    A   I -- could you repeat that?
2    Q   You allege that Mike Schmitz said you were
3  being terminated because you -- because you were
4  filing a petition for bankruptcy?
5    A   That's what Mike said.
6    Q   Okay.  Do you have any other facts other
7  than what you allege Mike Schmitz said to you that
8  support your claim under the 525 of the bankruptcy
9  code or your cause of action --
10    A   I do not.
11    Q   -- in your Complaint?
12    A   I do not.
13    Q   You do not?
14    A   I do not.
15    Q   Have you discussed this cause of action,
16  the one that you filed against Westconsin Credit
17  Union, with anyone?
18    A   No.
19    Q   Okay.  I should have said other than your
20  attorney.  But with anyone other than your attorney?
21    A   My husband knows.
22    Q   Okay.  Anyone else?
23    A   No.
24    Q   Did you communicate what Mike Schmitz told
25  you to anyone other than your attorney and your

54

```
1    husband?
2        A   No.
3            MS. McDUFFIE:  Why don't we take a
4    five-minute break.  I want to talk to Mike.
5            (Break taken)
6    BY MS. McDUFFIE:  (Continuing)
7        Q   Are you ready?
8        A   Yes.
9        Q   I have some follow-up questions for you.
10   When you met with Mike Schmitz on June 15th -- or,
11   excuse me, June 16th, 2009, did you tell Mike
12   Schmitz that you understood that the three circuit
13   court actions that were filed against you could
14   result in your termination?
15       A   I did not.
16       Q   Did you tell Mike Schmitz that the three
17   circuit court actions that were filed against you
18   evidence that you didn't handle your personal
19   finances in a businesslike manner?
20       A   No, I did not.
21       Q   And when Mike Schmitz showed up on
22   June 16th, the meeting that you had, you said, a
23   little bit after three o'clock on that day, was
24   your -- had you packed up all your things already?
25       A   No, I did not.
```

55

```
1        Q   Okay.  So the majority of your things were
2    not packed up that day, you just had a few other
3    things to add to the box?
4        A   There was nothing packed up at that day.
5        Q   Nothing packed up?
6        A   Nothing.
7        Q   When you meet with Mike Schmitz, there was
8    nothing packed?
9        A   Nothing.
10       Q   Okay.
11       A   Like I said, I had to empty a box.
12       Q   Had you ever been in any management
13   meetings in which the Insider Responsibilities
14   Statement was discussed?
15       A   Not discussed, no.
16       Q   Okay.  What -- what do you mean when you
17   say "not discussed"?
18       A   Well, basically what they did every year
19   was they -- probably not even a five-minute
20   conversation.  They just said, Your forms are coming
21   out, the insider responsibility, the oath of office.
22   And then there was another form, I don't remember
23   the name of it at this point.
24       Q   Okay.
25       A   They'll be coming out in packages.  Have
```

56

```
1    your employees sign them, get them back to HR, and
2    then they'd give us a date.
3        Q   Okay.  So there was never any management
4    meeting in which they went over that?  The Insider
5    Responsibilities Statement told you what different
6    aspects of it meant and explained it to the
7    managers?
8        A   No.
9        Q   Okay.  And as part of your duties as the
10   office manager, did you ever have to answer any
11   questions from any employees regarding the Insider
12   responsibilities Statement?
13       A   No, I did not.
14       Q   Were you ever involved in the termination
15   for a violation of insider responsibility statement?
16       A   No.
17       Q   Were you ever involved in discipline
18   regarding the Insider Responsibilities Statement?
19       A   No.
20       Q   And did you ever counsel any employee at
21   Westconsin Credit Union regarding the Insider
22   Responsibilities Statement in handling your finances
23   in a businesslike manner?
24       A   Can you explain coun-- what do you mean by
25   counsel somebody?
```

57

```
1        Q   Did you speak with them?  Someone has a
2    problem, you counsel them, you discuss what their
3    problems are?
4        A   Discussed an overdraft -- an overdrawn
5    checking account.
6        Q   But other than the overdrawn --
7        A   No.
8        Q   -- checking account, that was it?
9        A   That was it.
10       Q   And what did you tell them regarding the
11   overdrawn checking account?
12       A   Basically what we were told to tell them
13   is that they needed to get their account in the
14   positive, and after so many times that it was
15   negative, the credit union would close the account
16   out.
17       Q   And why did they have to get their account
18   in the positive?  What was the reasoning that you
19   gave?
20       A   Because it was with the credit union.  You
21   know, they -- they wanted their accounts in a
22   positive.
23       Q   Did you ever mention that having an
24   overdrawn checking account was failure to handle
25   your personal finances in a --
```

58

1      A   No, I did not.
2      Q   -- businesslike manner?  You got to let me
3   finish the questions.
4      A   Oh, sorry.
5      Q   That's okay.  We were doing so well at the
6   end last time, but I understand.
7          Did you ever tell the individual that you
8   counseled regarding the overdrawn checking account that
9   their failure -- because they had an overdrawn checking
10  account, they were failing to handle their personal
11  finances in a businesslike manner?
12     A   No.
13     Q   And who was the individual with the
14  overdrawn checking account, do you recall?
15     A   It was actually an employee's daughter,
16  and she was on the account with her employee.
17     Q   And who was the employee?
18     A   Or with her daughter.
19     Q   And who was the employee?
20     A   Pat Rohaw.
21     Q   I'm sorry?
22     A   Pat Rohaw, R-o-h-o-w, I believe.
23     Q   R-o-h-o-w.
24     A   Correct.
25     Q   Do you know an employee by the name of

59

1   Agnes Zignego?
2      A   Yes.
3      Q   And I'm pronouncing that name right?
4   Probably messing up the last name, aren't I?
5      A   I -- I couldn't correct you on that.
6      Q   But you do know --
7      A   I do know, yes.
8      Q   And was that individual an employee of the
9   Westconsin Credit Union?
10     A   Yes, she was.
11     Q   And how did you know her?
12     A   She was a teller for the New Richmond
13  branch for a short period of time.
14     Q   How long, do you know?
15     A   I couldn't tell you.  I'd say a year,
16  maybe.
17     Q   Okay.  Did you ever counsel Agnes
18  regarding any matters involving the New Richmond --
19     A   I did not personally, no.
20     Q   -- office?  You need to let me -- involving the
21  New Richmond branch office?
22     A   I did not personally.
23     Q   Do you know anyone who did?
24     A   Her supervisor.
25     Q   And were you involved at all?

60

1      A   I was not.
2      Q   Were you aware of why Agnes was being
3   counseled?
4      A   I believe I was.
5      Q   You believe you were?
6      A   I can't say for sure.  I mean, I know she
7   had a couple different issues.
8      Q   Okay.
9      A   But I -- I know two, for instance.  There
10  was a checking account that was overdrawn, and then
11  she was -- I believe she was late on a loan payment
12  at the credit union.
13     Q   And what was your involvement with her?
14     A   I was made aware of it by her supervisor,
15  'cause her supervisor had to sit down and meet with
16  her.
17     Q   Did her supervisor ever come to you and
18  ask you for advice on how to handle the situation?
19     A   She did not.  She went to her supervisor,
20  and her supervisor worked with her on it.
21     Q   Did Agnes's supervisor ever report to you
22  her conversations regarding --
23     A   I don't believe so, not word for word.
24  She just said that they had a conversation with her
25  in regards to her checking account or loan payment.

61

1      Q   And how -- how were you involved at all?
2   That's it, she just reported it to you --
3      A   That's correct.
4      Q   -- and that was the end of it?
5      A   Correct, that was it.
6      Q   Was that -- did she report it to you
7   verbally or did she send you an email or --
8      A   Verbally.
9      Q   Verbally.
10         And who was her supervisor, do you
11  recall?
12     A   Her supervisor was Tammy Jackson.
13     Q   Tammy Jackson.  And did Tammy Jackson
14  report to you?
15     A   She did not.
16     Q   Not directly?
17     A   Correct.
18     Q   Or just didn't report to you at all?
19     A   Did not report -- she reported indirectly
20  to me.
21     Q   Okay.  Who did Tammy Jackson report to?
22     A   Marie Gremore.
23     Q   Oh, okay.  Did Marie Gremore ever come to
24  you and discuss any employees and their failure to
25  handle their personal finances in a businesslike

62

1  manner?
2      A   No.  She reported to me on Agnes, that was
3  it.
4      Q   Okay.  Marie Gremore did?
5      A   She did.
6      Q   Did she report to you verbally or --
7      A   Verbally.
8      Q   You got to let me finish those sentences
9  up.  But that's okay, we'll work on it.
10         So the concept of handling your personal
11 finances in a businesslike manner just never came up
12 during your employment with Westconsin Credit Union; is
13 that correct?
14     A   Correct.
15     Q   And when Mike Schmitz came to visit you on
16 June 16th to -- as a result of that meeting, there
17 was a termination of your employment, he never
18 mentioned that he was terminating you because you
19 had violated the Insider Responsibilities Statement?
20     A   It was never brought up.
21     Q   And he never mentioned to you that you
22 were being terminated because you had failed to
23 handle your personal finances in a businesslike
24 manner?
25     A   No.

63

1          MS. McDUFFIE:  I'd like you to mark that.
2          (Deposition Exhibit No. 8 was marked for
3  identification.)
4      Q   Let me show you what's been marked as
5  Exhibit 8.
6          MS. DITTMAR:  Counsel, given the fact that
7  there's financial information attached to Exhibit 8,
8  do I have your agreement that this document will be
9  handled as a confidential document?
10         MS. McDUFFIE:  Yes, you do.
11         MS. DITTMAR:  Thank you.
12     Q   Have you had a chance to look through it?
13     A   Yes, I did.
14     Q   And not to read it entirely, but at least
15 to look through it.
16         I want to direct your attention to
17 Interrogatory No. 2.  It's on page two of that
18 document.
19         Would you take a moment to read through
20 the question and your answer.
21         Have you had a chance to read through it?
22     A   Yes.
23     Q   Would you identify for the record exactly
24 what Exhibit No. 9 is.
25         MS. DITTMAR:  It's eight, isn't it?

64

1      Q   Eight.  Excuse me, Exhibit No. 8 is,
2  please.
3      A   It's the Answers to the Interrogatories.
4      Q   From you?
5      A   From myself.
6      Q   Okay.  And going specifically to
7  Interrogatory No. 2, the question asked if you've
8  had -- describe in detail and specificity and detail
9  any and all communications that you've had with any
10 and all trustees and any and all bankruptcy filings
11 you've made since June 16th, 2009.  And your answer
12 is, I've had no communications with any bankruptcy
13 trustee.  Did I read the answer correctly?
14         MS. DITTMAR:  First of all, I'd object;
15 this does not properly state the question.
16     Q   Let me state the question differently.
17 The answer to Interrogatory No. 2 says that you've
18 had no communication with any bankruptcy trustee; is
19 that correct?
20     A   That's correct.
21     Q   Earlier you stated that you'd had a
22 discussion with a bankruptcy trustee; is that
23 correct?
24     A   Yes, if you call it communication.
25     Q   Okay.  Well, you describe for me what

65

1  communication means.
2      A   Well --
3          MS. DITTMAR:  I object, asked and
4  answered.
5          But go ahead, Tammy.
6          MS. McDUFFIE:  Thank you.
7      A   The only communication I had with the
8  bankruptcy lawyer -- or the bankruptcy -- or the
9  trustee was as we went in for our bankruptcy
10 discharge meeting, we sat there and he asked
11 specific questions on -- Basically he just went
12 through the normal, routine questions that a
13 bankruptcy trustee does.
14     Q   Okay.  Well, why don't you --
15     A   Nothing more was said.
16     Q   Okay.  Well, why don't you tell me what
17 those normal, routines questions were.
18     A   He asked us if -- one question he asked is
19 if we were planning on keeping our house.  I told
20 him no, we were not keeping our house.  He asked if
21 everything was listed in the bankruptcy,
22 everything -- if I was employed.  He asked me if I
23 was employed.  I said at this point, I am not
24 employed.
25     Q   Uh-hmm.

66

1    A   Or at the point of the bankruptcy filing I
2  was not employed.
3    Q   Okay.
4    A   He went through that.  And then he asked
5  if there was any objections, and that was that.
6    Q   So that was it, that was the extent of the
7  communication?
8    A   That was the extent.
9    Q   Okay.  And so you never received anything
10 in writing from the bankruptcy trustee?
11   A   No.
12   Q   Okay.  And you never gave the bankruptcy
13 trustee anything in writing, is that correct, other
14 than the filing, the bankruptcy filing?
15   A   Other than the filing, no, I did not.
16   Q   Okay.  Are you aware that the Westconsin
17 Credit Union has an employee manual?
18   A   Yes.
19   Q   Okay.
20       MS. McDUFFIE:  Will you mark that.
21       (Deposition Exhibit No. 9 was marked for
22   identification)
23   Q   Exhibit No. 9.  I'd like to show you
24 what's been marked as Exhibit No. 9.  Do you
25 recognize that?

67

1    A   Yes, I do.
2    Q   And is that your signature on that
3  document?
4    A   Yes, it is.
5    Q   And what is it?
6    A   It's an employee manual receipt form.
7    Q   And when did you sign this form?
8    A   It looks as if I signed it on August 12th
9  of '04.
10       (Deposition Exhibit No. 10 was marked
11   for identification).
12   Q   I'm going to show you what's been marked
13 as Exhibit 10.  Do you recognize that document?
14   A   I do not.
15   Q   Okay.  You've never seen this before?
16   A   Maybe, but I can't say yes or no for sure.
17   Q   So can you read what the document says at
18 the top as the title of it.
19   A   Sure.  It's HR-EM #102.02 - Insider
20 Responsibilities.
21   Q   And you don't recall ever seeing this?
22   A   Not that I can recall.
23   Q   Okay.
24       (Deposition Exhibit No. 11 was marked
25   for identification)

68

1    Q   Let me show you what's been marked as
2  Exhibit 11.  Do you recognize that document?
3    A   I do not.
4    Q   And can you just read what the title of
5  the document is.
6    A   Sure.  HR-EM #102.14/Disciplinary Action.
7    Q   And you've never seen this before either?
8    A   I can't say for sure.
9    Q   Okay.  Would it have been part of the
10 handbook, or you're not sure?
11   A   The handbook was on the Intranet.
12   Q   Uh-hmm.
13   A   So it could very well be part of the
14 employee manual.
15   Q   Okay.  And the same with Exhibit No. --
16 excuse me, Exhibit No. 10, could that have been part
17 of the employee manual, the handbook?
18   A   It could have been.
19   Q   Okay.  And that would have been part of
20 the Intranet?
21   A   Yes.
22   Q   Okay.
23       (Deposition Exhibit No. 12 was marked
24   for identification).
25   Q   Do you recognize this document, Exhibit

69

1  No. 12?
2    A   Do I recognize it, no.
3    Q   You've never seen it before?
4    A   I have not seen this, no.
5    Q   Okay.
6    A   I've seen the paper before, but --
7    Q   You've never seen this particular page of
8  the paper?
9    A   Correct, not this one.
10   Q   All right.  After you -- your employment
11 with the credit union was terminated, what was your
12 next job?  Or did you have a next job after June 16,
13 2009?
14   A   I did.
15   Q   And what did you do?
16   A   Are you looking for the business name
17 or --
18   Q   Yes.
19   A   -- my job title?
20   Q   Yes.  What was the business name?
21   A   Bank Cherokee.
22   Q   And what was your title?
23   A   Lead teller.
24   Q   And when did you get that job?
25   A   I started August 3rd, I believe, of 2009.

70

1    Q    Are you still employed with Bank Cherokee
2  as a lead teller?
3    A    I am not.
4    Q    Are you still employed with Bank Cherokee
5  at all?
6    A    I am not.
7    Q    And is the only position you held with
8  Bank Cherokee is lead teller?
9    A    At this given point, yes.
10   Q    Okay.  Had you held other positions with
11 Bank Cherokee?
12   A    I had.
13   Q    When?
14   A    Right before I started at the credit
15 union.
16   Q    Oh, okay.  So from August -- from
17 June 16th, 2009 to now the only position you've held
18 with Bank Cherokee is lead teller; is that correct?
19   A    Yes.
20   Q    Okay.  And when did you end your
21 employment with Bank Cherokee?
22   A    March 3rd of 2010.
23   Q    And are you currently employed?
24   A    Yes, I am.
25   Q    With who?

71

1    A    New Market Bank.
2    Q    And what's your title with New Market
3  Bank?
4    A    Senior customer service specialist.
5    Q    What does that entail?
6    A    Opening accounts.  I kind of run the
7  branch in the absence of the branch manager, do some
8  tellering.
9    Q    And where is New Market Bank located?
10   A    My branch is in Prior Lake.
11   Q    Prior Lake?
12   A    Prior Lake.
13   Q    How do you --
14   A    P-r-i-o-r, and then "Lake."
15   Q    And that's Westconsin?
16   A    Minnesota.
17   Q    Minnesota.  Hmm.  Okay.
18        And how long have you been with New
19 Market Bank?
20   A    Since March 8th.
21   Q    March 8th.
22        What is your salary with New Market Bank?
23   A    I think it's like $19.35 an hour, I
24 believe, or $19.32, somewhere around there.
25   Q    Between $19.32 and 19 --

72

1    A    $19.35, yes.
2    Q    And how -- is it a full-time position?
3    A    Yes, it is.
4    Q    So how many hours per week do you work?
5    A    Forty.
6    Q    And I'm going to assume you do receive
7  paychecks from New Market Bank up to now?
8    A    Yes.
9    Q    Okay.  And do they give you pay stubs for
10 each pay period that you're paid?
11   A    Yes.
12   Q    Okay.  And would you have those pay stubs,
13 check payment stubs?
14   A    They're online, yes.
15   Q    They're online.  So you have access to
16 them?
17   A    Yes, I do.
18   Q    What other benefits are offered to you as
19 the senior customer service specialist?
20   A    Insurance, medical insurance.
21   Q    Medical insurance?
22   A    Uh-hmm.  Dental insurance, vacation.  Or
23 it's actually PTO.
24   Q    Okay.
25   A    Free checking account.  At this point that

73

1  is it, because you have to be with the company for
2  over a year to qualify for 401(k).
3    Q    Okay.  Any other benefits?
4    A    No.
5    Q    And with Bank Cherokee, were you provided
6  any benefits while you were --
7    A    Yes, I was medical, family medical.
8    Q    Okay.
9    A    Dental.  Well, dental -- by the time I
10 qualified for dental, I was already gone, so
11 vacation, and that was it.
12   Q    So family medical and vacation?
13   A    Correct.
14   Q    Okay.  And what was your salary at Bank
15 Cherokee?
16   A    $16.35.
17   Q    And was that a full-time position?
18   A    Yes, it was.
19   Q    Since June 16th, 2009, other than Bank
20 Cherokee and New Market Bank, have you been offered
21 any other employment positions?
22   A    I have not.
23   Q    Okay.  And have you applied to anywhere
24 other than Bank Cherokee and New Market?
25   A    Yes, I have.

74

1    Q   Okay.  And where were those other
2  applications?
3    A   Online.  On -- there's a couple job Web
4  sites.
5    Q   And what are they?
6    A   CareerBuilder.com, and I cannot tell you
7  what the other one is.  I do not remember what the
8  name of it is.
9    Q   And when you -- You went online to apply
10 for positions?
11   A   Yes.
12   Q   Okay.  And then what record do you keep of
13 the positions you've applied for?
14   A   I don't have any records for those, 'cause
15 you apply right online.  You send it right from
16 their Web site.
17   Q   And you don't make a copy before you send
18 it or print it or anything?
19   A   I do not.
20   Q   You did not.
21   A   No.
22   Q   So you don't know how many applications
23 you've made?
24   A   I could give you a good guesstimate of how
25 many I've made.

75

1    Q   Okay.  Give me your guesstimate.
2    A   I'd say 20 to 25.
3    Q   Okay.  So since June 16th, 2009, you've
4  made 20 to 25 applications --
5    A   Yes.
6    Q   -- on CareerBuilder.com?
7    A   Correct.
8    Q   Okay.  But you have no record of those?
9    A   I don't have any record of those.
10   Q   Did you use any other mechanisms for
11 finding employment?
12   A   I did not.
13   Q   Okay.  So CareerBuilder.com and some
14 unknown Web site?
15   A   Correct.  I looked in the paper as well,
16 but that seems to be a way of the past.
17   Q   What paper?
18   A   The newspapers, like Pioneer Press.
19   Q   Uh-hmm.  Anyplace else?
20   A   I think that was it.
21   Q   Pioneer Press?
22   A   Uh-hmm.
23   Q   Did you utilize any employment agencies?
24   A   I did not.
25   Q   Did you contact any prior employers other

76

1  than Bank Cherokee?
2    A   No.
3    Q   And how did you get the Bank Cherokee job?
4  Did you contact them directly, or was that also
5  through the Web site?
6    A   It was neither way.
7    Q   Okay.  How did you --
8    A   My son works for Bank Cherokee.
9    Q   Oh, okay.  And so he referred you or he
10 just told you about an opening?
11   A   Actually, he was talking with one of the
12 VPs, and it was somebody that I knew personally, so
13 he told him that I was looking for a job and then
14 they called me.
15   Q   Okay.  And you interviewed and they
16 offered you a job?
17   A   Correct.
18   Q   How many interviews have you been on since
19 June 16th, 2009?
20   A   Maybe three.
21   Q   And who were those with?
22   A   Bank Cherokee were two, and then New
23 Market.
24   Q   Bank Cherokee, you had two interviews with
25 them?

77

1    A   Correct.
2    Q   So you interviewed -- both places you
3  interviewed, you got jobs?
4    A   Yes.
5    Q   Okay.  And have we covered all the ways
6  that you sought employment since June 16th, 2009;
7  that is, Pioneer Press, one CareerBuilder.com,
8  another unknown Web site, your son?
9    A   I believe so, yes.
10   Q   Okay.  Is there any way to go on
11 CareerBuilder.com and print out all your
12 applications, do you know?
13   A   I do not know.  I'm not sure.
14   Q   Have you tried to do that?
15   A   I have not.
16   Q   What kind of positions were you seeking on
17 CareerBuilder.com?  Can you describe what the
18 positions were?
19   A   Some of them were very similar, branch
20 manager positions, tellers.  I applied for a
21 couple -- there was one at St. Thomas.
22   Q   What is that?
23   A   It's a college.  And I applied for a
24 position with the financial area.  And then several
25 colleges I applied because they had positions open

78

1      for student loan staff.
2          Q    And were your applications in Wisconsin or
3      Minnesota?
4          A    Minnesota.
5          Q    Minnesota.
6          A    Uh-hmm.
7          Q    So you made no applications in Wisconsin?
8          A    No.
9          Q    In regard to looking at the newspaper, did
10     any of those result in you making an application in
11     any of the jobs openings in the Pioneer Press?
12         A    No.
13         Q    Okay.  Do you remember any -- you said
14     St. Thomas.  Do you remember any of the other banks
15     or credit unions that you applied to?
16         A    I did not apply to any credit unions.
17         Q    Okay.  No credit unions, okay.
18         A    Correct.
19         Q    Any other banks?
20         A    I want to say Anchor was one.  I can't
21     think of all of them.
22         Q    Any other ones come to mind?
23         A    No.
24         Q    Okay.  So St. Thomas, Anchor, and there
25     were other banks, you believe?

79

1          A    Yes.  And Rasmussen was one of the
2      colleges.
3          Q    Rasmussen, okay.
4          A    Uh-hmm.
5          Q    The applications you did on
6      CareerBuilder.com, did you get any responses back
7      from those applications?
8          A    No.  Well -- well, I take that back.  I
9      think I might have got an email from one saying
10     we've gotten your resume.  They'll be doing a
11     search, and we'll let you know if anything comes out
12     of it.
13         Q    Do you recall who that was from?
14         A    I want to say that was from Rasmussen, I
15     believe.
16         Q    Anyone else?
17         A    No.
18         Q    How much time would you say each day you
19     spent from June 16th, 2009 looking for a job?
20         A    From June 16th to the time that I started
21     my employment?
22         Q    Yes.  You started in August of 2000--
23         A    I started in August, correct, but I
24     accepted the position in probably mid to early
25     July --

80

1          Q    Okay.
2          A    -- is when I accepted that position.
3          Q    So from June 16th to mid to early July,
4      how many hours per day would you say you spent
5      looking for a job?
6          A    I'd say probably seven to eight hours a
7      day.
8          Q    Every day?
9          A    Not every day.
10         Q    How many --
11         A    I'd say probably four days a week.
12         Q    And this was through CareerBuilder.com?
13         A    Correct.
14         Q    And of seven to eight hours a day, four
15     days a week, you made 20 to 25 applications?
16         A    Correct.
17         Q    Can you give me a sense of or the extent
18     of your search?  You were spending, you said, seven
19     to eight hours a day, four days a week looking for a
20     job.  What were you doing on CareerBuilder.com that
21     amount of time?
22         A    Well, there's a lot of jobs out there.
23         Q    Okay.
24         A    And, I mean, you could go back months and
25     months and months looking for jobs.

81

1          Q    Okay.
2          A    So I tried narrowing it down to my
3      profession, where I was, but then I also had to go
4      outside of that box and look for other jobs as well,
5      so...
6          Q    And what other kind of jobs did you look
7      for outside of your profession?
8          A    Well, like I said, I -- I applied at some
9      colleges --
10         Q    Oh, okay.
11         A    -- in regards to -- even some clerical
12     positions.
13         Q    Like what?
14         A    There was a couple executive secretary
15     positions.  There was one that was a secretary to a
16     VP.  And I'm a very detail-oriented person, so that
17     was, you know, why I thought, well, I'd qualify for
18     that because I have the experience in regards to
19     secretarial.
20         Q    Okay.  Anything else?
21         A    Not that I can...
22         Q    Okay.  Did you put down Westconsin Credit
23     Union on your applications?
24         A    As?
25         Q    A prior job.

82

1    A   Yes, I did.
2    Q   For a reference?
3    A   Not for a reference.  Well, I listed them
4  as my prior employer.
5    Q   Uh-hmm.  But you didn't list anybody on
6  your applications as a reference from Westconsin
7  Credit Union?
8    A   No.
9    Q   Between June 16th, 2009 and the time you
10 got your job, did you receive unemployment
11 compensation benefits?
12   A   Yes, I did.
13   Q   Do you recall how many weeks that would
14 have been, six weeks or four weeks?
15   A   I think six weeks at the most is what I
16 got, I believe.
17   Q   What reason did you give to the
18 unemployment in the application for benefits for
19 your termination of employment?
20   A   I told them why I was terminated.
21   Q   What did you say?
22   A   I said that -- I explained my meeting with
23 Mike and the 16th and the 17th.
24   Q   And what did you --
25   A   I explained to them that Mike came out,

83

1  asked me about my financial situation, and then I
2  said that he came back out and I was fired because I
3  filed bankruptcy.
4    Q   And that's what you put on your
5  application, --
6    A   Uh-hmm.
7    Q   -- you were fired because you filed
8  bankruptcy?
9    A   I believe that's what I put, yes.
10   Q   Do you have a copy of your application for
11 UC benefits?
12   A   I do not.
13   Q   Other than the unemployment compensation,
14 your job with Bank Cherokee and New Market Bank, do
15 you have any other sources of income from June 16,
16 2009 till today?
17   A   No.
18   Q   Okay.
19       (Deposition Exhibit No. 13 was marked
20   for identification).
21   Q   I'll show you what's been marked as
22 Exhibit No. 13.  Do you recognize that?
23   A   I do.
24   Q   Okay.  And what is it?
25   A   It was a statement from my profit sharing

84

1  401(k) plan with Westconsin Credit Union.
2    Q   And what does this document represent?
3    A   It shows that I cashed out my 401(k).
4    Q   Ah, okay.  You cashed it out completely?
5    A   Correct.
6    Q   And when you say "cashed out," did you
7  transfer it someplace else or you took the money --
8    A   I took the cash.
9    Q   You took the cash, okay.
10       MS. McDUFFIE:  If you give me about five
11 minutes, we may be able to finish up in a couple
12 minutes.  I'll go through my notes and that may be
13 the end of it.
14       MS. DITTMAR:  You'll come and get us,
15 right?
16       MS. McDUFFIE:  No, I'll come get you.
17       (Break taken).
18 BY MS. McDUFFIE:  (Continuing)
19   Q   All right.  We'll try and finish up.
20       When you filed your bankruptcy petition,
21 had you already -- your employment with Westconsin
22 Credit Union been terminated already?
23   A   When it was filed, yes.
24   Q   Okay.  Do you know what the word
25 insolvency means?

85

1    A   I do.
2    Q   What does it mean?
3    A   It means that you have more debt than you
4  have income coming in.
5    Q   Than income coming in?
6    A   Correct.
7    Q   What does that mean?
8    A   You pay more than you have coming -- more
9  income.  You have more debt than you have income;
10 therefore, you can't pay.
11   Q   Pay?
12   A   Everything.
13   Q   Your bills?
14   A   Correct.
15   Q   During the June 15th meeting that you had
16 with Mike Schmitz, did he tell you that a credit
17 union member had informed him about the judgment
18 against you?
19   A   I actually asked him towards the end of
20 the meeting, I asked him how he found out about it.
21   Q   Okay.
22   A   And that's when he said that we actually
23 got a credit union member who called in.
24   Q   During the June 15th meeting that you had
25 with Mike, did you tell him that you were having

86

1  financial difficulty 'cause your husband's hours had
2  been cut?
3      A  No.
4      Q  Did you mention anything about your
5  husband during that June 15th meeting?
6      A  Yes, I did.
7      Q  What did you say?
8      A  I said that he was traveling an hour to
9  and from work every day.
10     Q  Did you mention to Mike during that
11 June 15th, 2009 meeting that your rental income had
12 dropped?
13     A  I did not.
14     Q  Had your rental income dropped?
15     A  No.
16     Q  And you rent properties, I take it,
17 apartments?
18     A  We do not.
19     Q  You do not?
20     A  We do not.
21     Q  So in 2009 you had no rental properties?
22     A  We did not have any rental properties.
23     Q  In 2008 you had no --
24     A  We --
25     MS. DITTMAR:  Wait.

87

1      A  We --
2      Q  You're going to have to wait. I'm going to
3  try and slow down and you try and slow down.  We'll
4  work on it.
5          You had no rental properties in 2008?
6      A  No, we did not.
7      Q  Okay.  Did you rent any land in 2008 or
8  2009?
9      A  Did I rent any land?
10     Q  To others.
11     A  No.
12     Q  Okay.  And did -- so did others rent land
13 from you?
14     A  Excuse me?
15     Q  Did anybody rent land from you?  Did you
16 own land that others rented from you --
17     A  No.
18     Q  -- in 2009 or 2008?
19     A  No, I did not.
20     Q  Did you tell Mike Schmitz during that --
21 during the June 15th or June 16th meeting that you
22 knew you could lose your job because of the three
23 civil cases pending?
24     A  I did not.
25     Q  Other than Mike Schmitz concerning your

88

1  intention to file for bankruptcy, did you have any
2  discussions with any other credit union employees?
3      A  In regards to?
4      Q  Your intention to file for bankruptcy.
5      A  No.
6      Q  Did you ever have any conversations other
7  than with Mike Schmitz regarding your personal
8  financial situation, someone at the credit union?
9      A  No.
10     Q  I want to direct your attention back to --
11 very early on to exhibits -- it would be one and
12 two.
13         I may have asked you this before.  Do you
14 know of any employee who's been terminated for failure
15 to adhere to the Insider Responsibilities Statement
16 policy?
17     A  Not that I'm aware of, no.
18     Q  You do not?
19     A  Not that I -- no.
20     Q  So during your employment at Westconsin
21 Credit Union, no employee was terminated for a
22 violation of the Insider Responsibilities Statement?
23     A  Not that I believe.  I --- not that I know.
24     Q  Okay.  Thank you.
25         Do you think the three cases that were

89

1  filed against you and/or your husband evidenced your
2  inability to handle your personal finances in a
3  businesslike manner?
4      MS. DITTMAR:  Objection, asked and
5  answered.
6          But go ahead.
7      A  I do not.
8      Q  You do not, okay.
9          I think -- during the June 15th meeting
10 did Mike Schmitz show you a copy of the -- the judgment
11 that was in the New Richmond newspaper, Exhibit No.--
12 I'll find it real quickly here--Exhibit No. 12?
13     A  Did he show me this?  (indicating)  No, he
14 did not.
15     Q  So as you said, you've never seen this
16 before?
17     A  Correct.
18     Q  Okay.  Do you think that public knowledge
19 of your financial situation would have impacted your
20 ability to perform your job with Westconsin --
21     A  I do not.  Go ahead.
22     Q  -- with Westconsin Credit Union?
23     A  I do not.
24     Q  Okay.  That will do it.
25     MS. DITTMAR:  I have just very brief

90

1  follow-up here.
2              EXAMINATION
3  BY MS. DITTMAR:
4      Q   Tammy, you indicated that you had two
5  conversations with Mike Schmitz on June 15 and one
6  on June 16; is that correct?
7      A   That is correct.
8      Q   Now, in any of those conversations did the
9  subject of your credit report come up?
10     A   Yes, it did.
11     Q   And which one?
12     A   It came up during the June 15th meeting.
13     Q   Which one, the first or the second one?
14     A   The first meeting.
15     Q   And what was said about your credit
16  report?
17     A   Mike asked me, he said, "What I'd like to
18  do is I'd like to pull up your credit.  When I get
19  back to my office, I'd like to pull up your credit
20  so that I can see everything that you have out
21  there.  Would that be all right with you?"
22     Q   And what was your response?
23     A   I said yes.
24     Q   All right.  Now, we're here today to give
25  attorney McDuffy the best recollection you have of

91

1  everything that was said in those two meetings on
2  June 15 and the one meeting on June 16.
3              Now, to the extent that you can recall,
4  have you told attorney McDuffy everything that's been
5  said?
6      A   Yes.
7      Q   Or that was said --
8      A   Yes.
9      Q   -- between and you Mr. Schmitz?
10     A   Yes.
11     Q   All right.  Now, I think this came out
12  with a double negative, so I just want to clarify
13  the record.  Did Mr. Schmitz ever tell you that you
14  were being terminated because you had failed to
15  handle your finances in a businesslike manner?
16     A   No.
17     Q   Now, do you believe -- well, here, go to
18  that -- those Exhibits 1 and 2 again.  Those are the
19  insider responsibility statements, right?
20     A   Yes.
21     Q   And is it paragraph one that talks about
22  businesslike manner for personal finances?
23     A   Yes.
24     Q   Okay.  And then the second sentence
25  indicates that if you -- if you think anything's

92

1  illegal, you should let the credit union know?
2      A   Correct.
3      Q   That's not verbatim, but that's to that
4  effect, right?
5      A   Yes.
6      Q   Now, you don't think filing bankruptcy is
7  illegal, do you?
8      A   I do not.
9      Q   All right.  Now, do you think that
10  filing -- by filing bankruptcy, or even stating your
11  intention to file bankruptcy, do you think that that
12  exhibited a failure to handle your finances in a
13  businesslike manner?
14     A   No.
15     Q   And why not, Tammy?
16     A   Because it's the economy.  I mean,
17  they're -- it's happening everywhere.  House values
18  dropped, gas prices tripled, credit cards raised all
19  their payments.
20     Q   And --
21     A   We were unable to make our payments.
22     Q   All right.  Now, this last -- I think one
23  of the last questions from attorney McDuffy was
24  whether you thought public knowledge of your
25  bankruptcy would impact your job.

93

1          MS. McDUFFIE:  I object; that wasn't my
2  question.  It wasn't of the bankruptcy.  I have not
3  referred to the bankruptcy.  I referred to the three
4  outstanding causes of action.
5          MS. DITTMAR:  Okay.  Thanks for that
6  clarification.
7      Q   Do you -- and please let me know if I
8  misstate it.  My notes are not the best.  That you
9  were asked if public knowledge of the three --
10         MS. DITTMAR:  Causes of action.
11     Q   -- causes of action would affect your
12  ability to do your job, and you said no.
13     A   Correct.
14     Q   Okay.  Why?
15     A   Because there wasn't anything that I was
16  doing for the credit union that would have been
17  affected.
18     Q   Okay.  What do you mean by that?
19     A   Well, everything I did -- I mean, nothing
20  was related to these actions, and I thought I worked
21  for a credit union and I thought our deal with the
22  credit union was, is, they're out to help people,
23  and if they can't help their own employees, who are
24  they helping.
25     Q   Okay.  And then let me ask, do you think

94

1    that public knowledge of your bankruptcy, if that
2    had become public knowledge, would that have
3    affected your ability to do your job?
4        A    I do not.
5        Q    And why not?
6        A    Again, because nothing that I was doing
7    had anything to do with my bankruptcy.
8        Q    When you say nothing you were doing --
9        A    As a position. I mean, you go out and you
10   work with students in the middle school and the high
11   school over budgeting and checking accounts. I can
12   still talk about checking accounts. I can talk
13   firsthand about struggling with the economy and
14   having to file bankruptcy.
15       Q    Okay. And, in fact, the two jobs that
16   you've held since the credit union have been in the
17   finance industry?
18       A    Absolutely.
19           MS. DITTMAR: I have nothing further.
20               FURTHER EXAMINATION
21   BY MS. McDUFFIE:
22       Q    I'd like to follow up with a couple
23   things.
24       A    Sure.
25       Q    I want to point your direction at

95

1    Exhibit 1 and 2. Exhibit 1 and 2, paragraph number
2    one in both of those, you've had a chance to review
3    that; is that correct?
4        A    Correct.
5        Q    And what it says is that you will adhere
6    to established policies and handle your personal
7    finances in a businesslike manner; is that correct?
8        A    That is correct.
9        Q    And it says if you fail -- or violate this
10   policy, that you will report it to the credit union;
11   is that correct? That's what it says in paragraph
12   number two?
13       A    Correct.
14       Q    Okay. And you have defined failure to
15   handle personal finances in a businesslike manner
16   as -- as not paying your bills when they become due.
17   Did you report that to the credit union?
18       A    I did not.
19       Q    Okay. Give me one second.
20           MS. McDUFFIE: Can we go off the record
21   for one second?
22           We can go back on the record.
23       Q    You said -- you testified just a few
24   minutes ago that in the June 15th meeting that you
25   had with Mike, that he asked you -- Was that the

96

1    first meeting or the second meeting that he asked
2    you if he could pull up your credit record?
3        A    The first one.
4        Q    The first one?
5        A    Uh-hmm.
6        Q    And when he met with you on June 16th, did
7    he ever refer to your credit report?
8            MS. DITTMAR: The 15th or the 16th?
9            MS. McDUFFIE: 16th now. He asked her on
10   the 15th if he could pull up her credit report.
11       Q    When he met with you on June 16th, did he
12   mention your credit report to you at all?
13       A    He did not.
14       Q    When he met with you later on June 16th,
15   because you said it was the first meeting that he
16   mentioned your credit report, you said there was a
17   second meeting. Did he mention your credit report
18   in that second meeting?
19           MS. DITTMAR: And, Liz, just so our record
20   is clear, I think you said 16th again, so just --
21   there's two on the 15th.
22           MS. McDUFFIE: Oh, I'm sorry.
23       Q    Two meetings -- you said there were two
24   -- you allege there were two meetings on the 15th --
25       A    Correct.

97

1        Q    -- correct?
2            And you said in the first meeting on
3    June 15th, he asked you if he could pull up your credit
4    report; is that correct?
5        A    That is correct.
6        Q    In the second meeting -- you allege there
7    was a second meeting on June 15th?
8        A    Yes.
9        Q    Did he mention your credit report in that
10   second meeting --
11       A    He did not.
12       Q    -- on June 15th?
13       A    He did not.
14       Q    You got to let me finish.
15           Did he mention your credit report in that
16   second meeting with you on June 15th?
17       A    No.
18       Q    Just one -- two more questions. You
19   testified that you did not think that your
20   bankruptcy filing was illegal; is that correct?
21       A    That is correct.
22       Q    Is it your interpretation of the Insider
23   Responsibilities Statement that you only had to
24   report something that was illegal?
25       A    Correct.

98

1      Q   Okay.  So under the Insider
2   Responsibilities Statement, if it wasn't illegal,
3   you didn't have to report it; is that correct?
4      A   Correct.
5      Q   That was your understanding?
6      A   Yes.
7      Q   And you never asked anyone about what the
8   Insider Responsibilities Statement meant?
9      A   No, I did not.
10      Q   I want to direct your attention to Exhibit
11   1 and Exhibit 2.  Strike that.
12         MS. McDUFFIE:  Okay.  That's all.  That's
13   all I have.
14         MS. DITTMAR:  I have nothing further.
15         MS. McDUFFIE:  Thank you very much, Miss
16   Robinette.  I appreciate your time.
17         THE WITNESS:  Thank you.
18             (The deposition terminated at 3:55 p.m.)
19
20
21
22
23
24
25

99

1   STATE OF MINNESOTA   )
2                        ss
                    CERTIFICATE
3   COUNTY OF DAKOTA    )
4        I, Lori Sorenson, RMR, a notary public in and
     for the County of Dakota, State of Minnesota, certify
5   that the foregoing is a true record of the deposition
     of TAMMY L. ROBINETTE, who was first duly sworn by me,
6   having been taken on May 21, 2010, at the law offices
     of Doar, Drill & Skow, 103 N. Knowles Avenue,
7   New Richmond, Wisconsin, in my presence and reduced to
     writing in accordance with my stenographic notes made
8   at said time and place.
9        I further certify that I am not a relative or
     employee or attorney or counsel of any of the parties
10   or a relative or employee of such attorney or counsel;
11        That I am not financially interested in the
     action and have no contract with the parties,
12   attorneys, or  persons with an interest in the action
     that affects or has a substantial tendency to affect my
13   impartiality;
14        That all parties who ordered copies have been
     charged at the same rate for such copies;
15
16        IN WITNESS WHEREOF, I have hereunto set my
     hand and affixed my seal of office at Hastings,
17   Minnesota, this 23rd day of May, 2010.
18
19
20
21
22        _____
23        Lori Sorenson, RMR
24
25

HR-BM 102.02-Exhibit                                                      Revised 03/2008

## INSIDER RESPONSIBILITIES STATEMENT

NAME  Tammy Robinette                    DATE 5/7/08

CREDIT UNION POSITION  Branch Manager

### Instructions

This statement is completed when an employee/director is hired/elected and annually, at the same time the OATH OF OFFICE is signed. After you complete and sign the statement, give it to the Human Resources Department who will maintain it in a confidential file for compliance examinations.

I have read and understand the Credit Union INSIDER RESPONSIBILITIES (Section 102.02) and ELECTRONIC COMMUNICATIONS (Section 102.20) policies, which I have Intranet access to in the CREDIT UNION EMPLOYEE MANUAL. As such:

### INSIDER RESPONSIBILITIES

1. I will adhere to established policies and handle my personal finances in a businesslike manner. If I have the slightest doubt about the legality of any action, I will contact my supervisor.

2. I understand it is my responsibility as an insider to report any violation of policy to the Corporate Officers, or if necessary, to the Chairman of the Board of Directors. If I violate any policy or fail to report a violation, I may be subject to disciplinary action, which may include termination.

3. I will sign the OATH OF OFFICE, agreeing to keep member account and Credit Union information confidential.

4. I agree not to engage in acts of fraud or dishonesty. This list of examples is not all inclusive:

    - making false entries in any book, report, computer record, account, or statement with intent to defraud

    - theft including stealing from members' accounts, overpayment of dividends, and creating fictitious loans

    - embezzlement

    - misapplication of funds

    - check kiting

    - forgery

    I understand that engaging in fraudulent or dishonest acts will result in disciplinary action, which may include termination and possible prosecution. In addition, I understand that the Credit Union is required to report acts of fraud or dishonesty to NCUA, the FBI, the US Attorney, the IRS, and possibly the Office of Financial Enforcement Treasury Department, and the Secret Service.



HR-EM 102.02-Exhibit                                                    Revised 03/2008

5. I have reviewed a list of the Credit Union's vendors to determine if I have possible conflicts of interest. This list of examples is not all-inclusive.

- Your spouse owns (or works at) the appraisal agency used by the Credit Union for real estate appraisals.

- Your sister has loans that require Loan Committee approval, and you are a Loan Committee member.

- You own a piece of land that the Credit Union is considering purchasing or lending to another member so that the member may purchase the land.

Except as described below, I am not aware of having any other relationships that may be a conflict of interest. The following is a list and explanation of situations where a conflict of interest may exist.

### POSSIBLE CONFLICTS OF INTEREST

_____

_____

_____

6. I agree not to use my position of trust and responsibility to gain "special" treatment for others or myself. In addition, I agree not to cash checks or perform transactions or file maintenance on my account, on accounts of my immediate family members or business associates, or on accounts I am listed as a joint owner or authorized user.

7. I agree not to use Credit Union staff, equipment, services, or supplies in the conduct or support of non-Credit Union business.

8. I agree not to accept bribes and kickbacks and understand that they may be criminal offenses.

9. I understand that the internal communication systems, as well as the equipment and data stored, are and remain at all times the property of the Credit Union.

10. I understand that I must have approval before connecting hardware, importing files, or loading programs onto our computer system.

11. I understand that I am accountable for anything done on my workstation.

12. I understand the importance of passwords and that they must be constructed, used, and protected appropriately to ensure security.

I am familiar with and will adhere to the Credit Union INSIDER RESPONSIBILITIES and ELECTRONIC COMMUNICATIONS policies.

_Tammy Robinette_                              _5/7/08_
**Employee Signature**                         **Date**

HR-BM 102.02-Exhibit                                          Revised 03/2009

# INSIDER RESPONSIBILITIES STATEMENT

NAME _Tammy Robinette_                              DATE _5/26/09_

CREDIT UNION POSITION _Office Manager_

**Instructions**

This statement is completed when an employee/director is hired/elected and annually, at the same time the OATH OF OFFICE is signed. After you complete and sign the statement, give it to the Human Resources Department who will maintain it in a confidential file for compliance examinations.

I have read and understand the Credit Union INSIDER RESPONSIBILITIES (Section 102.02) and ELECTRONIC COMMUNICATIONS (Section 102.20) policies, which I have Intranet access to in the CREDIT UNION EMPLOYEE MANUAL. As such:

## INSIDER RESPONSIBILITIES

1. I will adhere to established policies and handle my personal finances in a businesslike manner. If I have the slightest doubt about the legality of any action, I will contact my supervisor.

2. I understand it is my responsibility as an insider to report any violation of policy to the Corporate Officers, or if necessary, to the Chairman of the Board of Directors. If I violate any policy or fail to report a violation, I may be subject to disciplinary action, which may include termination.

3. I will sign the OATH OF OFFICE, agreeing to keep member account and Credit Union information confidential.

4. I understand that my agreement to keep member account and Credit Union information confidential continues even if my employment with WESTconsin Credit Union ends.

5. I agree not to engage in acts of fraud or dishonesty. This list of examples is not all inclusive:

   - making false entries in any book, report, computer record, account, or statement with intent to defraud

   - theft including stealing from members' accounts, overpayment of dividends, and creating fictitious loans

   - embezzlement

   - misapplication of funds

   - check kiting

   - forgery

   I understand that engaging in fraudulent or dishonest acts will result in disciplinary action, which may include termination and possible prosecution. In addition, I understand that the Credit Union is required to report acts of fraud or dishonesty to NCUA, the FBI, the US Attorney, the IRS, and possibly the Office of Financial Enforcement Treasury Department, and the Secret Service.



Robinette
DEPOSITION
EXHIBIT
2
5/27/10

HR-BM 102.02-Exhibit                                                                   Revised 03/2009

6.  I have reviewed a list of the Credit Union's vendors to determine if I have possible conflicts of interest. The below list of examples of conflicts of interest is not all-inclusive. You must consider your personal situation when evaluating conflicts of interest.

   • Your spouse owns (or works at) the appraisal agency used by the Credit Union for real estate appraisals.

   • A family member has loans that require Loan Committee approval, and you are a Loan Committee member.

   • A person or business that you or your family do business with has loans that you would have authority to approve.

   • You own a piece of land that the Credit Union is considering purchasing or lending to another member so that the member may purchase the land.

Except as described below, I am not aware of having any other relationships that may be a conflict of interest. The following is a list and explanation of situations where a conflict of interest may exist.

### POSSIBLE CONFLICTS OF INTEREST

_____

_____

_____

7.  I understand if a situation develops in the future resulting in a possible conflict of interest, I must disclose the possible conflict of interest in writing to my supervisor immediately.

8.  I agree not to use my position of trust and responsibility to gain "special" treatment for others or myself. In addition, I agree not to cash checks or perform transactions or file maintenance on my account, on accounts of my immediate family members or business associates, or on accounts I am listed as a joint owner or authorized user.

9.  I agree not to use Credit Union staff, equipment, services, or supplies in the conduct or support of non-Credit Union business.

10. I agree not to accept bribes and kickbacks and understand that they may be criminal offenses.

11. I understand that the internal communication systems, as well as the equipment and data stored, are and remain at all times the property of the Credit Union.

12. I understand that I must have approval before connecting hardware, importing files, or loading programs onto our computer system.

13. I understand that I am accountable for anything done on my workstation.

14. I understand the importance of passwords and that they must be constructed, used, and protected appropriately to ensure security.

I am familiar with and will adhere to the Credit Union INSIDER RESPONSIBILITIES and ELECTRONIC COMMUNICATIONS policies.

_____                    _____
Employee Signature                                    Date

# JOB TITLE:   Office Manager
**Reports To:**  Vice President - Operations
**Status:** Exempt
**Date:** 12/15/08

**SUMMARY:** Responsible for the effective, efficient, and profitable operation of the office; coaching employees to ensure they are providing quality service; and planning, assigning, and directing work within the office.

**ESSENTIAL INSIDER RESPONSIBILITIES:** Adheres to established policies and procedures; keeps member account and WCU information confidential; and handles personal finances in a businesslike manner.

**ESSENTIAL SERVICE RESPONSIBILITIES:** Greets members professionally and courteously whether in person, over the telephone, through electronic communication, or by letter; smiles and maintains eye contact for personal contact; wears WCU name tag and uses members' names; shows a desire to help by listening carefully to members; and thanks members after assisting them. Interacts with other WCU employees with the same respect.

**ESSENTIAL SALES RESPONSIBILITIES:** Understands and offers WCU products to members that will help them achieve financial success.

**ESSENTIAL LOAN COMMITTEE RESPONSIBILITIES:** May serve as a member of the Loan Committee and meet as often as needed to approve or deny loans which are over loan officers' lending authority or exceptions to WCU policy.

**ESSENTIAL MANAGEMENT RESPONSIBILITIES:** Serves as the main employee responsible for the effective and efficient operation of the office; cooperates with other managers to promote a positive team environment; and carries out responsibilities in accordance with WCU policies and procedures and applicable laws.  Other management responsibilities may include:

1. sets and monitors financial, sales, and operational goals for office
2. develops and carries out sales and business plans as needed
3. develops community relationships that will enhance our business and real estate lending program, business partner program, auto buying/dealer loan program, and financial education efforts, and our relations with other local organizations
4. negotiates agreements with outside contacts
5. sets and monitors annual office expense budget
6. responds to employee and member questions, concerns, and complaints
7. keeps supervisor informed of issues
8. resolves problems
9. recommends policy and procedure changes and additions
10. recommends interest rate and service charge changes
11. prepares, submits, and analyzes a variety of activity and operating reports
12. authorizes purchases within established limit
13. reads industry information and attends related courses and seminars
14. conducts product knowledge, sales, and other meetings



*Robinette*
DEPOSITION
EXHIBIT
3
5/21/10
PENGAD 800-631-6989

15. participates and encourages others employees to participate in the Staff Training & Recognition Program and other forms of personal development
16. participates and encourages employees to participate in local activities to promote WCU and to support the community
17. devotes the time required to get the job done, which may include evenings and weekends
18. performs other departmental functions based on site needs

**ESSENTIAL SUPERVISORY RESPONSIBILITIES:**  Supervises employees which may include those in the following positions: Facilities Supervisor, Financial Services Specialist, Office Supervisor, and Real Estate Loan Originator; cooperates with other supervisors to promote a positive team environment; and carries out responsibilities in accordance with WCU policies and procedures and applicable laws.  Other supervisory responsibilities may include:

1. interviews and hires employees
2. ensures employees are providing quality service
3. trains and coaches employees to help them meet expectations
4. ensures employees are following established policies and procedures
5. schedules employees
6. plans, assigns, and directs work
7. conducts performance reviews
8. sets and monitors individual employee goals
9. rewards and disciplines employees
10. recommends employee pay adjustments
11. keeps attendance records

**OTHER ESSENTIAL DUTIES AND RESPONSIBILITIES** may include the following.  Other duties may be assigned.

1. counsels members applying for loans when necessary
2. serves as Security Officer by monitoring and enforcing security policies and procedures
3. maintains office building and grounds
4. handles marketing, public relations, and donation requests within established limit
5. acts as authorized Signature Guarantor for Medallion Signature Guarantee Program
6. assists in developing policies and procedures for WCU offices
7. serves as Business Loan Officer
8. serves as Real Estate Loan Originator

**RESIDENCY REQUIREMENT:**          None

**QUALIFICATIONS:**  To perform this job successfully, an employee must be able to perform each essential duty satisfactorily.  The requirements listed below are representative of the knowledge, skill, and ability required.  Reasonable accommodations may be made to enable employees with disabilities to perform the essential functions.

**EDUCATION AND EXPERIENCE:**  Bachelor's degree from four-year college or university and two years of related experience and one year of management or supervisory experience; or Associate's degree from two-year college or technical school and four years of related experience and one year of management and supervisory experience; or six years of related experience and one year of management or supervisory experience; or a combination of six years of related education and experience and one year of management or supervisory experience.

**COMMUNICATION SKILLS:** Ability to read, analyze, and interpret technical journals, financial reports, and legal documents; to write procedure manuals; to coach and motivate other WCU employees; to respond to common inquiries and complaints from members, outside contacts, and other WCU employees; to write and prepare presentations; and to effectively present information and respond to questions from groups of members, outside contacts, Corporate Officers, and other WCU employees.

**EQUIPMENT SKILLS:** Ability to operate multiline telephone system with voice mail, fax machine, calculator, and copy machine; to complete file maintenance, post transactions, work with specific department software, and create reports on computer system; and to type intermediate level documents in Microsoft Word and create intermediate level spreadsheets in Microsoft Excel.

**LICENSES REQUIRED:** Must have a valid driver's license and Credit Life/Credit Accident & Health Insurance License.

**PHYSICAL DEMANDS:** The physical demands described here are representative of those that must be met by an employee to successfully perform the essential functions of this job. Reasonable accommodations may be made to enable employees with disabilities to perform the essential functions.

| | |
|---|---|
| Bending | -will spend under 1/3 amount of time on the job |
| Lifting | -will spend under 1/3 amount of time on the job, may lift up to 50 pounds |
| Reaching | -will spend under 1/3 amount of time on the job |
| Sitting | -will spend over 2/3 amount of time on the job |
| Standing | -will spend under 1/3 amount of time on the job |
| Walking | -will spend under 1/3 amount of time on the job |

**WORK ENVIRONMENT:** Work is performed largely in a pleasant office environment with minimal chance for personal injury and moderate noise level. There may be occasions when the work environment is stressful. Work hours will normally be from Monday through Saturday and may change depending upon our need. Occasional travel may be required. Reasonable accommodations may be made to enable employees with disabilities to perform the essential functions.

# Wisconsin Circuit Court Access (WCCA)
## Discover Bank vs. Tammy L Robinette

### St Croix County Case Number 2009CV000542

What Is RSS? **RSS**

| Filing Date | Case Type | Case Status |
|---|---|---|
| 04-23-2009 | Civil | Closed |
| **Class Code Description** | **Responsible Official** | |
| Money Judgment | Cameron, Howard W | |
| **Branch Id** | | |
| 4 | | |

## Parties

| Party Type | Party Name | Party Status |
|---|---|---|
| Plaintiff | Discover Bank | |
| Defendant | Robinette, Tammy L | |

## Civil Judgment(s)

| Type | Debtor Name | Multiple Debtors | Amount | Satisfaction | Judgment Status | Satis. Date |
|---|---|---|---|---|---|---|
| Judgment for money | Robinette, Tammy L | No | $ 6,745.60 | No | | |

## Party Details

**Discover Bank - Plaintiff**

| Date of Birth | Sex | Race[1] |
|---|---|---|

**Address** | | **Address Updated On**
6500 New Albany Road PO Box 3025, New Albany, OH 43054 | | 04-24-2009

**Party Attorney(s)**
**Attorney Name  GAL  Entered**
Walker, Jillian N  No   04-24-2009

**Robinette, Tammy L - Defendant**

| Date of Birth | Sex | Race[1] |
|---|---|---|

**Address** | | **Address Updated On**
1490 128th St, New Richmond, WI 54017 | | 04-24-2009

## Civil Judgment(s)

What Is RSS? **RSS**

**Judgment for money**

| County | Case Number | Case Caption |
|---|---|---|
| St Croix | 2009CV000542 | Discover Bank vs. Tammy L Robinette |

Page 1 of 2

*Robinette*
DEPOSITION
EXHIBIT
4
5/21/10

Generated on 05-20-2010 at 10:32 am

Case Details for 2009CV000542 in St Croix County

| Judgment/Lien Date | Total Amount | Warrant Number | | |
|---|---|---|---|---|
| 06-05-2009 | $ 6,745.60 | | | |
| **Date and Time Docketed** | **Service/Event Date** | | | |
| 06-08-2009 at 10:14 am | | | | |
| **Satisfaction** | **Judgment Status** | | Date | Type Of Tax |
| No | | | | |
| **Property/Remarks** | | | | |

**Judgment Parties**

| Party Type | Name | Dismissed | Status | Address | Attorney Name |
|---|---|---|---|---|---|
| Creditor | Discover Bank | No | Active | 6500 New Albany Road PO Box 3025,  New Albany, OH  43054 | Walker, Jillian N |
| Debtor | Robinette, Tammy L | No | Active | 1490 128th St,  New Richmond,  WI  54017 | |

**Costs / Amounts**

| Description | Amount |
|---|---|
| Costs and Disbursements | $ 586.00 |
| Docketing fee | $ 5.00 |
| Judgment amount | $ 6,154.60 |

1 The designation listed in the Race field is subjective. It is provided to the court by the agency that filed the case.

2 Non-Court activities do not require personal court appearances. For questions regarding which court type activities require court appearances, please contact the Clerk of Circuit Court in the county where the case originated.

Generated on 05-20-2010 at 10:32 am

# Wisconsin Circuit Court Access (WCCA)
## Citibank (South Dakota) NA vs. Jerald P Robinette

### St Croix County Case Number 2009CV000642

What is RSS?

**Filing Date**
05-11-2009

**Class Code Description**
Money Judgment

**Branch Id**
1

**Case Type**
Civil

**Responsible Official**
Lundell, Eric J.

**Case Status**
Closed

---

## Parties

| Party Type | Party Name | Party Status |
|---|---|---|
| Plaintiff | Citibank (South Dakota) NA | |
| Defendant | Robinette, Jerald P | |

---

## Party Details

### Citibank (South Dakota) NA - Plaintiff

**Date of Birth** | **Sex** | **Race[1]**

**Address**
701 E 60th St North, Sioux Falls, SD 57117

**Address Updated On**
05-12-2009

**Party Attorney(s)**
**Attorney Name GAL Entered**
Rausch, Julie A   No   05-11-2009

### Robinette, Jerald P - Defendant

**Date of Birth** | **Sex** | **Race[1]**

**Address**
1490 128th St, New Richmond, WI 54017-6161

**Address Updated On**
05-12-2009

---

1 The designation listed in the Race field is subjective. It is provided to the court by the agency that filed the case.

2 Non-Court activities do not require personal court appearances. For questions regarding which court type activities require court appearances, please contact the Clerk of Circuit Court in the county where the case originated.



Generated on 05-20-2010 at 10:32 am

# Wisconsin Circuit Court Access (WCCA)
## Citibank (South Dakota) N A vs. Tammy Robinette

### St Croix County Case Number 2009CV000684

What Is RSS? RSS

| Filing Date | Case Type | Case Status |
|---|---|---|
| 05-21-2009 | Civil | Closed |
| **Class Code Description** | **Responsible Official** | |
| Money Judgment | Lundell, Eric J. | |
| **Branch Id** | | |
| 1 | | |

## Parties

| Party Type | Party Name | Party Status |
|---|---|---|
| Plaintiff | Citibank (South Dakota) N A | |
| Defendant | Robinette, Tammy | |

## Party Details

### Citibank (South Dakota) N A - Plaintiff

| Date of Birth | Sex | Race[1] |
|---|---|---|

**Address**
701 E 60th Street North, Sioux Falls, SD 57117

**Address Updated On**
05-21-2009

**Party Attorney(s)**

| Attorney Name | GAL | Entered |
|---|---|---|
| Rausch, Julie A | No | 05-21-2009 |

### Robinette, Tammy - Defendant

| Date of Birth | Sex | Race[1] |
|---|---|---|

**Address**
1490 128th Street, New Richmond, WI 54017-6161

**Address Updated On**
05-21-2009

---

1 The designation listed in the Race field is subjective. It is provided to the court by the agency that filed the case.

2 Non-Court activities do not require personal court appearances. For questions regarding which court type activities require court appearances, please contact the Clerk of Circuit Court in the county where the case originated.



Generated on 05-20-2010 at 10:33 am

STATE OF WISCONSIN       CIRCUIT COURT       ST CROIX COUNTY
Branch ___

---

TAMMY L. ROBINETTE
1490 128th Street
New Richmond, WI 54017,       Case No.: 09 CV 1090

FILED

AUG 20 2009

        Plaintiff       Case Code: 30301 – Money Judgment

CLERK OF COURT
ST. CROIX COUNTY

vs.

WESTCONSIN CREDIT UNION
c/o Gregory A. Lentz, President/CEO
3333 Schneider Avenue SE
Menomonie, WI 54751,

        Defendant.

---

## COMPLAINT

NOW COMES THE PLAINTIFF, Tammy L. Robinette, by and through her attorney, Carol S. Dittmar, Carol Dittmar Law Office, LLC, and as and for a complaint against WESTconsin Credit Union states as follows:

1.      Plaintiff, Tammy L. Robinette, is an adult resident of St Croix County, Wisconsin, with an address of 1490 128th Street, New Richmond, WI 54017.

2.      Defendant, WESTconsin Credit Union ("WESTconsin"), is a Federally-insured Wisconsin credit union, with a physical address of 3333 Schneider Avenue SE, Menomonie, WI 54751. Its president/CEO is Gregory A. Lentz.

3.      Plaintiff was employed by WESTconsin Credit Union from August 18, 2004, until June 16, 2009.

4.      On June 15, 2009, Plaintiff was questioned by her supervisor about judgments which had been posted in the local newspaper publication listing her husband as the debtor.

5.      In response, Plaintiff advised her supervisor that due to their financial circumstances, Plaintiff and her husband had retained a bankruptcy attorney and they were going to file a bankruptcy petition.

Robinette
DEPOSITION
EXHIBIT
7
5/27/10

6.      Plaintiff, together with her husband, was individually responsible on loans to WESTconsin, among other liabilities, which would be included in the bankruptcy petition.

7.      Later in the day on June 15, 2009, Plaintiff was approached by the same supervisor and told that he could not tell her what debts she could or could not discharge in the bankruptcy.

8.      The next day, June 16, 2009, the same supervisor told Plaintiff that she was terminated because she was "filing for bankruptcy" and that "did not make WESTconsin look good."

9.      Plaintiff had been an exemplary employee and there was no other reason for her termination.

10.     A bankruptcy petition was filed on behalf of the Plaintiff and her husband on June 25, 2009.

11.     Plaintiff disclosed this cause of action in her bankruptcy filings, and the trustee in charge of Plaintiff's bankruptcy filings has indicated that Plaintiff may pursue this claim in her own, individual interest.

### CLAIM ONE – WRONGFUL TERMINATION

12.     Reallege Paragraphs 1-11 as if fully set forth herein.

13.     Although Plaintiff was an employee-at-will, Defendant's actions in terminating the Plaintiff constitute a wrongful discharge under the public policy exception recognized under Wisconsin law. The termination was unlawful because it violated the fundamental and well-defined public policy which allows citizens of this country to file bankruptcy petitions without, *inter alia*, retaliation by an employer, let alone an employer which happens to be a creditor.

14.     Plaintiff has been damaged as a result of Defendant's actions.

### CLAIM TWO – SECTION 525 DISCRIMINATION

15.     Reallege Paragraphs 1-11 and 13 as if fully set forth herein.

2

16.     Pursuant to Section 525 of the Bankruptcy Code, no private employer may discriminate against an employee because the employee has filed a bankruptcy petition or is insolvent before the filing of a petition.

17.     The only reason Plaintiff's employment was terminated was her disclosure that she and her husband were filing a bankruptcy petition and her insolvency.

18.     Plaintiff has been damaged as a result of Defendant's actions.

19.     Similar to Title VII discrimination claims, this court has concurrent jurisdiction over this federal statutory discrimination claim. See *Yellow Freight Sys., Inc. v. Donnelly*, 494 U.S. 820, 821, 110 S.Ct. 1566, 108 L.Ed.2d 834 (1990) (state and federal courts have concurrent jurisdiction over Title VII claims).

20.     This claim is in addition to Plaintiff's state law wrongful termination claim.

### CLAIM THREE – PUNITIVE DAMAGES

21.     Reallege Paragraphs 1-14, and 16-18 as if fully set forth herein.

22.     In terminating the employment of the Plaintiff, the Defendant acted in intentional or reckless disregard of the rights of the Plaintiff.

NOW THEREFORE, Plaintiff requests that judgment be entered against the Defendant and in her favor in an amount to be determined equal to her damages together with an amount for punitive damages and costs and attorneys fees as allowed by law.

Dated this 18th day of August, 2009.

Carol S. Dittmar
State Bar No. 1017344
Attorney for Plaintiff

Carol Dittmar Law Office, LLC
24 West Cedar Street
Chippewa Falls, WI 54729
Telephone: 715.720.1889
Facsimile: 866.431.3721

3

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

**TAMMY L. ROBINETTE,**

        Plaintiff,

vs.

**WESTCONSIN CREDIT UNION,**

        Defendant.

Case No.: 3:09-cv-00600-slc

---

### PLAINTIFF'S RESPONSES TO DEFENDANT'S FIRST SET OF INTERROGATORIES AND REQUESTS TO PRODUCE DOCUMENTS

---

### ANSWERS TO INTERROGATORIES

Plaintiff, Tammy L. Robinette, by and through her attorney, Carol S. Dittmar, Carol Dittmar Law Office, LLC, hereby submits the following Answers to Defendant's First Set of Interrogatories dated April 1, 2010, as follows:

**Interrogatory No. 1:** Please identify each and every individual who possesses information that supports or rebuts the allegations of your complaint and your claim for damages, and for each individual include:

    a) that individual's telephone number and address; and

    b) a statement of the facts known by that individual.

**Answer to Interrogatory No. 1:**    OBJECTION, this interrogatory is overbroad. Subject to the objection, I have information about all allegations of the complaint and my damages. Schmitz and those WESTconsin employees with whom he met and consulted about my employment would also have information about the reasons for the termination of my employment.



Robinette
DEPOSITION
EXHIBIT
8
3/2/10
PENGAD 800-631-6989

**Interrogatory No. 2:**          Please identify and describe with specificity and detail any and all communications that you had with any and all trustees in any and all bankruptcy filings you have made since June 16, 2009 and that relate to or regard your employment with the Credit Union and/or the above-captioned matter. For each communication listed, include:

   a) the date of the communication;

   b) the place the communication took place;

   c) the parties to the communication;

   d) the nature of the communication (telephone call, e-mail, etc.);

   e) the subject matter of the communication; and

   f) a description of any and all documents reflecting, regarding, or relating to the communication.

   **Answer to Interrogatory No. 2:**     I have had no communication with any bankruptcy trustee.

**Interrogatory No. 3:** Please identify and describe any and all communications you had with employees of the Credit Union regarding or relating to the civil cases filed against you and/or your husband in April 2009 and May 2009 and/or the June 5, 2009 judgment against you. For each communication identified, include:

   a) the date of the communication;

   b) the place the communication took place;

   c) the parties to the communication;

   d) the nature of the communication (telephone call, e-mail, etc.);

   e) the subject matter of the communication; and

   f) a description of any and all documents reflecting, regarding, or relating to the

2

communication.

**Answer to Interrogatory No. 3:**     The only "communication" which occurred with a credit union employee was Mike Schmitz' inquiry about them to me on June 15, 2009.

**Interrogatory No. 4:** Please identify and describe any and all communications you had with employees of the Credit Union regarding or relating to any and all bankruptcy filings made by you and/or your husband since June 16, 2009. For each communication identified, include:

a) the date of the communication;

b) the place the communication took place;

c) the parties to the communication;

d) the nature of the communication (telephone call, e-mail, etc.);

e) the subject matter of the communication; and

f) a description of any and all documents reflecting, regarding, or relating to the communication.

**Answer to Interrogatory No. 4:**     In response to Mike Schmitz' inquiry about the judgments on June 15, 2009, I told him that my husband and I were in the process of filing a bankruptcy petition.  He later came back that day and told me that he could not tell me what debts could be included in the discharge or not.  The next day he told me I was being discharged because the bankruptcy petition would make the credit union look bad.

**Interrogatory No. 5:** Please identify and describe any and all communications you had with any and all Credit Union employees under your supervision regarding or relating to that employee's failure or potential failure to conduct his or her personal finances in a businesslike manner in accordance with his or her duties under the Insider Responsibility Statement.  For each communication identified, include:

3

a) the date of the communication;

b) the place the communication took place;

c) the parties to the communication;

d) the nature of the communication (telephone call, e-mail, etc.);

e) the subject matter of the communication; and

f) a description of any and all documents reflecting, regarding, or relating to the communication.

**Answer to Interrogatory No. 5:**     None.

**Interrogatory No. 6:** Please describe with specificity and detail the nature of the damages you sustained, as alleged in the Complaint, including but not limited to the precise amount of any wage loss you sustained as a direct result of the allegedly unlawful conduct of the Defendant; the precise amount of other monetary losses you sustained, such as lost insurance benefits, health care benefits, 401 (k) benefits, pension benefits or other similar types of benefits, as a direct result of the allegedly unlawful conduct of the Defendant; and the precise method or formula you used to calculate the damages you allegedly sustained.

**Answer to Interrogatory No. 6:**     I was earning $73,369.92 per year at the time I was terminated.  I was also eligible for and maintained family and dental insurance, individual life and disability insurance, and WESTconsin deposited 10% of my salary into a retirement fund. After five years of service that would have increased to 10% and also been 100% vested.  I medical savings account was also available to me and I was eligible for an annual incentive.  In calendar year 2007, my annual incentive, paid biannually, was approximately $3,800 and I was paying approximately $150 per month for my family health and dental insurance.

4

Assuming a 2% annual increase in my annual salary, a static annual incentive of $3,800, and the difference between my interim earnings and insurance costs, including the unemployment compensation I received, my wage and benefit loss through June 15, 2020, has been roughly calculated to be approximately $532,000. A present value calculation as of the trial date would bring the figure back to $482,000, approximately.

**Interrogatory No. 7:** Please describe with specificity and detail the amount(s) and source(s) of all income you have received from June 16,2009 to the present, including but not limited to the precise amount and source of any income that you received from June 16,2009 to the present and the precise amount of other monetary benefits that you received, such as insurance benefits, health care benefits, 401(k) benefits, pension benefits or other similar types of benefits from June 16, 2009 to the present.

**Answer to Interrogatory No. 7:**     I received $2,069 in unemployment compensation benefits subsequent to my termination in 2009.   I became employed by Bank Cherokee in St. Paul as a head teller on August 3, 2009, and remained in that employment until March 3, 2010. I made $16.35 per hour in that position and worked a 40 hour week.  I also paid $400 per month for my family's health insurance benefits.

On March 8, 2010, I became employed by the New Market Bank as a Senior Customer Service Representative.   I am earning $19.32 per hour and working a 40 hour week.  I am paying $700 per month for my family's health insurance benefits in this employment position.

**Interrogatory No. 8:** If your response to any request for admission was anything other than an unqualified admission:

a) state each and every fact that supports or rebuts your denial of the statement set forth in that Request for Admission;

5

b) identify each and every person with knowledge that supports or rebuts your denial of the statement set forth in that Request for Admission and separately state the facts known by such person(s); and

c) identify each and every document that supports or rebuts your denial of the statement set forth in that Request for Admission.

**Answer to Interrogatory No. 8:**     OBJECTION this interrogatory is overbroad. Subject to the objection, I would have information supporting any denial.  No documents supporting any denial are known to me at this time. Investigation continues.

**Interrogatory No. 9:** State each and every fact, not stated in your responses to the other Interrogatories, that supports or rebuts the allegations of your Complaint and your claim for damages.

**Answer to Interrogatory No. 9:**     OBJECTION, this interrogatory is overbroad. Subject to this objection, all facts known to me at this time have been disclosed.  Investigation continues.

**Interrogatory No. 10:**     Identify each and every communication, not already identified in your responses to the other Interrogatories, that supports or rebuts the allegations of your Complaint and your claim for damages.

**Answer to Interrogatory No. 10:**     OBJECTION, this interrogatory is overbroad. Subject to the objection, all communications known to me at this time have been disclosed. Investigation continues.

**Interrogatory No. 11:**     Identify each and every document, not identified in your answers to other Interrogatories, that supports or rebuts the allegations of your Complaint and your claim for damages.

**Answer to Interrogatory No. 11:**    Not applicable.

## <u>RESPONSES TO REQUESTS TO PRODUCE</u>

Plaintiff, Tammy L. Robinette, by and through her attorney, Carol S. Dittmar, Carol Dittmar Law Office, LLC, hereby submits the following Responses to Defendant's First Set of Requests to Produce Documents dated April 1, 2010, as follows:

**<u>Request to Produce No. 1:</u>**  Please produce any and all documents identified in your responses to the above Interrogatories.

**Response to Request to Produce No. 1:**    Not applicable.

**<u>Request to Produce No. 2:</u>**  Please produce any and all documents reflecting, regarding, or relating to any and all bankruptcy filings you have made from June 16, 2009 to the present.

**Response to Request to Produce No. 2:**    OBJECTION, this request is overbroad and in addition seeks privileged information.  All filings I made with the bankruptcy court and all orders issued by that court are a matter of public record.

**<u>Request to Produce No. 3:</u>**  Please produce any and all documentation of and documents reflecting, regarding, and relating to any and all communications you had with any and all bankruptcy trustees regarding your employment with the Credit Union and/or the above-captioned action.

**Response to Request to Produce No. 3:**    Not applicable.

**<u>Request to Produce No. 4:</u>**  Please produce copies and each and every statement taken from any person regarding the claims and defenses in the above-captioned action.

**Response to Request to Produce No. 4:**    Not applicable.

**<u>Request to Produce No. 5:</u>**  Please produce each and every document provided by or originated by the Credit Union or any of its agents that is in your possession, custody or control.

**Response to Request to Produce No. 5:**    OBJECTION, this request is overbroad.

**Request to Produce No. 6:**   Please produce each and every federal and state income tax return you have filed individually or jointly with another person since January 1, 2009, including any and all attachments to each tax return.

**Response to Request to Produce No. 6:**    See attached.

**Request to Produce No. 7:**   Please produce each and every statement of wages or other income you have received since June 16, 2009.

**Response to Request to Produce No. 7:**    Objection, this Request is overbroad. Subject to the objection, all wage or other income information through 12/31/2009 is included in the attached tax returns. In addition, I have attached a copy of my last 2010 pay stub from Bank Cherokee and my last paystub from my current employer, New Market Bank.

**Request to Produce No. 8:**   Please produce each and every document regarding each position of employment for which you applied since June 16, 2009, including but not limited to any resume, cover letter, job application, employment opportunity advertisements in newspapers and periodicals, offers of employment, rejection letters, other correspondence between you and prospective employers and information and documents exchanged with prospective employers electronically, such as e-mails and attachments.

**Response to Request to Produce No. 8:**    Objection, this interrogatory if overbroad. Subject to the objection I have attached the two offers of employment I received from Bank Cherokee and New Market Bank. Many of my job application attempts were done electronically on the internet.

**Request to Produce No. 9:**   Please produce any and all documents relating to or regarding each position of employment you have held since June 16, 2009, including but not limited to W-2s,

8

1099s, and documents relating to or regarding fringe benefits you were and/or are eligible to receive.

**Response to Request to Produce No. 9:**   OBJECTION, this request is overbroad and also seeks information not reasonably calculated to lead to the discovery of admissible evidence. Subject to the objection, the wage and benefit information through 12/31/2009 is included in the attached tax returns.  Also see the two letters offering me employment at the Bank Cherokee and New Market Bank.

**Request to Produce No. 10:** Please produce any and all documents not produced in response to the other Requests to Produce that support or rebut the claims in your Complaint and/or your claim for damages in the above-captioned action.

**Response to Request to Produce No. 10:**   OBJECTION, this request is overbroad. Subject to the objection, all relevant documents known to me and in my possession have been produced.  Investigation Continues.

Dated this 29th day of April, 2010.

Tammy L. Robinette

STATE OF ~~WISCONSIN~~ MN       )
                                                          ) ss.
COUNTY OF  Scott                          )

Personally came before me this 29 day of April, 2010, the above-named Tammy L. Robinette to me known to be the person who executed the foregoing instrument and acknowledged the same.

Viktor O. Tearing, Notary Public
State of ~~Wisconsin~~ MN
My commission expires 01/31/2015

**AS TO OBJECTIONS:**

Dated this *29th* day of April, 2010.

Carol S. Dittmar
State Bar No. 1017344
Attorney for Plaintiff, Tammy L. Robinette

Carol Dittmar Law Office, LLC
24 West Cedar Street
Chippewa Falls, WI 54729
Telephone: 715.720.1889
Facsimile: 866.431.3721

10

February 17th 2010

Tammy Robinette

Rosemount, MN 55068

Dear Tammy:

We are pleased to offer you the position of Head Teller Senior Customer Service
Specialist at New Market Bank, reporting to Victor Yermishkin, at a rate of $19.32
per hour. Your grade level will be grade 3.

This offer of employment is contingent upon a favorable background check.

This letter contains all terms and conditions of employment and does not create
an express or implicit contract of employment for any definite period.  New
Market Bank is an "employment at will" bank, which means you or the bank may
terminate your employment at any time and for any reason.

We are looking forward to you joining our team at New Market Bank and are
confident your employment with us will be challenging and rewarding.  Please
sign this letter and return it to us at your earliest convenience.


Sincerely,                                       Offer Accepted By:


_____          _____
HR Administrator                              Tammy Robinette

 **BankCherokee**

Job Offer Outline
        Developed exclusively for **Tammy Robinette**

| | |
|---|---|
| Title: | Lead Teller |
| Hourly Rate: | $16.35 |
| Position Details: | Full time hourly position at the Smith Avenue location.  Schedule will vary based on coverage needs.  Typical schedule will be worked out with Patty.  Supervisor is Patty Thomas.  Next review is at year-end 2008. |
| Vacation: | 2 weeks available yearly – (prorated based on start date). |
| Sick Time: | 6 days per year – prorated based on start date. |
| Start Date: | _____ |
| Additional Benefits: | We have competitive benefits.  Refer to the attached booklet.
Banking Products
Confidential Employee Assistance Program
Flexible Benefits Plan |

*Job offer extended by*      _____       _____
                             Nancy Tuomie, VP Director of HR      Date

*Job offer accepted by*      _____       _____
                             Tammy Robinette                      Date

**PERSONAL AND CHECK INFORMATION**
TAMMY ROBINETTE
~~~~~~~~~~~~~~
ROSEMOUNT, MN 55068

Soc Sec #: XXX-XX-XXXX   Employee ID: 61344
Hire Date: 03/08/10
Status: FT
Filing Status:
Federal: Married, 0
State: MN, Married, 0
Br/Dept: 103/20

Pay Period: 03/15/10 to 03/30/10
Check Date: 03/31/10      Check #: 301029

**NET PAY ALLOCATIONS**

| DESCRIPTION | CURRENT ($) | YTD ($) |
| --- | --- | --- |
| Net Pay | 0.00 | 0.00 |

**EARNINGS**

| DESCRIPTION | HOURS | RATE | CURRENT ($) | YTD HOURS | YTD ($) |
| --- | --- | --- | --- | --- | --- |
| REGULAR EARNING | 88.25 | 19.3200 | 1704.99 | 128.25 | 2477.79 |
| OVERTIME EARNIN | | | | 0.50 | 14.49 |
| GROSS | 88.25 | | 1704.99 | 128.75 | 2492.28 |

**DEDUCTIONS**

| DESCRIPTION | CURRENT ($) | YTD ($) |
| --- | --- | --- |
| NET PAY (DD AMT | 1353.20 | 2057.32 |
| TOTAL | 1353.20 | 2057.32 |

**WITHHOLDINGS**

| DESCRIPTION | CURRENT ($) | YTD ($) |
| --- | --- | --- |
| FEDERAL WH | 147.42 | 153.65 |
| OASDI | 105.71 | 154.52 |
| MEDICARE | 24.72 | 36.14 |
| STATE WH MN | 73.94 | 90.65 |
| TOTAL | 351.79 | 434.96 |

| **NET PAY** | CURRENT ($) | YTD ($) |
| --- | --- | --- |
| | 0.00 | 0.00 |

Payrolls by Paychex, Inc.
0456-F103 NEW MARKET BANK

**Earnings Statement**

**ADP®**

| CO. FILE DEPT. CLOCK VCHR NO. 560 |
| FED: 092491 001010 E 0000090020 |

*BANKCHEROKEE*
*607 S SMITH AVE*
*ST PAUL, MINNESOTA 55107*

Period Ending:   03/05/2010
Pay Date:        03/05/2010

00000000012
**TAMMY L ROBINETTE**

**ROSEMOUNT, MN 55068**

Taxable Marital Status:   Married
Exemptions/Allowances:
  Federal:    0
  MN:       0

Social Security Number: XXX-XX-0291

| Earnings | rate | hours | this period | year to date |
|----------|------|-------|-------------|--------------|
| Regular | 16.3500 | 72.58 | 1,186.68 | 6,264.99 |
| Overtime | 24.5250 | .25 | 6.13 | 34.57 |
| Vac | 16.3500 | 8.00 | 130.80 | |
| Gross Pay | | | $1,323.61 | 7,280.56 |

| Deductions | Statutory | | |
|------------|-----------|--|--|
| | Federal Income Tax | -59.20 | 416.33 |
| | Social Security Tax | -69.24 | 395.97 |
| | Medicare Tax | -16.20 | 92.61 |
| | MN State Income Tax | -42.48 | 257.05 |
| | **Other** | | |
| | Checkg | -929.76 | |
| | Dental | -34.94* | 34.94 |
| | Med Prem | -171.79* | 858.95 |
| | Net Pay | $0.00 | |

\* Excluded from federal taxable wages

Your federal taxable wages this period are
$1,116.88

© 1996, 2008, ADP, Inc. All Rights Reserved.

▲ TEAR HERE

VERIFY DOCUMENT AUTHENTICITY - COLORED BACKGROUND MUST CHANGE IN TONE GRADUALLY AND EVENLY FROM DARK AT TOP TO LIGHTER AT BOTTOM

*BANKCHEROKEE*
*607 S SMITH AVE*
*ST PAUL, MINNESOTA 55107*

Advice number:    00000090020
Pay date:         03/05/2010

Deposited to the account of
TAMMY L ROBINETTE

| account number | transit ABA | amount |
|----------------|-------------|--------|
| XXXXXX9506 | XXXX XXXX | $929.76 |

**NON-NEGOTIABLE**

THIS IS NOT A CHECK

VOID VOID VOID

| Form **1040** | Department of the Treasury - Internal Revenue Service | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | **U.S. Individual Income Tax Return** | **20 09** | (99) | IRS Use Only - Do not write or staple in this space. | | | | | |

For the year Jan. 1- Dec. 31, 2009, or other tax year beginning _____, 2009, ending _____, 20____     OMB No. 1545-0074

**Label** (See inst. on pg 14.) **Use the IRS label.** Otherwise, please print or type.

JERALD P ROBINETTE
TAMMY L ROBINETTE

NEW RICHMOND, WI 54017

Your social security number ▮▮▮▮▮▮

Spouse's social security number ▮▮▮▮▮▮

▲ You must enter your SSN(s) above. ▲

Checking a box below will not change your tax or refund.

**Presidential Election Campaign** ▶ Check here if you, or your spouse if filing jointly, want $3 to go to this fund (see page 14) ▶   ☐ You  ☐ Spouse

**Filing Status**
Check only one box.

1 ☐ Single
2 ☒ Married filing jointly (even if only one had income)
3 ☐ Married filing separately. Enter spouse's SSN above & full name here. ▶
4 ☐ Head of household (with qualifying person). (See page 15.) If the qualifying person is a child but not your dependent, enter this child's name here. ▶
5 ☐ Qualifying widow(er) with dependent child (see page 16)

**Exemptions**

6a ☒ Yourself. If someone can claim you as a dependent, do not check box 6a.
b ☒ Spouse

Boxes checked on 6a and 6b — **2**

c Dependents:

| (1) First name    Last name | (2) Dependent's social security number | (3) Dependent's relationship to you | (4) if qual. child for child tax cr. |
|---|---|---|---|
| JERALD ROBINETTE JR | ▮▮▮▮ | SON | |
| TYLER ROBINETTE | ▮▮▮▮ | SON | ☒ |
| RILEY ROBINETTE | ▮▮▮▮ | DAUGHTER | ☒ |

No. of children on 6c who: • lived with you — **3**
• did not live with you due to divorce or separation (see page 18)
Dependents on 6c not entered above

If more than four dependents, see page 17 and check here ▶ ☐

d Total number of exemptions claimed. Add numbers on lines above ▶ **5**

**Income**

Attach Form(s) W-2 here. Also attach Forms W-2G and 1099-R if tax was withheld.

If you did not get a W-2, see page 22.

Enclose, but do not attach, any payment. Also, please use Form 1040-V.

| | | | |
|---|---|---|---|
| 7 | Wages, salaries, tips, etc. Attach Form(s) W-2 | 7 | 92,167. |
| 8a | Taxable interest. Attach Schedule B if required | 8a | 50. |
| b | Tax-exempt interest. Do not include on line 8a | 8b | |
| 9a | Ordinary dividends. Attach Schedule B if required | 9a | |
| b | Qualified dividends (see page 22) | 9b | |
| 10 | Taxable refunds, credits, or offsets of state and local income taxes (see page 23) | 10 | 2,482. |
| 11 | Alimony received | 11 | |
| 12 | Business income or (loss). Attach Schedule C or C-EZ | 12 | |
| 13 | Capital gain or (loss). Attach Schedule D if required. If not required, check here ▶ ☐ | 13 | |
| 14 | Other gains or (losses). Attach Form 4797 | 14 | |
| 15a | IRA distributions   15a | b Taxable amt | 15b | |
| 16a | Pensions and annuities   16a | b Taxable amt | 16b | 26,417. |
| 17 | Rental real estate, royalties, partnerships, S corporations, trusts, etc. Attach Schedule E | 17 | |
| 18 | Farm income or (loss). Attach Schedule F | 18 | |
| 19 | Unemployment compensation in excess of $2,400 per recipient | 19 | 0. |
| 20a | Social security benefits   20a | b Taxable amt (see page 27.) | 20b | |
| 21 | Other income. List type and amount (see page 29) | 21 | |
| 22 | Add the amounts in the far right column for lines 7 through 21. This is your total income. ▶ | 22 | 121,116. |

**Adjusted Gross Income**

| | | | |
|---|---|---|---|
| 23 | Educator expenses (see page 29) | 23 | |
| 24 | Certain business expenses of reservists, performing artists, and fee-basis government officials. Attach Form 2106 or 2106-EZ | 24 | |
| 25 | Health savings account deduction. Attach Form 8889 | 25 | |
| 26 | Moving expenses. Attach Form 3903 | 26 | |
| 27 | One-half of self-employment tax. Attach Schedule SE | 27 | |
| 28 | Self-employed SEP, SIMPLE, and qualified plans | 28 | |
| 29 | Self-employed health insurance deduction (see page 30) | 29 | |
| 30 | Penalty on early withdrawal of savings | 30 | |
| 31a | Alimony paid   b Recipient's SSN ▶ | 31a | |
| 32 | IRA deduction (see page 31) | 32 | |
| 33 | Student loan interest deduction (see page 34) | 33 | |
| 34 | Tuition and fees deduction. Attach Form 8917 | 34 | |
| 35 | Domestic production activities deduction. Attach Form 8903 | 35 | |
| 36 | Add lines 23 through 31a and 32 through 35 | 36 | 121,116. |
| 37 | Subtract line 36 from line 22. This is your adjusted gross income. ▶ | 37 | 121,116. |

KBA   For Disclosure, Privacy Act, and Paperwork Reduction Act Notice, see page 97.

Form **1040** (2009)

1040 (2009)
Form Software Copyright 1998 - 2010 HRB Tax Group, Inc.     FD1040-1WV 1.25

Form 1040 (2009)   JERALD P & TAMMY L ROBINETTE                     Page 2

| | | |
|---|---|---|
| **Tax and Credits** | 38 Amount from line 37 (adjusted gross income) | 38 | 121,116. |

39a Check if: You were born before January 2, 1945, [ ] Blind. Total boxes
Spouse was born before January 2, 1945, [ ] Blind. checked ▶ 39a

b If your spouse itemizes on a separate return or you were a dual-status alien, see pg 35 & check here ▶ 39b [ ]

**Standard Deduction for -**
• People who check any box on line 39a, 39b, or 40b or who can be claimed as a dependent, see page 35.
• All others:
Single or Married filing separately, $5,700
Married filing jointly or Qualifying widow(er), $11,400
Head of household, $8,350

40a Itemized deductions (from Schedule A) or your standard deduction (see left margin) | 40a | 20,951.
b If you are increasing your standard deduction by certain real estate taxes, new motor vehicle taxes, or a net disaster loss, attach Schedule L and check here (see page 35) ▶ 40b [ ]
41 Subtract line 40a from line 38 | 41 | 100,165.
42 Exemptions. If line 38 is $125,100 or less and you did not provide housing to a Midwestern displaced individual, multiply $3,650 by the number on line 6d. Otherwise, see page 37. | 42 | 18,250.
43 Taxable income. Subtract line 42 from line 41. If line 42 is more than line 41, enter -0- | 43 | 81,915.
44 Tax (see page 37). Check if any tax is from: a [ ] Form(s) 8814 b [ ] Form 4972 | 44 | 12,856.
45 Alternative minimum tax (see page 40). Attach Form 6251 | 45 |
46 Add lines 44 and 45. | 46 | 12,856.
47 Foreign tax credit. Attach Form 1116 if required | 47 |
48 Credit for child and dependent care expenses. Attach Form 2441 | 48 |
49 Education credits from Form 8863, line 29 | 49 | 1,500.
50 Retirement savings contributions credit. Attach Form 8880 | 50 |
51 Child tax credit (see page 42) | 51 | 1,400.
52 Credits from Form: a [ ] 8396 b [ ] 8839 c [ ] 5695 | 52 |
53 Other credits from Form: a [ ] 3800 b [ ] 8801 c [ ] | 53 |
54 Add lines 47 through 53. These are your total credits | 54 | 2,900.
55 Subtract line 54 from line 46. If line 54 is more than line 46, enter -0- | 55 | 9,956.

**Other Taxes**
56 Self-employment tax. Attach Schedule SE | 56 |
57 Unreported social security and Medicare tax from Form: a [ ] 4137 b [ ] 8919 | 57 |
58 Additional tax on IRAs, other qualified retirement plans, etc. Attach Form 5329 if required   NO | 58 | 2,642.
59 Additional taxes: a [ ] AEIC payments b [ ] Household employment taxes. Attach Schedule H | 59 |
60 Add lines 55 through 59. This is your total tax | 60 | 12,598.

**Payments**
61 Federal income tax withheld from Forms W-2 and 1099 | 61 | 13,311.
62 2009 estimated tax payments and amount applied from 2008 return | 62 |
63 Making work pay and government retiree credits. Attach Sch M | 63 | 800.
64a Earned income credit (EIC)   NO | 64a |
b Nontaxable combat pay election | 64b |
65 Additional child tax credit. Attach Form 8812 | 65 |
66 Refundable education credit from Form 8863, line 16 | 66 | 1,000.
67 First-time homebuyer credit. Attach Form 5405 | 67 |
68 Amount paid with request for extension to file (see page 72) | 68 |
69 Excess social security and tier 1 RRTA tax withheld (see page 72) | 69 |
70 Credits from Form: a [ ] 2439 b [ ] 4136 c [ ] 8801 d [ ] 8885 | 70 |
71 Add lines 61, 62, 63, 64a, and 65 through 70. These are your total payments. | 71 | 15,111.

**If you have a qualifying child, attach Schedule EIC.**

**Refund**
Direct deposit?
See page 73 and fill in 73b, 73c, and 73d, or Form 8888.
72 If line 71 is more than line 60, subtract line 60 from line 71. This is the amount you overpaid | 72 | 2,513.
73a Amount of line 72 you want refunded to you. If Form 8888 is attached, check here ▶ 73a | 73a | 2,513.
b Routing number 291070001 ▶ c Type: [X] Checking [ ] Savings
d Account number 9439999506
74 Amount of line 72 you want applied to your 2010 estimated tax ▶ 74 |

**Amount You Owe**
75 Amount you owe. Subtract line 71 from line 60. For details on how to pay, see page 74. ▶ | 75 |
76 Estimated tax penalty (see page 74) | 76 |

**Third Party Designee**
Do you want to allow another person to discuss this return with the IRS (see page 75)? [ ] Yes. Complete the following. [X] No
Designee's name                  Phone no.          Personal ID number (PIN) ▶

**Sign Here**
Under penalties of perjury, I declare that I have examined this return and accompanying schedules and statements, and to the best of my knowledge and belief, they are true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.
Your signature   Date   Your occupation WELDER   Daytime phone number
Spouse's signature. If a joint return, both must sign.   Date   Spouse's occupation BANKER
Joint return? See page 15. Keep a copy for your records.

**Paid Preparer's Use Only**
Preparer's signature   Date   Check if self-employed [ ]   Preparer's SSN or PTIN
Firm's name   EIN
address, and ZIP code   Phone no.

Form 1040 (2009)
1040 (2009)   FD1040-2WV 1.25
Form Software Copyright 1996 - 2010 HRB Tax Group, Inc.



SCHEDULE A (Form 1040) — Itemized Deductions — OMB No. 1545-0074 — 2009 — Attachment Sequence No. 07

Department of the Treasury, Internal Revenue Service (99)

▶ Attach to Form 1040. ▶ See Instructions for Schedule A (Form 1040).

Name(s) shown on Form 1040: JERALD P & TAMMY L ROBINETTE

Your social security number

**Medical and Dental Expenses**
- Caution. Do not include expenses reimbursed or paid by others.
- 1 Medical and dental expenses (see page A-1)
- 2 Enter amount from Form 1040, line 38
- 3 Multiply line 2 by 7.5% (.075)
- 4 Subtract line 3 from line 1. If line 3 is more than line 1, enter -0-

**Taxes You Paid** (See page A-2.)
- 5 State and local  a [X] Income taxes, or  b [ ] General sales taxes ... 5  5,589.
- 6 Real estate taxes (see page A-5) ... 6  1,755.
- 7 New motor vehicle taxes from line 11 of the worksheet on page 2. Skip this line if you checked box 5b ... 7
- 8 Other taxes. List type and amount ▶ PERSONAL PROPERTY TAXES  120. ... 8  120.
- 9 Add lines 5 through 8 ... 9  7,464.

**Interest You Paid** (See page A-6.)
Note. Personal interest is not deductible.
- 10 Home mortgage interest and points reported to you on Form 1098 ... 10  13,352.
- 11 Home mortgage interest not reported to you on Form 1098. If paid to the person from whom you bought the home, see page A-7 and show that person's name, identifying no., and address ▶
- 12 Points not reported to you on Form 1098. See page A-7 for special rules ... 12
- 13 Qualified mortgage insurance premiums (see page A-7) ... 13
- 14 Investment interest. Attach Form 4952 if required. (See page A-8.) ... 14
- 15 Add lines 10 through 14 ... 15  13,352.

**Gifts to Charity** If you made a gift and got a benefit for it, see page A-8.
- 16 Gifts by cash or check. If you made any gift of $250 or more, see page A-8 SEE ATTACHMENT ... 16  135.
- 17 Other than by cash or check. If any gift of $250 or more, see page A-8. You must attach Form 8283 if over $500 ... 17
- 18 Carryover from prior year ... 18
- 19 Add lines 16 through 18 ... 19  135.

**Casualty and Theft Losses**
- 20 Casualty or theft loss(es). Attach Form 4684. (See page A-10.) ... 20

**Job Expenses and Certain Miscellaneous Deductions** (See page A-10.)
- 21 Unreimbursed employee expenses - job travel, union dues, job education, etc. Attach Form 2106 or 2106-EZ if required. (See page A-10.) ▶ ... 21
- 22 Tax preparation fees ... 22
- 23 Other expenses - investment, safe deposit box, etc. List type and amount ▶ ... 23
- 24 Add lines 21 through 23 ... 24
- 25 Enter amount from Form 1040, line 38 ... 25
- 26 Multiply line 25 by 2% (.02) ... 26
- 27 Subtract line 26 from line 24. If line 26 is more than line 24, enter -0- ... 27

**Other Miscellaneous Deductions**
- 28 Other - from list on page A-11. List type and amount ▶ ... 28

**Total Itemized Deductions**
- 29 Is Form 1040, line 38, over $166,800 (over $83,400 if married filing separately)?
  [X] No. Your deduction is not limited. Add the amounts in the far right column for lines 4 through 28. Also, enter this amount on Form 1040, line 40a. ▶ ... 29  20,951.
  [ ] Yes. Your deduction may be limited. See page A-11 for the amount to enter.
- 30 If you elect to itemize deductions even though they are less than your standard deduction, check here ▶ [ ]

KBA  For Paperwork Reduction Act Notice, see Form 1040 Instructions.
1040-Sch A (2009)  FDA-1WV 1.9
Form Software Copyright 1996 - 2010 HRB Tax Group, Inc.
Schedule A (Form 1040) 2009

Form **8863**

**Education Credits (American Opportunity, Hope and Lifetime Learning Credits)**

► See separate Instructions to find out if you are eligible to take the credits.
► Attach to Form 1040 or Form 1040A.

OMB No. 1545-0074

**2009**

Department of the Treasury
Internal Revenue Service (99)

Attachment
Sequence No. **50**

Name(s) shown on return
JERALD P & TAMMY L ROBINETTE

Your social security number

**Caution:** You cannot take both an education credit and the tuition and fees deduction (see Form 8917) for the same student for the same year.

**Part I** **American Opportunity Credit**

Use Part II if you are claiming the Hope credit for a student attending school in a Midwestern disaster area. If you use Part II, you cannot use Part I for any student.

**Caution:** You cannot take the American opportunity credit for more than 4 tax years for the same student.

| 1 | (a) Student's name (as shown on page 1 of your tax return) First name Last name | (b) Student's social security number (as shown on page 1 of your tax return) | (c) Qualified expenses (see instructions). Do not enter more than $4,000 for each student. | (d) Subtract $2,000 from the amount in column (c). If zero or less, enter -0-. | (e) Multiply the amount in column (d) by 25% (.25) | (f) If column (d) is zero, enter the amount from column (c). Otherwise, add $2,000 to the amount in column (e). |
|---|---|---|---|---|---|---|
| | JERALD | | | | | |
| | ROBINETTE | | 4,000. | 2,000. | 500. | 2,500. |
| | | | | | | |
| | | | | | | |
| | | | | | | |

| 2 | Tentative American opportunity credit. Add the amounts on line 1, column (f). Skip Part II if line 2 is more than zero. If you are taking the lifetime learning credit for a different student, go to Part III; otherwise, go to Part IV | | 2 | 2,500. |
|---|---|---|---|---|

**Part II** **Hope Credit**

Use this part if you are claiming the Hope credit for a student attending school in a Midwestern disaster area and elect to waive the computation method in Part I for all students.

**Caution:** You cannot take the Hope credit for more than 2 tax years for the same student.

| 3 | (a) Student's name (as shown on page 1 of your tax return) First name Last name | (b) Student's social security number (as shown on page 1 of your tax return) | (c) Qualified expenses (see instructions). Do not enter more than $2,400* for each student. | (d) Enter the smaller of the amount in column (c) or $1,200** | (e) Add column (c) and column (d) | (f) Enter one-half of the amount in column (e) |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |

\* For each student who attended an eligible educational institution in a Midwestern disaster area, **do not** enter more than $4,800.
\*\* For each student who attended an eligible educational institution in a Midwestern disaster area, enter the smaller of the amount in column (c) or $2,400.

| 4 | Tentative Hope credit. Add the amounts on line 3, column (f). If you are taking the lifetime learning credit for a different student, go to Part III; otherwise, go to Part V | | ► | 4 | |
|---|---|---|---|---|---|

**Part III** **Lifetime Learning Credit. Caution:** You cannot take the American opportunity credit or the Hope credit and the lifetime learning credit for the same student in the same year.

| 5 | (a) Student's name (as shown on page 1 of your tax return) First name                Last name | (b) Student's social security number (as shown on page 1 of your tax return) | (c) Qualified expenses (see instructions) |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

| 6 | Add the amounts on line 5, column (c), and enter the total . . . . . . . . . . . . . . . . | 6 | |
|---|---|---|---|
| 7a | Enter the smaller of line 6 or $10,000 . . . . . . . . . . . . . . . . . . . | 7a | |
| b | For students who attended an eligible educational institution in a Midwestern disaster area, enter the smaller of $10,000 or their qualified expenses included on line 6 (see special rules on page 3 of the instructions) . . . . | 7b | |
| c | Subtract line 7b from line 7a . . . . . . . . . . . . . . . . . . . . | 7c | |
| 8a | Multiply line 7b by 40% (.40) . . . . . . . . . . . . . . . . . . . . | 8a | |
| b | Multiply line 7c by 20% (.20) . . . . . . . . . . . . . . . . . . . . | 8b | |
| c | Tentative lifetime learning credit. Add lines 8a and 8b. If you have an entry on line 2, go to Part IV; otherwise, go to Part V. | 8c | |

KBA   For Paperwork Reduction Act Notice, see page 5 of separate instructions.

Form **8863** (2009)

8863 (2009)       FD8863-1WV 1.0
Form Software Copyright 1996 - 2010 HRB Tax Group, Inc.

Form 8863 (2009) JERALD P & TAMMY L ROBINETTE      ▮▮▮▮▮▮▮    Page 2

**Part IV   Refundable American Opportunity Credit**

| | | | |
|---|---|---|---|
| 9 | Enter the amount from line 2 . . . . . . . . . . . . . . . . . | **9** | **2,500.** |
| 10 | Enter: $160,000 if married filing jointly; $90,000 if single, head of | | |
| | household, or qualifying widow(er) | **10**   180,000. | |
| 11 | Enter the amount from Form 1040, line 38,* or Form 1040A, line 22 | **11**   121,116. | |
| 12 | Subtract line 11 from line 10. If zero or less, stop; you cannot take any | | |
| | education credit | **12**   58,884. | |
| 13 | Enter: $20,000 if married filing jointly; $10,000 if single, head of household, | | |
| | or qualifying widow(er) | **13**   20,000. | |
| 14 | If line 12 is: | | |
| | • Equal to or more than line 13, enter 1.000 on line 14 . . . . | **14** | **1.000** |
| | • Less than line 13, divide line 12 by line 13. Enter the result as a decimal (rounded to | | |
| | at least three places) | | |
| 15 | Multiply line 9 by line 14. Caution: If you were under age 24 at the end of the year and meet | | |
| | the conditions on page 5 of the instructions, you cannot take the refundable American opportunity | | |
| | credit. Skip line 16, enter the amount from line 15 on line 17, and check this box ▶ ☐ | **15** | **2,500.** |
| 16 | **Refundable American opportunity credit.** Multiply line 15 by 40% (.40). Enter the amount | | |
| | here and on Form 1040, line 66, or Form 1040A, line 43. Then go to line 17 below | **16** | **1,000.** |

**Part V   Nonrefundable Education Credits**

| | | | |
|---|---|---|---|
| 17 | Subtract line 16 from line 15 . . . . . . . . . . . . . . | **17** | **1,500.** |
| 18 | Add line 4 and line 8c. If you have no entry on these lines, skip lines 19 through 24, and | | |
| | enter the amount from line 17 on line 25. | **18** | |
| 19 | Enter: $120,000 if married filing jointly; $60,000 if single, head of household, or | | |
| | qualifying widow(er) . . . . . . . . . . . . . . . | **19** | |
| 20 | Enter the amount from Form 1040, line 38,* or Form 1040A, line 22 . . | **20** | |
| 21 | Subtract line 20 from line 19. If zero or less, skip lines 22 and 23, and enter | | |
| | zero on line 24. . . . . . . . . . . . . . . . . | **21** | |
| 22 | Enter: $20,000 if married filing jointly; $10,000 if single, head of household, | | |
| | or qualifying widow(er) . . . . . . . . . . . . . . | **22** | |
| 23 | If line 21 is: | | |
| | • Equal to or more than line 22, enter the amount from line 18 on line 24 and go to line 25. | | |
| | • Less than line 22, divide line 21 by line 22. Enter the result as a decimal (rounded to | **23** | |
| | at least three places) | | |
| 24 | Multiply line 18 by line 23 . . . . . . . . . . . . . ▶ | **24** | |
| 25 | Add line 17 and line 24. If zero, stop; you cannot take any nonrefundable education credit | **25** | **1,500.** |
| 26 | Enter the amount from Form 1040, line 46, or Form 1040A, line 28 . . . . | **26** | **12,856.** |
| 27 | Enter the total, if any, of your credits from: | | |
| | • Form 1040, lines 47, 48, and the amount from Schedule R entered on | | |
| | line 53 . . . . . . . . . . . . . . . . . . . | **27** | |
| | • Form 1040A, lines 29 and 30. . . . . . . . . . . . . | | |
| 28 | Subtract line 27 from line 26. If zero or less, stop; you cannot take any nonrefundable | | |
| | education credit . . . . . . . . . . . . . . . . . | **28** | **12,856.** |
| 29 | **Nonrefundable education credits.** Enter the smaller of line 25 or line 28 here and on Form 1040, | | |
| | line 49, or Form 1040A, line 31 . . . . . . . . . . . . . | **29** | **1,500.** |

* If you are filing Form 2555, 2555-EZ, or 4563, or you are excluding income from Puerto Rico, see Pub. 970 for the amount to enter.

Form 8863 (2009)

Form Software Copyright 1996 - 2010 HRB Tax Group, Inc.
FD8863-2WV 1.0

**SCHEDULE M**
(Form 1040A or 1040)

Department of the Treasury
Internal Revenue Service (99)

**Making Work Pay and Government Retiree Credits**

▶ Attach to Form 1040A, 1040, or 1040NR.        ▶ See separate instructions.

OMB No. 1545-0074

**2009**

Attachment
Sequence No. **166**

Name(s) shown on return

JERALD P & TAMMY L ROBINETTE

Your social security number

**1a   Important:** See the instructions if you can be claimed as someone else's dependent or are filing Form 1040NR. Check the "No" box below and see the instructions if   (a) you have a net loss from a business,   (b) you received a taxable scholarship or fellowship grant not reported on a Form W-2,   (c) your wages include pay for work performed while an inmate in a penal institution,   (d) you received a pension or annuity from a nonqualified deferred compensation plan or a nongovernmental section 457 plan, or   (e) you are filing Form 2555 or 2555-EZ.

Do you (and your spouse if filing jointly) have 2009 wages of more than $6,451 ($12,903 if married filing jointly)?

☒ **Yes.** Skip lines 1a through 3. Enter $400 ($800 if married filing jointly) on line 4 and go to line 5.

☐ **No.** Enter your earned income (see instructions) . . . . . . . . . . . . . . | 1a |

**b** Nontaxable combat pay included on
line 1a (see instructions) . . . . . . . . . | 1b |

**2** Multiply line 1a by 6.2% (.062) . . . . . . . . . . . . . . . . . . . | 2 |

**3** Enter $400 ($800 if married filing jointly) . . . . . . . . . . . . . | 3 |

**4** Enter the smaller of line 2 or line 3 (unless you checked "Yes" on line 1a) . . . . . . | 4 | 800

**5** Enter the amount from Form 1040, line 38*, or Form 1040A, line 22 . . . . | 5 | 121,116

**6** Enter $75,000 ($150,000 if married filing jointly) . . . . . . . . . . . | 6 | 150,000

**7** Is the amount on line 5 more than the amount on line 6?
☒ **No.**   Skip line 8. Enter the amount from line 4 on line 9 below.
☐ **Yes.**  Subtract line 6 from line 5. . . . . . . . . . . . . . | 7 |

**8** Multiply line 7 by 2% (.02) . . . . . . . . . . . . . . . . . . . | 8 |

**9** Subtract line 8 from line 4. If zero or less, enter -0- . . . . . . . . . . . | 9 | 800

**10** Did you (or your spouse, if filing jointly) receive an economic recovery payment in 2009? You may have received this payment if you received social security benefits, supplemental security income, railroad retirement benefits, or veterans disability compensation or pension benefits (see instructions).
☒ **No.**   Enter -0- on line 10 and go to line 11.
☐ **Yes.**  Enter the total of the payments received by you (and your spouse, if filing jointly). Do not enter more than $250 ($500 if married filing jointly)   } . . . . . . . . | 10 | 0

**11** Did you (or your spouse, if filing jointly) receive a pension or annuity in 2009 for services performed as an employee of the U.S. Government or any U.S. state or local government from work,  not covered by social security? Do not include any pension or annuity reported on Form W-2.
☒ **No.**   Enter -0- on line 11 and go to line 12.
☐ **Yes.** ● If you checked "No" on line 10, enter $250 ($500 if married filing jointly) and the answer on line 11 is "Yes" for both spouses)
          ● If you checked "Yes" on line 10, enter -0- (exception: enter $250 if filing jointly and the spouse who received the pension or annuity did not receive an economic recovery payment described on line 10)   } . . . . . . | 11 | 0

**12** Add lines 10 and 11. . . . . . . . . . . . . . . . . . . . . | 12 |

**13** Subtract line 12 from line 9. If zero or less, enter -0- . . . . . . . . . . | 13 | 800

**14** Making work pay and government retiree credits. Add lines 11 and 13. Enter the result here and on Form 1040, line 63; Form 1040A, line 40; or Form 1040NR, line 60 . . . . . . . | 14 | 800

*If you are filing Form 2555, 2555-EZ, or 4563 or you are excluding income from Puerto Rico, see instructions.

KBA   For Paperwork Reduction Act Notice, see Form 1040A, 1040, or 1040NR instructions.          Schedule M (Form 1040A or 1040) 2009

**Supporting Schedules**   **2009**

Name: JERALD P & TAMMY L ROBINETTE                    SSN: ███████

Schedule A
Line 16 - Gifts by Cash or Check
Description                                              Amount

| Description | Amount |
|---|---|
| UNITED WAY | 20 |
| GIRL SCOUTS | 50 |
| CMN | 40 |
| CANCER SOCIETY | 25 |
| Total | 135 |

 **H&R BLOCK®**

## 2009 STATE TAX RETURN FILING INSTRUCTIONS

WISCONSIN

**FOR THE YEAR ENDING**
December 31, 2009

| | |
|---|---|
| **Prepared for** | JERALD P ROBINETTE and TAMMY L ROBINETTE |

| **Tax Summary** | | |
|---|---|---|
| Gross Income ............................. | $ | 123,185 |
| Adjusted Gross Income..................... | $ | 120,703 |
| Total Deductions ......................... | $ | 0 |
| Total Taxable Income ..................... | $ | 117,203 |
| Total Tax ................................ | $ | 6,815 |
| Total Payments ........................... | $ | 5,589 |
| Refund Amount ............................ | $ | 0 |
| Amount You Owe ........................... | $ | 1,226 |

| | |
|---|---|
| **Make check payable to** | Wisconsin Department of Revenue |

| | |
|---|---|
| **Mailing Address** | Wisconsin Department of Revenue<br>PO Box 268<br>Madison, WI  53790-0001 |

**Special Instructions**

SIGN AND DATE YOUR RETURN
Please sign and date Form WI 1.  When filing a joint return,
both you and your spouse need to sign the form.

ASSEMBLE WHAT YOU NEED TO MAIL
Attach any schedules and forms behind Form WI 1.  If there
are supporting statements, arrange them in the same order as
the schedules and forms they support and attach them last.
Attach a copy of each W-2, W-2G, 1099R and 1099G for which WI
tax has been withheld.

PAY BALANCE DUE ON YOUR TAXES
Complete your check or money order for $1226.  Do not send
cash and do not forget to sign the check.  Enclose WI EPV
with your check.  Write your Social Security number(s),
daytime phone number, 2009, and Form WI 1
on your check or money order (U.S. funds only).

MAIL FORM WI 1 & OTHER DOCUMENTS TO:
Mailing Address listed above.
To retain the proof of mailing, we recommend using certified
mail to send your form(s). When mailing to an address without
a P.O. box, you may also use:
Airborne Express, DHL Worldwide Express, FedEx, or UPS.

KEEP A COPY
Click on Main Menu and then E-File or Print to print your
return. Attach your copy of each W-2, W-2G, 1099R or 1099G
with withholding. Keep with your records for three years.

For more information about tax, mortgage and financial services call  1-800-HRBLOCK  or visit **hrblock.com**

## 1 Wisconsin income tax

**2009**

For the year Jan. 1 – Dec. 31, 2009,
or other tax year
beginning _____, 2009
ending _____, 20___.

Complete
form using
BLACK INK

D O   N O T   S T A P L E

Your social security number █████  Spouse's social security no. █████

| | | M.I. |
|---|---|---|
| Your legal last name | Legal first name | P |
| ROBINETTE | JERALD | |
| If a joint return, spouse's legal last name | Spouse's legal first name | M.I. |
| ROBINETTE | TAMMY | L |

Home address (number and street). If you have a PO Box, see page 8.   Apt. No.

| City or post office | State | Zip code |
|---|---|---|
| NEW RICHMOND | WI | 54017 |

**State election campaign fund**
If you want $1 to go to the State Election
Campaign Fund, check here.
___ You ___ Your spouse
Designating an amount will not change
your tax or refund.

**Tax district**
Check below then fill in either the name of city,
village, or town and the county in which you
lived at the end of 2009.

___ City ___ Village  X Town

City, village,
or town ▶ RICHMOND
County of ▶ ST CROIX

School district number See page 37
**3962**

**Filing status**  Check ✓ below

___ Single

X  Married filing joint return

___  Married filing separate return.
Fill in spouse's SSN above and
full name here. ▶

| | Legal last name | |
|---|---|---|
| | Legal first name | M.I. |

___  Head of household (see page 8).
Also, check here if married. ▶

If married, fill in spouse's
SSN above and full name here

Special
conditions

SEE PAGE 34 BEFORE ASSEMBLING RETURN

PAPER CLIP PYMT HERE

| | | | | NO COMMAS; NO CENTS |
|---|---|---|---|---|
| 1 | Federal adjusted gross income (see page 9) | | 1 | 123185.00 |
| | Form W-2 wages included in line 1 ▶ 92167.00 | | | |
| 2 | State and municipal interest (see page 9) | | 2 | .00 |
| 3 | Capital gain/loss addition (see page 10) | | 3 | .00 |
| 4 | Other additions { Fill in code number and amount, see page 10. | .00 | | |
| | Fill in total other additions on line 4. | | 4 | .00 |
| | .00     .00     .00 | | | |
| 5 | Add the amounts in the right column for lines 1 through 4 | | 5 | 123185.00 |
| 6 | State tax refund (Form 1040, line 10) | 6 | | 2482.00 |
| 7 | United States government interest | 7 | | .00 |
| 8 | Unemployment compensation (see page 12) | 8 | | .00 |
| 9 | Social security adjustment (see page 12) | 9 | | .00 |
| 10 | Capital gain/loss subtraction (see page 12) | 10 | | .00 |
| 11 | Other subtractions { Fill in code number and amount, see page 13. | | | |
| | Fill in total other subtractions on line 11. | | | |
| | .00     .00     .00 | | | |
| | .00     .00     11 | | | .00 |
| 12 | Add lines 6 through 11 | | 12 | 2482.00 |
| 13 | Subtract line 12 from line 5. This is your Wisconsin income | | 13 | 120703.00 |

I-010I

Form 1 (2009)  Name  **JERALD P & TAMMY L ROBINETTE**   SSN ▉▉▉▉▉▉▉   Page 2 of 4

| | | | NO COMMAS IN CENTS |
|---|---|---|---|
| 14 | Wisconsin income from line 13 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 14 | 120703.00 |
| 15 | Standard deduction. See table on page 45, OR ▼ . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 15 | .00 |
| | If someone else can claim you (or your spouse) as a dependent, see page 21 and check here . . . . . . . . . . . . . . . . . ▶ ☐ | | |
| 16 | Subtract line 15 from line 14. If line 15 is larger than line 14, fill in 0 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 16 | 120703.00 |
| 17 | Exemptions (Caution: see page 22) | | |
| | a  Fill in exemptions from your federal return     5   x $700 . . . . . . . . . . . . . . . . . . . 17a     3500.00 | | |
| | b  Check if 65 or older,__You +,__Spouse=__  x $250 . . . . . . . . . . . . . . . . 17b     .00 | | |
| | c  Add lines 17a and 17b . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17c | | 3500.00 |
| 18 | Subtract line 17c from line 16. If line 17c is larger than line 16, fill in 0. This is your taxable income . . . . . . . . | 18 | 117203.00 |
| 19 | Tax (see table on page 38) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 19 | 7312.00 |
| 20 | Itemized deduction credit. Enclose Schedule 1, page 4 . . . . . . . . . . . . . . . . 20     674.00 | | |
| 21 | Armed forces member credit (must be stationed outside U.S. See page 22) . . . . . . . . . . . 21     .00 | | |
| 22 | School property tax credit | | |
| | a  Rent paid in 2009 - heat included _____.00   Find credit from   22a     .00 | | |
| |     Rent paid in 2009 - heat not included _____.00   table page 24 | | |
| | b  Property taxes paid on home in 2009   1786.00   Find credit from   22b     215.00 | | |
| |     table page 25 | | |
| 23 | Historic rehabilitation credits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23     .00 | | |
| 24 | Working families tax credit { If line 14 is less than $10,000   24     .00 | | |
| |     ($19,000 if married filing joint), see page 25 | | |
| 25 | Certain nonrefundable credits from line 3 of Schedule CR . . . . . . . . . . . . . . . . . . . . . . 25     .00 | | |
| 26 | Add credits on lines 20 through 25 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 26 | 889.00 |
| 27 | Subtract line 26 from line 19. If line 26 is larger than line 19, fill in 0 . . . . . . . . . . . . . . . . . . . . . . . . . . . | 27 | 6423.00 |
| 28 | Alternative minimum tax. Enclose Schedule MT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 28 | .00 |
| 29 | Add lines 27 and 28 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 29 | 6423.00 |
| 30 | Married couple credit. Enclose Schedule 2, page 4 . . . . . . . . . . . . .  30     480.00 | | |
| 31 | Other credits from Schedule CR, line 15 . . . . . . . . . . . . . . . . . . . .  31     .00 | | |
| 32 | Net income tax paid to another state. | | |
| |     Enclose Schedule OS . . . . . . . . . . . . . . . . . . . . . . . . . .  32     .00 | | |
| 33 | Add lines 30, 31, and 32 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 33 | 480.00 |
| 34 | Subtract line 33 from line 29. If line 33 is larger than line 29, fill in 0. This is your net tax . . . . . . . . . . . . . . | 34 | 5943.00 |
| 35 | Recycling surcharge. Enclose Schedule RS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 35 | .00 |
| 36 | Sales and use tax due on out-of-state purchases (see page 27) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 36 | .00 |
| 37 | Advance earned income credit (see page 28) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 37 | .00 |
| 38 | Donations (decreases refund or increases amount owed) | | |
| |   a Endangered resources ◢ _____.00   f Firefighters memorial _____.00 | | |
| |   b Packers football stadium ⊕ _____.00   g Prostate cancer research _____.00 | | |
| |   c Breast cancer research _____.00   h Military family relief _____.00 | | |
| |   d Veterans trust fund _____.00   i Second Harvest _____.00 | | |
| |   e Multiple sclerosis ⊛ _____.00      Total (add lines a through i) . . . . . . . . . . . . ▶ 38i | | .00 |
| 39 | Penalties on IRAs, retirement plans, MSAs, etc. (see page 28) . . . .  2642.00  x .33 = . . . . . . . . | 39 | 872.00 |
| 40 | Credit repayments and other penalties (see page 29) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 40 | .00 |
| 41 | Add lines 34 through 37, and 38i through 40 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 41 | 6815.00 |

N E W ↳

Form 1 (2009)                                                                                          Page 3 of 4

| Name(s) shown on Form 1 | Your social security number |
|---|---|
| JERALD P & TAMMY L ROBINETTE | |

42  Amount from line 41 ............................................................. 42    **6815**.00

43  Wisconsin tax withheld. Enclose withholding statements. .................. 43    **5589**.00

44  2009 estimated tax payments and amount
    applied from 2008 return. ....................................... 44    .00

45  Earned income credit. Number of qualifying children. ................... ▶ ____
    Federal
    credit ... ____ .00 x ____ % = , .................. 45    .00

46  Farmland preservation credit. Enclose Schedule FC. ..................... 46    .00

47  Repayment credit (see page 30) .................................... 47    .00

48  Homestead credit. Enclose Schedule H or H-EZ ......................... 48    .00
49  Farmland tax relief credit.
    Property taxes
    on farmland .. ____ .00 x .18 = .................... 49    .00

50  Eligible veterans and surviving spouses property tax credit. ............... 50    .00

51  Other credits from Schedule CR, line 22. Enclose Schedule CR. ............ 51    .00

52  Add lines 43 through 51 .......................................... 52    **5589**.00

53  If line 52 is larger than line 42, subtract line 42 from line 52.
    This is the AMOUNT YOU OVERPAID ................................ 53    .00

54  Amount of line 53 you want REFUNDED TO YOU .......................... 54    .00
55  Amount of line 53 you want
    APPLIED TO YOUR 2010 ESTIMATED TAX ............................. 55    .00

56  If line 52 is smaller than line 42, subtract line 52 from line 42. This is the
    AMOUNT YOU OWE. Paper clip payment to page 1 of return ................ 56    **1226**.00

57  Underpayment interest. Fill in exception code - See Schedule U. ........ ____ 57    .00
    Also include on line 56 (see page 33)

**Third**   Do you want to allow another person to discuss this return with the department (see page 34)?    ___ Yes   Complete the following.  **X** No
**Party**
**Designee**   Designee's      Phone      Personal
         name ▶         no. ▶      identification ▶
                                                number (PIN)

**Paper clip copies of your federal income tax return and schedules to this return.**
**Assemble your return (pages 1-4) and withholding statements in the order listed on page 34.**

## Sign here
 Under penalties of law, I declare that this return and all attachments are true, correct, and complete to the best of my knowledge and belief.

| Your signature | Spouse's signature (if filing jointly, BOTH must sign) | Date | Daytime phone |
|---|---|---|---|

| I-010ai | | | For Department Use Only |
|---|---|---|---|
| Mail your return to: | Wisconsin Department of Revenue | | |

If tax due. ............... PO Box 268, Madison, WI 53790-0001
If refund or no tax due ....... PO Box 59, Madison, WI 53785-0001
If homestead credit claimed. .. PO Box 34, Madison, WI 53786-0001

For Department Use Only
R    T    MAN    C

**Do Not Submit**
**Photocopies**

Form 1 (2009) | Name **JERALD P & TAMMY L ROBINETTE** | SSN ██████ | Page 4 of 4

NO COMMAS · NO CENTS

## Schedule 1 – Itemized Deduction Credit (see page 22)

1 Medical and dental expenses from line 4, federal Schedule A. See instructions for
exceptions ................................................................ **1** _____ .00

2 Interest paid from line 15, federal Schedule A. Do not include interest paid on a
second home located outside Wisconsin or on a residence which is a boat. Also,
do not include interest paid to purchase or hold U.S. government securities ............. **2** _____ **13352**.00

3 Gifts to charity from line 19, federal Schedule A. See instructions for exceptions ............... **3** _____ **135**.00

4 Casualty losses from line 20, federal Schedule A, only if the loss is directly related to a federally-declared disaster ..... **4** _____ .00

5 Add lines 1 through 4 ........................................................... **5** _____ **13487**.00

6 Fill in your standard deduction from line 15 on page 2 on Form 1 ..................... **6** _____ .00

7 Subtract line 6 from line 5. If line 6 is more than line 5, fill in 0 ....................... **7** _____ **13487**.00

8 Rate of credit is .05 (5%) ......................................................... **8** _____ **X .05**

9 Multiply line 7 by line 8. Fill in here and on line 20 on page 2 of Form 1 ................. **9** _____ **674**.00

► **You must submit this page with Form 1 if you claim either of these credits** ◄

## Schedule 2 – Married Couple Credit When Both Spouses Are Employed (see page 26)
When completing this schedule, be sure to fill in your income in column (A) and your spouse's income in column (B)

| | (A) YOURSELF | (B) SPOUSE |
|---|---|---|
| 1 Taxable wages, salaries, tips, and other employee compensation. Do NOT include deferred compensation, interest, dividends, pensions, unemployment compensation, or other unearned income .......... **1** | **44688**.00 | **47479**.00 |
| 2 Net profit or (loss) from self-employment from federal Schedules C, C-EZ, and F (Form 1040), Schedule K-1 (Form 1065), and any other taxable self-employment or earned income ............ **2** | .00 | .00 |
| 3 Combine lines 1 and 2. This is earned income .......... **3** | **44688**.00 | **47479**.00 |
| 4 Add amounts from your federal Form 1040, lines 24, 28, and 32, plus repayment of supplemental unemployment benefits, and contributions to secs. 403(b) and 501(c)(18) pension plans included in line 36, and any Wisconsin disability income exclusion. Fill in the total of these adjustments that apply to your or your spouse's income. ........... **4** | .00 | .00 |
| 5 Subtract line 4 from line 3. This is qualified earned income. If less than zero, fill in 0 ............. **5** | **44688**.00 | **47479**.00 |

6 Compare the amounts in columns (A) and (B) of line 5.
Fill in the smaller amount here. If more than $16,000, fill in $16,000 .................... **6** _____ **16000**.00

7 Rate of credit is .03 (3%) ........................................................ **7** _____ **X .03**

8 Multiply line 6 by line 7. Fill in here and on line 30 on page 2 of Form 1 ..................... **8** _____ **480**.00  Do not fill in more than $480.



| SCHEDULE I | ADJUSTMENTS TO CONVERT 2009 FEDERAL ADJUSTED GROSS INCOME AND ITEMIZED DEDUCTIONS TO THE AMOUNTS ALLOWABLE FOR WISCONSIN | 2009 |
|---|---|---|
| Wisconsin Department of Revenue | ◆ Enclose with Wisconsin Form 1 or Form 1NPR ◆ | |

Name(s) shown on Form 1 or Form 1NPR
**JERALD P ROBINETTE**
**TAMMY L ROBINETTE**

Your social security number

## PART I - FEDERAL ADJUSTED GROSS INCOME

(Read instructions before completing Schedule I)

1. Fill in your 2009 federal adjusted gross income from line 37, Form 1040 (line 21, Form 1040A) . . . . . . . . . . . . . . . . . . . . . **1**  **121116.00**

2. Capital gains and losses (federal Schedule D)
   a. Fill in any loss claimed on line 13, Form 1040, as a positive amount . . . . . . . . . . . . . . . . . **2a**
   b. Fill in any gain reported on line 13, Form 1040 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2b** ( )
   c. Fill in revised capital gain or (loss) from line 13 of revised Form 1040 (attach revised Schedule D and any accompanying forms and schedules) . . . . . . . . . . . . . **2c**
   d. Combine lines 2a, 2b, and 2c - indicate a loss by parentheses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2d**

3. Supplemental schedule of gains or losses (federal Forms 4797 and 4684)
   a. Fill in any loss claimed on line 14, Form 1040, as a positive amount . . . . . . . . . . . . . . . . . **3a**
   b. Fill in any gain reported on line 14, Form 1040 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **3b** ( )
   c. Fill in revised gain or (loss) from line 14 of revised Form 1040 (attach revised Form 4797, Form 4684, and any accompanying forms and schedules) . . . . . . . . . . . . . . . **3c**
   d. Combine lines 3a, 3b, and 3c - indicate a loss by parentheses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **3d**

4. Combine lines 1, 2d, and 3d . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4**  **121116.00**

5. Other adjustments:

| Description | COL. I Amount per 2009 federal return | COL. II Amount determined under IRC in effect for Wisconsin | COL. III Difference (see line 5 instructions) |
|---|---|---|---|
| a. UNEMPLOYMENT | 0.00 | 2069.00 | 2069.00 |
| b. | | | |
| c. | | | |
| d. | | | |
| e. | | | |
| f. | | | |
| g. | | | |
| h. | | | |
| i. Total difference (combine amounts in Col. III) . . . . . . . . . . . . . . . **5i** | | | 2069.00 |

6. Federal adjusted gross income as computed under the Internal Revenue Code in effect for Wisconsin (combine lines 4 and 5i). Fill in here and on line 1 of Wisconsin Form 1 or line 33 of Form 1NPR. (Note: The above figures must also be used to complete Columns A and B for each of the lines 1 through 31 of Form 1NPR.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **6**  **123185.00**

(See page 2 of form)

I-028 35

1-Sch I (2009)          WII-1WV 1.8
Form Software Copyright 1996 - 2010 HRB Tax Group, Inc.

## PART II - ITEMIZED DEDUCTIONS

(Complete this part only for those federal itemized deductions which may be
used in computing the Wisconsin itemized deduction credit.)

**Who must complete Part II:**

This part should be completed only by individuals claiming the Wisconsin itemized deduction credit. Whenever adjustments have
been made in Part I, federal itemized deductions which are based on federal adjusted gross income are affected. Part II must be
completed to report the difference in the amount of the deduction based on the revised federal adjusted gross income. Part II must
also be completed whenever specific items require adjustment.

7. Adjustments:

| | Description | COL. I<br>Amount<br>per 2009<br>federal return | COL. II<br>Amount<br>determined under<br>IRC in effect for<br>Wisconsin |
|---|---|---|---|
| a. | Medical expense | 0.00 | 0.00 |
| b. | Contributions | 135.00 | 135.00 |
| c. | Interest | 13352.00 | 13352.00 |
| | | | |
| | | | |
| | | | |
| | | | |

The amounts in Col. II should be used to compute the Wisconsin itemized deduction credit (Schedule 1 of Form 1 or Form 1NPR).

# Child Tax Credit Worksheet - 2009

Name(s) **JERALD P ROBINETTE**                                              SSN [redacted]          **1** | **2,000**

1. Number of qualifying children:  **2**  x $1,000. Enter the result.

2. Enter the amount from Form 1040, line 38; Form 1040A, line 22; or Form 1040NR, line 36.                    **2** | **121,116**

3. 1040 filers. Enter the total of any:
   - Exclusion of income from Puerto Rico, and
   - Amounts from Form 2555, lines 45 and 50; Form 2555-EZ, line 18; and Form 4563, line 15.

   1040A and 1040NR filers. Enter - 0 - .                    **3** | **0**

4. Add lines 2 and 3. Enter the total.                    **4** | **121,116**

5. Enter the amount shown below for your filing status.
   - Married filing jointly - $110,000
   - Single, head of household, or qualifying widow(er) - $75,000
   - Married filing separately - $55,000                    **5** | **110,000**

6. Is the amount on line 4 more than the amount on line 5?
   ☐ No.   Leave line 6 blank. Enter - 0 - on line 7.
   ☒ Yes.  Subtract line 5 from line 4.
   If the result is not a multiple of $1,000, increase it to the next multiple of $1,000.
   For example, increase $425 to $1,000, increase $1,025 to $2,000, etc.                    **6** | **12,000**

7. Multiply the amount on line 6 by 5% (.05). Enter the result.                    **7** | **600**

8. Is the amount on line 1 more than the amount on line 7?
   ☐ No.   STOP You cannot take the child tax credit on Form 1040, line 51; Form 1040A, line 33; or Form 1040NR, line 47. You also cannot take the additional child tax credit on Form 1040, line 65; Form 1040A, line 42; or Form 1040NR, line 61. Complete the rest of your Form 1040, 1040A, or 1040NR.
   ☒ Yes.  Subtract line 7 from line 1. Enter the result. Go to line 9.                    **8** | **1,400**

9. Enter the amount from Form 1040, line 46; Form 1040A, line 28; or Form 1040NR, line 43.                    **9** | **12,856**

10. Add the following amounts from:

| Form 1040 | or | Form 1040A | or | Form 1040NR | | |
|---|---|---|---|---|---|---|
| Line 47 | | | | Line 44 | + | |
| Line 48 | | Line 29 | | Line 45 | + | |
| Line 49 | | Line 31 | | | + | 1,500 |
| Line 50 | | Line 32 | | Line 46 | + | |
| Form 5695, line 11 | | | | | + | |
| Form 8834, line 22 | | | | | + | |
| Form 8910, line 21 | | | | | + | |
| Form 8936, line 14 | | | | | + | |
| Schedule R, line 24 | | | | | + | |

Enter the total.                    **10** | **1,500**

11. Are you claiming any of the following credits?
    - Mortgage interest credit, Form 8396
    - Adoption credit, Form 8839
    - Residential energy efficient property credit, Form 5695, Part II
    - District of Columbia first-time homebuyer credit, Form 8859

    ☒ No.   Enter the amount from line 10.
    ☐ Yes.  Complete the Line 11 Worksheet to figure the amount to enter here.                    **11** | **1,500**

12. Subtract line 11 from line 9. Enter the result.                    **12** | **11,356**

13. Is the amount on line 8 of this worksheet more than the amount on line 12?
    ☒ No.   Enter the amount from line 8.    This is your
    ☐ Yes.  Enter the amount from line 12.   child tax credit.
    See the NOTE below.                    **13** | **1,400**

Enter this amount on Form 1040, line 51; Form 1040A, line 33; or Form 1040NR, line 47.

Note: You may be able to take the additional child tax credit on Form 1040, line 65; Form 1040A, line 42; or Form 1040NR, line 61, only if you answered "Yes" on line 13.
- First, complete your Form 1040 through line 64 (also complete line 66), Form 1040A through line 41a, or Form 1040NR through line 60 (also complete line 63).
- Then, use Form 8812 to figure any additional child tax credit.

 **H&R BLOCK**

## 2009 Federal Tax Return Filing Instructions
### FOR THE YEAR ENDING
December 31, 2009

| | |
|---|---|
| **Prepared for** | JERALD P ROBINETTE<br>TAMMY L ROBINETTE |

| | | | |
|---|---|---|---|
| **Tax Summary** | Gross Income ................................... | $ | 121,116 |
| | Adjusted Gross Income......................... | $ | 121,116 |
| | Total Deductions .............................. | $ | 39,201 |
| | Total Taxable Income ......................... | $ | 81,915 |
| | Total Tax ...................................... | $ | 12,598 |
| | Total Payments ............................... | $ | 15,111 |
| | Refund Amount ............................... | $ | 2,513 |
| | Amount You Owe .............................. | $ | 0 |

| | |
|---|---|
| **Make check payable to** | United States Treasury |

| | |
|---|---|
| **Mailing Address** | Since you are filing your return electronically and you chose to use an electronic signature, you do not mail your return. |

**Instructions**
STEP 1 – Once your e-filed return has been accepted, you will receive an e-mail

STEP 2 – Keep a copy
  Print a copy of the return for your records.
  Please attach a copy of each W-2, W-2G, 1099G and 1099R to your return.

PAYER: State of Wisconsin
Department of Workforce Development
P.O. Box 7945
Madison, WI   53707-7945
608-266-2999

WI ID# 553682-6

**1. Unemployment compensation**

$2,069.00

**OMB No.** 1545-0120

# 2009

Form **1099-G**

**Certain
Government
Payments**

PAYER'S federal identification number | RECIPIENT'S identification number
39-1864821

**4. Federal income tax withheld**

$208.00

## Copy B
## For Recipient

RECIPIENT'S name

TAMMY L ROBINETTE

NEW RICHMOND WI 54017-6161

**10. Amount repaid on overpayment**

$.00

**11. State income tax withheld**

$101.00

This is important tax information and is being furnished to the Internal Revenue Service. If you are required to file a return, a negligence penalty or other sanction may be imposed on you if this income is taxable and the IRS determines that it has not been reported.

Form **1099-G**

Department of the Treasury - Internal Revenue Service

✂

---

PAYER: State of Wisconsin
Department of Workforce Development
P.O. Box 7945
Madison, WI   53707-7945
608-266-2999

WI ID# 553682-6

**1. Unemployment compensation**

$2,069.00

**OMB No.** 1545-0120

# 2009

Form **1099-G**

**Certain
Government
Payments**

PAYER'S federal identification number | RECIPIENT'S identification number
39-1864821

**4. Federal income tax withheld**

$208.00

## Copy B
## For Recipient

RECIPIENT'S name

TAMMY L ROBINETTE

NEW RICHMOND WI 54017-6161

**10. Amount repaid on overpayment**

$.00

**11. State income tax withheld**

$101.00

This is important tax information and is being furnished to the Internal Revenue Service. If you are required to file a return, a negligence penalty or other sanction may be imposed on you if this income is taxable and the IRS determines that it has not been reported.

Form **1099-G**          Keep for your records.          Department of the Treasury - Internal Revenue Service

✂

PAYER'S name, street address, city, state, and ZIP code

CAP DAILY ACCOUNT
MARSHALL & ILSLEY TRUST CO N.A.
11270 W. PARK PLACE SUITE 400
MILWAUKEE WI 53224
FOR ASSISTANCE CALL:
   (800) 858-3829

$98/0017319

2009 Form 1099-R
COPY B

Distributions From Pensions, Annuities, Retirement or Profit-Sharing Plans, IRAs, Insurance Contracts, etc.

| | |
|---|---|
| 1 Gross distribution $ 26,417.15 | |
| 2a Taxable amount $ 26,417.15 | |
| 2b Taxable amount not determined ☐ | Total distribution ☒ | 3 Capital gain (included in box 2a) $ |

| 4 Federal income tax withheld $ 5,283.43 | 5 Employee contributions/Designated Roth contributions or insurance premiums $ 0.00 | 6 Net unrealized appreciation in employer's securities $ | 7 Distribution Code(s) 1 | IRA/SEP/ SIMPLE ☐ |

Report this income on your federal tax return. If this form shows federal income tax withheld in box 4, attach this copy to your return. This information is being furnished to the Internal Revenue Service.

| PAYER'S Federal identification number 39-6436442 | RECIPIENT'S identification number | 8 Other $ 0.00 % | 9a Your percentage of total distribution % |
| | | 9b Total employee contributions $ | 10 State tax withheld $ 0.00 |

TAMMY L ROBINETTE
NEW RICHMOND WI 54017

| 11 State / Payer's state number | 12 State distribution $ |
| 13 Local tax withheld $ | 14 Name of locality | 15 Local distribution $ |

RECIPIENT'S name, street address, city, state, and ZIP code

Account Number

1st yr of desig. Roth contrib.

---

PAYER'S name, street address, city, state, and ZIP code

CAP DAILY ACCOUNT
MARSHALL & ILSLEY TRUST CO N.A.
11270 W. PARK PLACE SUITE 400
MILWAUKEE WI 53224
FOR ASSISTANCE CALL:
   (800) 858-3829

2009 Form 1099-R
COPY C
For Recipient's Records

Distributions From Pensions, Annuities, Retirement or Profit-Sharing Plans, IRAs, Insurance Contracts, etc.

| | |
|---|---|
| 1 Gross distribution $ 26,417.15 | |
| 2a Taxable amount $ 26,417.15 | |
| 2b Taxable amount not determined ☐ | Total distribution ☒ | 3 Capital gain (included in box 2a) $ |

| 4 Federal income tax withheld $ 5,283.43 | 5 Employee contributions/Designated Roth contributions or insurance premiums $ 0.00 | 6 Net unrealized appreciation in employer's securities $ | 7 Distribution Code(s) 1 | IRA/SEP/ SIMPLE ☐ |

This information is being furnished to the Internal Revenue Service.

| PAYER'S Federal identification number 39-6436442 | RECIPIENT'S identification number | 8 Other $ 0.00 % | 9a Your percentage of total distribution % |
| | | 9b Total employee contributions $ | 10 State tax withheld $ 0.00 |

Keep this copy for your records.

TAMMY L ROBINETTE
NEW RICHMOND WI 54017

| 11 State / Payer's state number | 12 State distribution $ |
| 13 Local tax withheld $ | 14 Name of locality | 15 Local distribution $ |

RECIPIENT'S name, street address, city, state, and ZIP code

Account Number

1st yr of desig. Roth contrib.

# 2009 W-2 and EARNINGS SUMMARY

**ADP**

Safe, accurate, FAST! Use **e-file**  Visit the IRS Web Site at www.irs.gov/efile.

## Employee Reference Copy

**W-2 Wage and Tax Statement 2009**
OMB No. 1545-0008

Copy B for employee's records.

| d Control number | Dept. | Corp. | Employer use only |
|---|---|---|---|
| 092483 07/EED | 001010 | T | 82 |

c Employer's name, address, and ZIP code
**BANKCHEROKEE**
**607 SOUTH SMITH AVENUE**
**ST PAUL MN 55107**

Batch #00953

e/f Employee's name, address, and ZIP code
**TAMMY L ROBINETTE**
**14219 AZALEA PATH**
**ROSEMOUNT, MN 55068**

| b Employer's FED ID number 41-0187190 | a Employee's SSA number |
|---|---|
| 1 Wages, tips, other comp. 9687.77 | 2 Federal income tax withheld 446.14 |
| 3 Social security wages 9687.77 | 4 Social security tax withheld 600.64 |
| 5 Medicare wages and tips 9687.77 | 6 Medicare tax withheld 140.47 |
| 7 Social security tips | 8 Allocated tips |
| 9 Advance EIC payment | 10 Dependent care benefits |
| 11 Nonqualified plans | 12a See instructions for box 12 |
| 14 Other | 12b |
| | 12c |
| | 12d |
| | 13 Stat emp. Ret. plan 3rd party sick pay |
| 15 State Employer's state ID no. WI 036000011998002 | 16 State wages, tips, etc. 9687.77 |
| 17 State income tax 474.41 | 18 Local wages, tips, etc. |
| 19 Local income tax | 20 Locality name |

This blue Earnings Summary section is included with your W-2 to help describe portions in more detail. The reverse side includes general information that you may also find helpful.

**1. The following information reflects your final 2009 pay stub plus any adjustments submitted by your employer.**

| | | | |
|---|---|---|---|
| Gross Pay | 11102.39 | Social Security Tax Withheld Box 4 of W-2 | 600.64 | WI State Income Tax Box 17 of W-2 | 474.41 |
| | | SUI/SDI Box 14 of W-2 | |
| Fed. Income Tax Withheld Box 2 of W-2 | 446.14 | Medicare Tax Withheld Box 6 of W-2 | 140.47 |

**2. Your Gross Pay was adjusted as follows to produce your W-2 Statement.**

| | Wages, Tips, other Compensation Box 1 of W-2 | Social Security Wages Box 3 of W-2 | Medicare Wages Box 5 of W-2 | WI State Wages, Tips, Etc. Box 16 of W-2 |
|---|---|---|---|---|
| Gross Pay | 11,102.39 | 11,102.39 | 11,102.39 | 11,102.39 |
| Less Other Cafe 125 | 1,414.62 | 1,414.62 | 1,414.62 | 1,414.62 |
| Reported W-2 Wages | 9,687.77 | 9,687.77 | 9,687.77 | 9,687.77 |

**3. Employee W-4 Profile.** To change your Employee W-4 Profile information, file a new W-4 with your payroll dept.

**TAMMY L ROBINETTE**
**ROSEMOUNT, MN 55068**

Social Security Number:
Taxable Marital Status: MARRIED
Exemptions/Allowances:
FEDERAL: 0
STATE: 0

© 2009 ADP, INC.

— Fold and Detach Here —

| 1 Wages, tips, other comp. 9687.77 | 2 Federal income tax withheld 446.14 |
|---|---|
| 3 Social security wages 9687.77 | 4 Social security tax withheld 600.64 |
| 5 Medicare wages and tips 9687.77 | 6 Medicare tax withheld 140.47 |
| d Control number 092483 07/EED  Dept. 001010 | Corp. T  Employer use only 82 |

c Employer's name, address, and ZIP code
**BANKCHEROKEE**
**607 SOUTH SMITH AVENUE**
**ST PAUL MN 55107**

| b Employer's FED ID number 41-0187190 | a Employee's SSA number |
|---|---|
| 7 Social security tips | 8 Allocated tips |
| 9 Advance EIC payment | 10 Dependent care benefits |
| 11 Nonqualified plans | 12a See instructions for box 12 |
| 14 Other | 12b |
| | 12c |
| | 12d |
| | 13 Stat emp. Ret. plan 3rd party sick pay |

e/f Employee's name, address, and ZIP code
**TAMMY L ROBINETTE**
**ROSEMOUNT, MN 55068**

| 15 State Employer's state ID no. WI 036000011998002 | 16 State wages, tips, etc. 9687.77 |
|---|---|
| 17 State income tax 474.41 | 18 Local wages, tips, etc. |
| 19 Local income tax | 20 Locality name |

**Federal Filing Copy**
**W-2 Wage and Tax Statement 2009**
OMB No. 1545-0008
Copy B to be filed with employee's Federal Income Tax Return.

| 1 Wages, tips, other comp. 9687.77 | 2 Federal income tax withheld 446.14 |
|---|---|
| 3 Social security wages 9687.77 | 4 Social security tax withheld 600.64 |
| 5 Medicare wages and tips 9687.77 | 6 Medicare tax withheld 140.47 |
| d Control number 092483 07/EED  Dept. 001010 | Corp. T  Employer use only 82 |

c Employer's name, address, and ZIP code
**BANKCHEROKEE**
**607 SOUTH SMITH AVENUE**
**ST PAUL MN 55107**

| b Employer's FED ID number 41-0187190 | a Employee's SSA number |
|---|---|
| 7 Social security tips | 8 Allocated tips |
| 9 Advance EIC payment | 10 Dependent care benefits |
| 11 Nonqualified plans | 12a |
| 14 Other | 12b |
| | 12c |
| | 12d |
| | 13 Stat emp. Ret. plan 3rd party sick pay |

e/f Employee's name, address, and ZIP code
**TAMMY L ROBINETTE**
**ROSEMOUNT, MN 55068**

| 15 State Employer's state ID no. WI 036000011998002 | 16 State wages, tips, etc. 9687.77 |
|---|---|
| 17 State income tax 474.41 | 18 Local wages, tips, etc. |
| 19 Local income tax | 20 Locality name |

**WI State Reference Copy**
**W-2 Wage and Tax Statement 2009**
OMB No. 1545-0008
Copy 2 to be filed with employee's State Income Tax Return.

**EMPLOYEE MANUAL RECEIPT FORM**

I, _Tammy Robinette_ , acknowledge on this date, I was advised that access to the WESTconsin Credit Union Employee Manual is available to me on the WESTconsin Credit Union Intranet site. I agree to use this only for my or my family's informational purposes. I also have been advised and understand that future changes and revisions to the Employee Manual will be updated on the intranet site and that all employees will be notified through electronic communication of any revisions. I acknowledge that I will review any future updates or changes and will take responsibility for reading and adhering to the policies of the Credit Union.

_Tammy Robinette_
Employee's Signature

_8-12-04_
Date

_Jamie Fowler_ , on this date reviewed with _Tammy Robinette_ , accessed to the WESTconsin Credit Union Employee Manual.

_Jamie Fowler_
Witness' or Supervisor's Signature

_8-20-04_
Date

Revised 09/00


FERRAO 004-007-0683
Robinette
DEPOSITION
EXHIBIT
9

## HR-EM #102.02 – Insider Responsibilities

Your job performance and personal conduct reflects directly and indirectly upon the reputation of the Credit Union. As a Credit Union employee, you will be expected to keep member account and Credit Union information confidential, not to engage in acts of fraud or dishonesty, and to report any conflict of interest. In addition, it is important that you adhere to established policies and handle your personal finances in a business like manner, avoiding occurrences of delinquent loans, delinquent credit card payments, or overdrafts. Overdrafts are embarrassing for both the employee and the Credit Union. Overdrafts will not be allowed except for an infrequent, inadvertent occurrence and will be subject to usual member fee. If you have the slightest doubt about the legality of any action, please contact your supervisor.

In addition, it is the responsibility of an insider to report any violation to the Corporate Officers or, if necessary, to the Chairman of the Board of Directors. Areas of concern will be discussed by the Corporate Officers at their meetings and will be reported to the Board of Directors, if necessary. Actions will be determined by the Corporate Officers and the Board of Directors.

Not reporting a violation may expose you and the Credit Union to legal action. Insiders who violate any policy or fail to report a violation may be subject to disciplinary action, which may include termination.

Definitions

- business associate: any person or persons you have an active and financial business relationship with.
- conflict of interest: any relationship in which you have a material or financial interest.
- immediate family member: includes your spouse, child, parent, brother, sister, grandparent, grandchild, in-law, or any other member of your immediate household.
- insider: any member of our official family, including our Board of Directors, Loan Committee, Supervisory Committee, Corporate Officers, and all other employees.

## OATH OF OFFICE
Insiders will be required to sign the OATH OF OFFICE at the time of hire and annually, agreeing to keep member account and Credit Union information confidential.

## Confidential Information
Insiders are exposed to a great deal of confidential information. None of this information, including information about member accounts, Board of Director and other meetings, Credit Union operations, and computer transactions should be divulged to third parties except with proper authority or proper legal process. Also, insiders may not



Robinette
DEPOSITION
EXHIBIT
10

use such information to obtain directly or indirectly a personal financial benefit for
themselves or others.

## INSIDERS RESPONSIBILITIES STATEMENT

Insiders will be required to complete and sign the INSIDER RESPONSIBILITIES
STATEMENT at the time of hire and annually, agreeing not to engage in acts of fraud or
dishonesty and to report any conflict of interest (see 102.02 Exhibit). A list of Credit
Union suppliers and vendors will be available in each office to assist you in reporting
possible conflicts of interest.

### Fraudulent or Dishonest Acts

False entries in any book, report, computer record, account, or statement with intent to
defraud, theft, embezzlement, misapplication of funds, check kiting, and forgery will
result in disciplinary action, which may include termination and possible prosecution.

### Conflict of Interest

Insiders shall avoid serving as a director, manager, consultant, or employee for an
outside organization that does business with or competes with the Credit Union.

Insiders shall avoid involvement in any Credit Union transaction and decision making
process affecting an outside party with whom the insider has a direct or indirect
material personal interest. An example may be that the insider has a relative, friend, or
business associate who owns or works at an enterprise used or seeking to be used by
the Credit Union for paid services (law firm, appraiser, computer vendor, supply
company, etc.).

Insiders shall avoid situations in which they either own an asset the Credit Union plans
to purchase or has a decision making role relative to a loan to another individual to
enable that individual to purchase the insider's asset.

### Internal Transactions

Insiders may not use their position of trust and responsibility to gain "special" treatment
for themselves or others.

Employees may not cash checks or perform any other transaction or file maintenance
involving their own account, accounts on which they are named joint owner or
authorized user on, or those of an immediate family member or business associate.

The terms and conditions for an employee loan will be the same as for any other Credit
Union member. Procedures for employee loans are outlined in Loan Policy (see LP
#101.04). Loan Committee members and Loan Officers must also have their loans
reported to the Board of Directors monthly.

Insiders may not use Credit Union staff, equipment, services, or supplies in the conduct or support of non-Credit Union business.

Any Credit Union supplier or vendor seeking loans in their personal or corporate role must be approved by the Vice President - Lending or Vice President - Operations.

## Non-Credit Union Business
Insiders may not use Credit Union staff, equipment, services, or supplies in the conduct or support of non-Credit Union business.

## Gift Acceptance
Bribes and kickbacks are illegal and may be criminal offenses. We will select suppliers in a completely impartial manner on the basis of price, quality, performance, and suitability of the product or service. You are expected to avoid doing anything which could imply selection of a supplier on any basis, other than the best interest of the Credit Union.

An insider and members of their immediate family may not solicit, demand, accept, or agree to accept directly or indirectly anything from any person in connection with any Credit Union related business activity or transaction. Unsolicited gifts, less than $25.00 value, received by an insider must be reported to your supervisor and may be retained. Unsolicited gifts with a value of $25.00 or more must be given to your supervisor who will arrange for their disposition.

You are able to participate in business related functions and activities which occur in conjunction with seminars, exhibits, meetings, and presentations that incorporate meals, refreshments, or entertainment. You may also accept gifts of reasonable value related to commonly recognized events or occasions, such as weddings, retirements, and holidays.

Revised 03/07/07

## HR-EM #102.14 - Disciplinary Action

We have rules and regulations to insure that the efficiency of our work place is maintained and that the rights of our employees are respected. You are expected to use common sense and good judgment in your actions and to follow established Credit Union policies as outlined in the EMPLOYEE MANUAL, LENDING POLICY MANUAL, etc.

The following acts are causes for disciplinary action. This list is not all-inclusive.

- violating the OATH OF OFFICE
- fraudulent or dishonest acts including theft, embezzlement, check kiting, or forgery
- using your position of trust and responsibility to gain "special" treatment for yourself or others
- accepting bribes or kickbacks
- excessive absences or tardiness
- harassment
- mismanagement of personal finances
- unacceptable dress and grooming
- drug or alcohol use at work

When you fail to satisfy the standards of reasonable conduct and good judgment or violate a specific Credit Union rule, disciplinary action may consist of an oral discussion with your supervisor, suspension, a written warning, or termination depending upon our assessment of the seriousness of the act and the circumstances involved.

Revision Date: 08/00



*Robinette*
DEPOSITION
EXHIBIT
11

*New Richmond News - Thursday, May 28, 2009 - 11C*

# County Traffic Violations

All violations are for speeding unless otherwise noted. SBV stands for seat belt violation; OWI for operating while intoxicated.

One hundred seventy-two cases were heard in St. Croix County last week; below are the local cases.

Jeremy Abramson, 19, Star Prairie, non-registration of auto, $160.80.

Martin Bowers, 28, Houlton, failure to stop at sign, $160.80.

Paul Dworznik, 27, Hudson, $160.80.

Dennis Fogarty, 53, Glenwood City, non-registration of auto, $160.80.

Miguel Alvarado, 36, Ellsworth, operating without valid license, $186.

Nathan Garner, 32, Prescott, SBV, $10.

Marco Medina, 37, Hudson $160.80.

Garret Hines, 23, River Falls, SBV, $10.

Rosemary Kevin, 29, New Richmond, $186.

Cheryl Marlatt, 46, River Falls, $186.

Brandon Meister-Place, 18, New Richmond, non-registration of auto, $160.80.

Jacklyn Condon, 16, Roberts, SBV, $10.

Tiffany Mercado, 26, River Falls, SBV, $10.

Sarah Mellics, 17, Hudson, non-registration of auto, $160.80.

Aaron Nelson, 28, Baldwin, $160.80.

Wilford Orange, 24,

Hudson, $160.80.

Kenneth Peters, 18, Baldwin, $186.

Lucas Ross, 27, River Falls, SBV, $10.

Chase Weaver, 20, New Richmond, $160.80.

Robert Browee, 59, River Richmond, $186.

Melissa Carufel, 37, New Richmond, non-registration of auto, $160.80.

Jennee Madrid, 52, Roberts, SBV, $10.

Douglas Cudd, 60, River Falls, $160.80.

Ryan Goering, 31, Roberts, $160.80.

Heather Gandersen, 17, New Richmond, $186.

Kevin Hicks, 24, New

Richmond, SBV, $10.

Sarah Hogan, 35, New Richmond, operating without carrying license, $125.60.

Jonathan Husted, 20, Roberts, SBV, $10.

Matthew Johnson, 27, River Falls, $211.20.

Kelly Klebuchar, 29, Woodville, $186.

Juli Lagerstrom, 22, Hudson, $160.80.

Jeanne Madrid, 52, Glenwood City, SBV, $10.

Samuel Miller, 16, Baldwin, operating left of center line, $198.60.

Allison Miller, 23, Glenwood City, SBV, $10.

James Pemberton, 36, River Falls, $160.80.

Joshua Shores, 23,

Hudson, SBV, $10.

Heather Sommers, 36, Hammond, $186.

Brady Winters, 29, Hudson, operating motorcycle without valid license, $186.

Mark Wrobel, 33, Hudson, $186.

Aaron Young, 22, Hudson, SBV, $10.

Kevin Soone, 41, Glenwood City, $123.

Charles Effelson III, 27, River Falls, SBV, $10.

Josiah Huppert, 22, Ellsworth, operator, making illegal right on red, $123.

Norman Kolbe, 18, Hudson, $160.80.

Katharine Quinn, 18, Hudson, $186.

Troy Reed, 30, River Falls, Old-Fire, SBV, Jeffrey Winter, 19, Baldwin, $230.50.

Christopher Eitzseld, 31, New Richmond, $186.

Mark Grayson, 26, Hudson, SBV, $10.

Christopher Hecht, 24, Somerset, operating without carrying license, $186.

Katherine Lijard, 44, New Richmond, $186.

Chad Mosbrey, 37, Somerset, $186.

Julie Marvin, 33, Hudson, $186.

Chris McGill, 41, New Richmond, $186.

Meredeth Search, 24, Hudson, non-registration of auto, $160.80.

# Civil Courts

Town of St. Joseph, 1337 County Road V, Hudson, filed suit against Michael Smith, Houlton.

According to the complaint, Smith owns about five dogs and has been issued numerous citations for violating town ordinances, including citations for dogs running at large, failure to license dogs and dogs killing cats.

In 2008, according to the suit, the town's animal control officer received about 12 complaints, including seven complaints of cats killed. Smith paid citations for his dogs killing four cats.

The complaint says this year Smith's dogs have been loose on neighbors' property several times and attacked one family's dog. Neighbors took pictures of Smith's dog sitting on their property and of the dog chewing on a dead cat.

According to the complaint, the dogs have caused

received correspondence from Chilbourne that their loans hadn't been paid.

When they called their Wells Fargo loan officer, they were told "You're the second one."

The complaint says that although the Haningers left messages for Jason Fischer at Real (Source), he never returned their calls. When they called the closer for Real (Source), she told them she no longer works for the company, that it was closing down and that all the files would be transferred to New Millennium.

The Haningers say after phone messages weren't returned, they drove to New Millennium and were told their files weren't there. They then went to Real (Source) where they were told that Wells Fargo had issued the check for the refinance to Real (Source), but that the company's trust account had been frozen.

vehicle accident caused by the negligence of Orn Weissman.

Bruce is making a claim for underinsured motorist benefits through the coverage with Nationwide.

The Lutheran Home River Falls, 640 N. Main St., River Falls, filed suit against Robert and Marian Rodewald, Plum City.

According to the complaint, the Rodewalds failed to pay for services and now owe $23,370.

The Lutheran Home River Falls, 640 N. Main St., River Falls, filed suit against Charlotte Isen, 625 N. Main St., River Falls.

According to the complaint, Isen failed to pay for services and now owes $12,504.

Beneficial Wisconsin, Virginia Beach, Va., filed

According to the complaint, Hanzberger borrowed money, failed to make payments and now owes $8,314.

Associated Bank, Stevens Point, filed suit against Bryce W. Yang, Sacramento, Calif.

According to the complaint, Yang, who also lived at 851 Laslie Lane, Hudson, borrowed money from Associated, failed to pay the debt and now owes $6,853.

HSBC Bank against Patrick and Kayla Erwin, 1405 Sweet Grass St., Hudson.

According to the complaint, the Erwins borrowed money, failed to make payments and now owe $31,052.

Household Finance Corporation III, Virginia Beach, Va., filed suit against

Discover Bank, Hilliard, Ohio, filed suit against Patrick R. Cimarova, 431 Second St., Hudson.

Discover Bank, Hilliard, Ohio, filed suit against Carrie A. Ross, Baldwin.

According to the complaint, Ross used a credit card to make purchases, failed to pay bills and now owes $5,105.

Discover Bank, Hilliard, Ohio, filed suit against Curtis A. Ross, Baldwin.

According to the complaint, Ross used a credit card to make purchases, failed to pay bills and now owes $10,298.

Citibank, Sioux Falls, S.D., filed suit against Jerald P. Robinette, 1690 120th St., New Richmond.

According to the complaint, Robinette used a credit card to make purchases, failed to pay bills and now owes $11,478.

and 2246 74th St., Plat of Wild Turkey Retreat II, town of Somerset. According to the complaint, the ambini owed on the loan is $166.045.

Against Bank against Shelly D. and Richard W. Kraus Jr., 1538 Sequoia Lane, New Richmond. According to the complaint, the Krauses owe $142,267.

BAC Home Loans Servicing against Pamela K. and Steven J. Hirsch, Cape Coral, Fla. The mortgaged property is 1599 Leila Lane, New Richmond. According to the complaint, the Hirschs owe $125,493.

BAC Home Loans Servicing against Pamela K. and Steven J. Hirsch, Cape Coral, Fla. The mortgaged property is 4545 Leila Lane, New Richmond. According to the complaint, the Hirschs

Robinette
DEPOSITION
EXHIBIT
12
5/21/10

**PAYER'S name, street address, city, state, and ZIP code**

CAP DAILY ACCOUNT
MARSHALL & ILSLEY TRUST CO N.A.
11270 W. PARK PLACE SUITE 400
MILWAUKEE WI 53224
FOR ASSISTANCE CALL:
(800) 858-3829

498I00117218

2008
Form 1099-R
COPY B
For Recipient

**Distribution From Pensions, Annuities, Retirement or Profit-Sharing Plans, IRAs, Insurance Contracts, etc.**

| | |
|---|---|
| 1 Gross distribution $ 26,417.15 | |
| 2a Taxable amount $ 26,417.15 | |
| 2b Taxable amount not determined ☐ | Total distribution ☒ | 3 Capital gain (included in box 2a) |

| 4 Federal income tax withheld $ 5,283.43 | 5 Employee contributions/Designated Roth contributions or insurance premiums $ 0.00 | 6 Net unrealized appreciation in employer's securities | 7 Distribution Code(s) 1 | IRA/SEP/ SIMPLE ☐ | Report this income on your federal tax return. If this form shows federal income tax withheld in box 4, attach this copy to your return. This information is being furnished to the Internal Revenue Service. |
| PAYER'S Federal identification number 39-6436442 | RECIPIENT'S identification number | 9 Other $ 0.00 % | 9a Your percentage of total distribution % | | |
| | | 9b Total employee contributions $ | 10 State tax withheld $ 0.00 | | |
| TAMMY L ROBINETTE NEW RICHMOND  WI  54017 | | 11 State /  Payer's state number | 12 State distribution $ | | |
| | | 13 Local tax withheld $ | 14 Name of locality | 15 Local distribution $ | |
| RECIPIENT'S name, street address, city, state, and ZIP code | | Account Number 7  961002555 | | 1st yr of desig. Roth contrib. | |

---

**PAYER'S name, street address, city, state, and ZIP code**

CAP DAILY ACCOUNT
MARSHALL & ILSLEY TRUST CO N.A.
11270 W. PARK PLACE SUITE 400
MILWAUKEE WI 53224
FOR ASSISTANCE CALL:
(800) 858-3829

2008
Form 1099-R
COPY C
For Recipient's Records

**Distribution From Pensions, Annuities, Retirement or Profit-Sharing Plans, IRAs, Insurance Contracts, etc.**

| | |
|---|---|
| 1 Gross distribution $ 26,417.15 | |
| 2a Taxable amount $ 26,417.15 | |
| 2b Taxable amount not determined ☐ | Total distribution ☒ | 3 Capital gain (included in box 2a) $ |

| 4 Federal income tax withheld $ 5,283.43 | 5 Employee contributions/Designated Roth contributions or insurance premiums $ 0.00 | 6 Net unrealized appreciation in employer's securities | 7 Distribution Code(s) 1 | IRA/SEP/ SIMPLE ☐ | This information is being furnished to the Internal Revenue Service. |
| PAYER'S Federal identification number 39-6436442 | RECIPIENT'S identification number | 9 Other $ 0.00 % | 9a Your percentage of total distribution % | | Keep this copy for your records. |
| | | 9b Total employee contributions $ | 10 State tax withheld $ 0.00 | | |
| TAMMY L ROBINETTE NEW RICHMOND  WI  54017 | | 11 State /  Payer's state number | 12 State distribution $ | | |
| | | 13 Local tax withheld $ | 14 Name of locality | 15 Local distribution $ | |
| RECIPIENT'S name, street address, city, state, and ZIP code | | Account Number 7  961002555 | | 1st yr of desig. Roth contrib. | |

Robinette
DEPOSITION
EXHIBIT
13
PENGAD 800-631-6989   3/24/10